## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## (ALEXANDRIA DIVISION)

| | |
|---|---|
| **JUSTIN SLABY** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No. 1:12-cv-01235 (AJT/IDD)** |
| **ERIC HIMPTON HOLDER, JR.** ) | |
| **In his official capacity as Attorney General,** ) | |
| **Defendant.** ) | |
| ) | |

## PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Federal law requires the FBI to be a "model employer." 29 C.F.R. § 1614.203. This case arises because the FBI has behaved as the exact opposite.  It dismissed Justin Slaby, a Special Agent with superior qualifications, only because he has a disability – a prosthetic left hand. While it claimed he could not shoot a gun with his prosthetic hand, the truth is that it refused to allow him to prove his ability to do so.  To prohibit an incredibly talented and dedicated employee from proving himself, only because he has a disability, is the essence of illegal discrimination.

Slaby files this motion for partial summary judgment on the following issues: first, that he is a qualified person with a disability; second, that the FBI removed him because of his disability; third, that there is no evidence to support the FBI's affirmative defense of direct threat.

## INTRODUCTION

The Rehabilitation Act of 1973 was enacted to ensure that people with disabilities "are not denied jobs or other benefits because of prejudiced attitudes or ignorance of others." *School*

*Board of Nassau County v. Arline*, 107 S.Ct 1128, 1129 (1987).  This case arises because the FBI

engaged in conduct the law proscribes: It disqualified Slaby from his job as a Special Agent

before his training was completed, because he has a disability – and even though he can perform

all the essential functions of the job.  He is an excellent marksman, proficient in defensive

tactics, and had proven himself through years of military service in real world tactical situations

in Iraq and Afghanistan.

   If the FBI had judged him the way it judges agents who do not have disabilities, Slaby

would be proudly serving as a Special Agent today.  But the FBI Training Division made sure

that did not happen even before Slaby reported to Quantico as a New Agent.  The contrast

between the treatment of Special Agents without disabilities and Slaby's experience could not be

any starker, as this record reveals.

   The agents who do not have disabilities get instruction and training before their abilities

are critiqued.  They even get one-on-one training and remedial help if they need it.  But for Slaby,

things were entirely different.  The FBI expected him to prove his ability to do everything in the

training curriculum before any instruction or time for training.  And then the FBI removed him

during the middle of training without even letting him prove his ability to perform the task of

one-handed shooting that was ostensibly a concern.

   In fact, the FBI wanted Slaby to fail so badly that they berated or retaliated against FBI

personnel who tried to assist him.  For example, after the FBI dismissed Slaby without allowing

him to prove his abilities in March of 2011, Slaby asked that experts from the FBI's elite Hostage

Rescue Team (HRT – the "Special Forces" of the FBI) to witness his attempt to prove himself

2

and get back into the academy. (Ex. 1, Pierce Dep., pp. 11, 27, 41). Chuck Pierce was such an

expert because he served as the head of operations and training for the HRT.  (Ex. 1, Pierce Dep.,

pp. 9, 14, 27, 41-42). Not only was Pierce not allowed to attend, but then it got worse. (Ex. 1,

Pierce Dep, p. 42). Instead of thanking Pierce for his efforts, Defendant called him into a large

meeting in which he was roundly criticized for offering assistance. (Ex. 1, Pierce Dep., pp. 24-25,

27-28). When Pierce disagreed with the training academy's approach, they immediately removed

Slaby from HRT and brought him back to the Academy – to keep Slaby from getting help. (Ex. 1,

Pierce Dep., pp. 27-28). Pierce testified that there was no good reason for the way Slaby was

treated. (Ex. 1, Pierce Dep., pp. 39-40, 42, 53, 61, 64-65). Unsurprisingly, Pierce believed that

this Special Agent, especially with his military training in Iraq and Afghanistan, was an

incredibly talented asset to the FBI. (Ex. 1, Pierce Dep., p. 37, 65-66).

## STATEMENT OF MATERIALLY UNDISPUTED FACTS

There is nothing required of an FBI agent that Slaby cannot do.  But competence is never

enough for those who are motivated by prejudice, and so it is here.  So dysfunctional was the

FBI's behavior that, before even meeting Slaby, the training division instructors were encouraged

to find fault with him and to make lists of tasks that "require the use of 2 hands to be effective."

(Ex. 2, FBI 2893-94).  This despite the fact that the FBI had already certified him as fit for duty.

Slaby's Application.  Not all of the FBI's divisions were so off put by Slaby's job skills

and life experience.  Slaby's interactions with the FBI started on a positive note with the

Milwaukee Field Office encouraging his interest in the position. (Ex. 3, Slaby Dec. at Slaby 153-

154).  After meeting with a Special Agent in Milwaukee to discuss the prospect of becoming a

3

Special Agent, Slaby went back to school, earned a college degree, and acquired business experience outside the military. (Ex. 3, Slaby Dec. at Slaby 153-154).  As soon as his degree was awarded, he applied to work as an FBI special agent, telling the FBI that "I have always felt it to be my duty, to protect and to serve." (Ex. 2, FBI 935-936).  His letter closed with the following statement: "If given the opportunity to prove myself, I will exceed and surpass every expectation laid before me." *Id.* at 936.  And surpass them he did.

There are many steps on the road to becoming a Special Agent.  After he applied, Slaby passed the first phase of written testing and was scheduled for oral testing by three Special Agents. (Ex. 2, FBI 587). After a several month review of his application and test results, the FBI extended him a conditional offer for the position of Special Agent. (Ex. 2, FBI 583-586). However, that offer was contingent on Slaby passing, among other things, a fitness for duty examination and a background check.  He passed the background check, but FBI headquarters conducted a much more thorough than normal investigation of Slaby's physical condition, because of his left hand.  The FBI required Slaby to submit to a Functional Capacity Examination. (Ex. 2, FBI 646, 735, 742, 745).  The FBI provided a list of the 247 essential functions to a Ph.D. physical therapist and asked him to assess Slaby's ability to perform those tasks. (Ex. 2, FBI 735-742). Assisting the doctor that day were two Special Agents, Luke Langer and Mark Crider.  After a lengthy test, Slaby was found capable of performing all the essential functions that were tested.  (Ex. 2, FBI 711-718).  They reported Slaby's successful results to FBI Headquarters, where physicians and nurses at the FBI's Health Care Programs Unit thoroughly reviewed the data.  (Ex. 2, FBI 118-120). All of these representatives of the FBI knew of Slaby's

4

physical condition and agreed that he was qualified for the job. *Id.*

Accordingly, on December 9, 2010, the FBI hired him as the first Special Agent with a prosthetic hand in the Agency's history. (Ex. 4, Delaney Dep, p. 54; Ex. 5, Moyet-Treretola Dep., pp. 101-102; Ex. 6, Slaby 36-39). Slaby reported for training and took the FBI Special Agent's oath. (Ex. 3, Slaby Dec. at 2).

Unfortunately, the attitudes of the training personnel at Quantico were the polar opposite of the rigorous process that led the FBI Headquarters to certify that Slaby was qualified to perform the job.  While the FBI admits that Slaby was "an excellent student, very conscientious, and dedicated," (Ex. 4, Delaney Dep, p. 62), the Training Division ignored all this while obsessing over Slaby's prosthetic left hand.

The Academy.   Although Slaby did not know it at the time, the FBI signaled what would happen to him at Quantico in the weeks before he arrived. When the FBI's trainers learned that Slaby was coming to Quantico, they were incredulous that a person with a missing hand had been hired. (*See* Ex. 5, Moyet-Treretola Dep, p. 111).  Rather than considering ways in which they might work with Slaby to help him proceed through the academy and address its challenges, they instead responded negatively – exchanging emails in which they speculated that he could not do things according to the "acceptable (FBI) technique" or with "two hands."  (*See, e.g.*, Ex. 2, FBI 2893-94, 3180-3181, 6882). Though they had never met or worked with Slaby, they made a list of things they assumed he could not do.  *Id.* The Training Division never discussed these items with Slaby; they just prepared to see him fail. (Ex. 3, Slaby Dec. at 3).

Because the Training Division never informed him of their unfounded concerns, Slaby was not prepared for what he encountered when he reported to Quantico for training on January 30, 2011:  a brick wall of resistance and prejudice.  Instead of welcoming him, as they did his classmates, the trainers searched for any pretext to disqualify him.  The disparate treatment started from the very beginning.  For example, the FBI singled out Slaby for an additional multi-hour "assessment" on the first day of firearms training from 5:30 to after 7:30 in the evening. (Ex. 3, Slaby Dec. at 3; Ex. 4, Delaney Dep., p. 49, 52; Ex. 2, FBI 21-31 at p. 2). While his classmates ate dinner and concentrated on their homework, Slaby was required to prove he could perform all the firearms tasks that would be taught over the course of the full 21-week curriculum. (Ex. 2, FBI 21-31 at p. 15). At that time, he was closely scrutinized by not only three firearms trainers, but also four other Academy officials. *Id.* at p. 2.  Similar assessments were held in defensive tactics and practical applications, where, before receiving training and time to practice, Slaby was required to prove that he could do every task in the 21 week curriculum. (Ex. 2, FBI 1309-1319, PTU Assessment at p. 9; FBI 1457-1478, PAU Assessment).  In other words, while Slaby's classmates would be tested on tasks only after receiving weeks of training, including remedial training if necessary, Slaby was evaluated before he had even been trained. (Ex. 4, Delaney Dep., pp. 38, 70, 77; Ex. 3, Slaby Dec. at 3). The Training Division thus set Slaby up for failure from the beginning, as a pretext for claiming that he was deficient.  In fact, Slaby was only allowed to train for approximately 6 weeks of the 21 week program and during that time was removed multiple times for assessments. (Ex. 7, Flannagan Dep., p. 124-127).

After these multi-hour assessments, the FBI spent hours writing reports on the assessments and scrutinizing Slaby's performance in great detail. (Ex. 5, Moyet-Treretola, p. 279).  As Nathan Williams testified, just the one assessment he wrote up required more than five hours of his time. (Ex. 8, Williams Dep., pp. 259-260).  It is a document of more than 20 pages. (Ex. 2, FBI 32-60).

When Slaby successfully performed the tasks, but did so in a different manner than would a person with two biological hands, the FBI faulted him for doing so. (Ex. 3, Slaby Dec. at 5). The FBI also faulted Slaby for his performance on tasks that his class would not be taught for months to come – including tasks taught in June. (*E.g.*, Ex. 2, FBI 21-31). Yet these "assessments" of Slaby happened in February, days after his arrival.  Though the FBI has relied on these assessments to justify firing Slaby, none of them involved the 247 essential functions of the job. (Ex. 2, FBI 735-742; Ex. 4, Delaney Dep., pp. 114-115). To this day, the FBI has never been able to identify any essential function of the job that requires the use of the non-dominant hand alone.  For more than a year, the FBI has been asked where any such requirement exists, and to this date, after the close of discovery, it appears nowhere.

At the academy, the FBI demanded that Slaby perform training exercises the same way people with two biological hands would perform them, and if Slaby would modify or adapt his way of performing the task to take advantage of his prosthetic, the FBI contended that this was an accommodation that required approval, and sent it up the chain of command. (Ex. 8, Williams Dep., p. 69).  Slaby did not consider that his way of adapting and use of his left hand was an accommodation; instead, he was just getting the job done with the use of his dominant normal

7

right hand, along with his state-of-the-art prosthetic left hand. (Ex. 3, Slaby Dec. at 5).

While the FBI now piously claims that it was only trying to assist Slaby, the underlying facts show otherwise.  Even before Slaby arrived at the academy, the FBI Training Division called a special meeting and informed its trainers that they were not to assist Slaby in suggesting any accommodations or changes that might benefit him. (Ex. 5, Moyet-Treretola Dep., pp. 91-92, 121-122; Ex. 4, Delaney Dep., pp. 26, 168; Ex. 2, FBI 6882, 6884-6885).  Trainers were only permitted to transmit Slaby's requests up the chain of command.  They told him that all determinations would be made by groups at headquarters: the Office of General Counsel and the EEO office, with absolutely no back and forth or interactive process with Slaby. (Ex. 5, Moyet-Treretola Dep., pp.93-95).

One example of the Training Divisions fixation on his left hand occurred during the assessment of his ability to search suspects.  When Slaby asked to demonstrate that he could use his left hand to perform the searching technique taught by the FBI, instructor Ray Flannagan refused to believe that he could do it, and would not allow him to demonstrate. (Ex. 3, Slaby Dec. at 6). Instead, without any basis and in spite of Slaby's protests to the contrary, the FBI branded him as having no sensory perception with his prosthesis.  Slaby tried to explain the science and technology behind his ability to feel with his prosthetic hand, but his instructor cut him off, saying, "I theoretically disagree." (Ex. 3, Slaby Dec. at 6). The head of the new agent training program, Diana Moyet-Treretola, was present when this occurred, but said nothing. (Ex. 3, Slaby Dec. at 6). This was not an isolated instance, and it is not surprising since none of the people evaluating Slaby had any expertise is prosthetics. (Ex. 4, Delaney Dep., pp. 28-29). Nor

did they seek any guidance from experts or even listen to Slaby himself. *Id.*

During the application process, the FBI told Slaby (truthfully) that off-hand shooting (using the non-dominant hand to shoot guns) was not a required part of the Special Agent skill set. (Ex. 9, Crider Dep., pp. 25-27). So at the beginning of training, Slaby had not yet become proficient in shooting with his left hand. However, the firearms instructors claimed that he needed to be able to shoot with his left hand, although they would not tell Slaby if and how this would be tested. Moyet-Treretola continually told him she did not know if this skill was going to be assessed or not. (Ex. 3, Slaby Dec. at 7). So Slaby figured out how to shoot with his prosthetic left hand. He approached firearms instructor Nate Williams and asked if he could demonstrate this task for Williams. Williams said he would do so but only with two other firearms instructors, Zemites and Cook, present as well. So Slaby showed his instructors that he had developed a method to shoot with his left hand. (Ex. 3, Slaby Dec. at 7). When he finished the demonstration, Slaby asked if this was acceptable. None of the instructors said anything. Although Slaby asked for feedback, they refused to provide it telling him only that they would get back with him. (Ex. 3, Slaby Dec. at 7). But they never did. Instead of helping, they simply drafted another email claiming that Slaby's technique was a safety concern. (Ex. 2, FBI 3698-3700).

The worst of the trainers in terms of his undisguised hostility was firearms instructor Michael Zemites. His words, as well as his body language and tone of voice when addressing Slaby, were consistently negative. And when Slaby tried to explain that he could perform the skills needed for the job, Zemites directly told Slaby said he was not concerned about Slaby's

9

ability to perform specific tasks, but with the speculative "what ifs" of his situation. (Ex. 3, Slaby Dec. at 8). Again, Moyet-Treretola was present and said nothing.  When Slaby asked her when the questions would stop, she responded, "the questions won't stop." (Ex. 3, Slaby Dec. at 8).

One-Hand Shooting.  It was at the beginning of week 7 that the training academy simply removed Slaby from the academy. The pretext was the firearms session in which shooting with the non-dominant hand came up.  But Moyet-Treretola admits that the discussions about removing Slaby began when he arrived at the academy. (Ex. 5, Moyet-Treretola Dep., pp. 195).

While the FBI's list of the 247 essential functions contains no requirement for shooting with the non-dominant hand, (Ex. 4, Delaney Dep., p. 99), there is a session at the beginning of week seven of the Academy titled "Introduction to One Hand Shooting." (Ex. 2, FBI 6604-6606). All the trainees except Slaby went to the shooting range to complete a pistol qualifications course of 50 rounds – 45 rounds with the dominant hand at various distances and 5 rounds with the non-dominant hand, five yards from the target.  Though the FBI asks trainees to fire five shots with the off hand, *it does not require that any of those shots hit the target*.   (Ex. 4, Delaney Dep., p. 103). Trainees simply need to hit the target with 40 of their 50 total shots.  Agents can and do pass without shooting the 5 rounds using the off hand at all, according to Williams. (Ex. 8, Williams Dep, p. 104).

The FBI denied Slaby the opportunity to prove his ability to shoot with his left hand and told him that he could shoot only with his dominant hand that day. (Ex. 3, Slaby Dec. at 9; Ex. 5, Moyet-Treretola Depo., pp. 192-94).  When he completed the shooting course, Melinda Casey, the class counselor, and Moyet-Treretola were waiting for him with paperwork and took him

upstairs to the office of Tim Delaney, Section Chief of the New Officers Training Program, who advised him that he was being "medically recycled." (Ex. 3, Slaby Dec. at 9, pp. Slaby 155-156; Ex. 2, FBI 6966-6969). This despite the fact that he could pass the firearms test even without ever shooting with his left hand at all.

The FBI removed Slaby for an alleged medical reason that its own doctor opposed. Medical recycling is what happens when someone is temporarily injured or becomes ill during the 21 week program. (Ex. 2, FBI 6952-6965). The Academy physician, Dr. Thomas Gross, pointed out that Slaby was found fit for duty and that nothing had changed.  He had no temporary issue.  Dr. Gross argued that a medical recycle is not designed for a situation where the person is already at maximum medical improvement. (Ex. 2, FBI 7024).  After all, Slaby cannot grow a new hand.  Dr. Gross reached the unremarkable conclusion that the FBI had found Slaby "fit for duty" and that his condition had not changed, so a medical recycle was not warranted. (Ex. 2, FBI 5373-5374, 7024). Two other FBI physicians, Yoder and Fabbri, concurred. (Ex. 10, Yoder Depo., pp. 188-190). The trainers went over his head and got permission to call Slaby's removal a medical recycle when, as Dr. Gross said, its own regulations preclude this action. (Ex. 2, FBI 6952-6965, 7024).

The FBI's Actions Show They Never Intended to Allow Slaby Back.  When the FBI removed Slaby from his class, they told him he could come back and try again to satisfy the trainers. (Ex. 5, Moyet-Treretola Dep., pp. 73-74, 196, Ex. 4, Delaney Dep., p. 100).  Moyet-Treretola told him that, in addition to the one-hand shooting concern that caused his removal, there were 13 other concerns about his ability to perform as a Special Agent. (Ex. 3, Slaby Dec.

11

at 10).  But she provided no list.  And even when Slaby repeatedly asked for the list, so that he

could address the concerns, it was not forthcoming. *Id.* The only way Slaby learned of the

Training Division's unfounded fears was when the Hostage Rescue Team members, where Slaby

was housed during this "recycling," managed to get their hands on this list. *Id.* But, as noted at

the beginning of this motion, FBI management berated Pierce for the HRT efforts to assist Slaby

and, when he did not agree with their approach, immediately removed Slaby from HRT. (Ex. 1,

Pierce Dep., pp. 27-28).  And even though the HRT members are tactical and combat specialists

at the FBI, the Training Academy would not allow them to be present to witness the second set of

assessments of Slaby, which Moyet-Treretola admits. (Ex. 5, Moyet-Treretola Dep., pp. 226-

227).

    Slaby returned for the second set of assessments in April.  Slaby proved that he could

shoot with his left hand. (Ex. 8, Williams Depo., pp. 32-33).  Or course, this alleged deficiency is

why the FBI removed him from his class.  Even when the FBI added more items for him to

prove, he did so. (Ex. 3, Slaby Dec. at 11).  But the door to the academy remained closed.   Here

is what the FBI said:

> Prior to NAT Slaby's reintegration/reassignment into the NATP, he will need to
> be able to demonstrate his ability to safely and effectively perform all required
> skills in the (firearms or defensive tactics or practical applications) portion of the
> curriculum in force at the time.

(Ex. 2, FBI 101).  This standard was never applied to Slaby's classmates.  It would be a rare

trainee who can "demonstrate his ability to safely and effectively perform all required skills"

*before those skills have been taught*.  The only one of the cited tasks that had been taught by that

point was one-hand shooting, which Slaby demonstrated. (Ex. 8, Williams Dep., pp. 32-33).  His

classmates would eventually be taught and allowed to practice the remainder of the tasks, and only then be required to perform the tasks safely and effectively.  In contrast, Slaby was given no such training or opportunity, but was removed based on fear.

Though Slaby was, and is, able to perform all the essential functions of an FBI Special Agent, that was not enough for the FBI.  Because he is missing a hand, he was subject to prejudices of those who sought only to make him fail.  As Delaney put it, "It's not that [Slaby] was unable to perform the essential functions of the special agent position, but more of **an opinion** ... that he **would be – would probably not** be able to do that[.]" (Ex. 4, Delaney Dep., p. 101 (emphasis added).  It does great damage to people with disabilities when they are judged based on such unfounded opinion and speculation, which is why such rash, prejudicial decision-making is outlawed by the Rehabilitation Act.

And even Delaney, the FBI's designated spokesman, admits that the FBI put Slaby in an impossible situation by forcing him to immediately demonstrate techniques that other agents in training had weeks to learn, observe and perfect. (Ex. 4, Delaney Depo, pp. 38, 70 and 77 ("It's wrong to fault anyone for inability to do a tactic or a technique until it is taught.")).  Yet that is precisely what the FBI did.

## ARGUMENT AND AUTHORITIES

### Issues Presented

First, Slaby has a "disability" as defined under relevant law.  Second, Slaby is "qualified" under the Act.  Third, there is no evidence to support the government's affirmative defense of direct threat.

13

## Standard of Review

Pursuant to the Federal Rules of Civil Procedure, Rule 56(c), a summary judgment shall be rendered if "there is no genuine issue as to any material fact and...the moving party is entitled to a judgment as a matter of law ." FED.R.CIV.P. 56(C). *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986). The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. *Id.* Summary judgment is precluded under Rule 56(c) only when the facts in dispute might affect the outcome of the suit under governing law and the dispute is genuine. *Id.* The movant need not disprove the non-moving party's claims in order to secure a summary judgment.

## Slaby's Prima Facie Case

To establish a prima facie case of disability discrimination, a plaintiff must prove: (1) he has a "disability;" (2) he is a "qualified individual;" and (3) in discharging him, his employer discriminated against him because of his disability. 42 U.S.C. § 12112(a); *Martinson v. Kinney Shoe Corp*. 104 F.3d 683, 686 (4th Cir. 1997); *Doe v. University of Maryland Med. Sys. Corp.,* 50 F.3d 1261, 1264-65 (4th Cir.1995). "When an employer concededly discharges an employee because of a disability," as the FBI did here, "the employee need prove nothing more to meet the third prong of the prima facie test." *Martinson*, 104 F.3d 683 at 686.

## Slaby is an Individual with a Disability

The FBI admits that Slaby is missing a hand. (FBI 118). Thus, Slaby easily meets the

14

definition of disability under the Rehabilitation Act.[1]  "[P]artially or completely missing limbs or mobility impairments ... substantially limit musculoskeletal function," which is an operation of a major bodily function and a major life activity.  29 C.F.R. § 1630.2 (i) and (j)(3)(iii). By law, the fact that Slaby uses a set of various prosthetic devices as a mitigating measure does not diminish the substantially limiting nature of his impairment. *Id.* at 1630.2(j)(1)(vi).

## Slaby is Qualified

The term "qualified individual with a disability'" means an individual with a disability who, with or without reasonable accommodation, has the requisite skills and experience for the job, and can perform the essential functions of the employment position that he holds or desires. 42 U.S.C. § 12111; *See also Taylor v. Hampton Roads Regional Jail Authority*,  550 F.Supp.2d 614, 616-617 (E.D.Va. 2008) ("It seems counterintuitive to conclude that a one-handed person could perform the essential functions of a jail officer, but the ADA was intended to move society beyond stereotypes and into evidence of a disabled person's actual abilities.")

The FBI admits Slaby had the requisite education and experience for the job, and offered it to him for that reason. (Ex. 2, FBI 583-586; Exhibit 6, Slaby 36-39).  Before Slaby set foot in the Quanitico training program, the FBI took care to establish that he was able to perform the essential functions of the job. (Ex. 2, FBI 711-718).

---

1        When Congress amended the ADA in 2009 to broaden the definition of disability, it made those same changes applicable to the Rehabilitation Act.  29 U.S.C. § 705(9) (tying Rehabilitation Act definition of disability to that of the ADA); 29 C.F.R. § 1630.1 (ADA does not apply a "lesser standard" than the Rehabilitation Act or its regulations).

**The FBI Commissioned an In-Depth, Nationwide Study of the Essential Functions of the Special Agent Position and None of them Involve the Non-dominant Hand**

Before Slaby applied for the job, the FBI had taken great care to prepare a complete list of the essential functions of a special agent. It paid to have the position closely examined over a long period of time, resulting in a 410 page report. (Ex. 11, FBI 7325-7734). One of the reasons for preparing that report was to comply with the Rehabilitation Act. (Ex. 11, FBI 7331). The report drew on detailed information provided by the FBI, including "job descriptions, previous job analyses, application requirements for selection, training materials and requirements, job performance evaluation forms, listing of assignments, and injury data." (Ex. 11, FBI 7332). That information was then combined with data from other law enforcement research projects and used to develop a preliminary task list. Then, researchers conducted site visits with actual special agents, training personnel, and management teams across the country to conduct interviews and make first-hand observations. *Id.* at 7332-7333.

The end result of that effort is a list of 247 essential functions. (Ex. 2, FBI 7-19 ). The FBI cannot point to a single function on that list that Slaby is incapable of performing, despite being challenged to do so for entire history of this case. (Ex. 4, Delaney Dep., pp. 101, 166). The Fourth Circuit recognizes that, when an employer has no proof that an employee is unable to perform the essential functions on the employer's written job descriptions, it is reasonable to conclude that employee is capable of performing those essential functions. *Calef v. FedEx Ground Packaging System, Inc.*, 343 Fed.Appx. 891, 902, 2009 WL 2632147, *10 (4th Cir. Aug.

16

27, 2009).[2]   Thus, it is undisputed that Slaby can perform the essential functions of a special

agent. ("It's not that [Slaby] was unable to perform the essential functions of the special agent

position, but more of **an opinion** ... that he **would be** – **would probably not** be able to do

that[.]") (Ex. 4, Delaney Dep., p. 101 (emphasis added)).

### The FBI Made Negative Assumptions Regarding Slaby's Physical Capabilities

Rather than give Slaby the same chance as every other agent to succeed, the FBI simply

decided that Slaby was incapable. (Ex. 2, FBI 2893-94, 3180-3181, 6882).  It assumed he could

not fire a weapon with his non-dominant hand.  (Ex. 8, Williams Dep., p.30). Yet, when he

demonstrated that ability, he was still barred from the academy. (Ex. 8, Williams Dep., p. 64; Ex.

2, FBI 3698-3700).  The FBI's internal assessments show that the only way he could have

returned is to prove – long before any training and time to practice – that he could satisfy the

subjective concerns of trainers that he could do every task trained at the academy.  (*E.g.* Exhibit

2, FBI 101). This double standard is clearly a hallmark of disability discrimination.  It is not the

strengths that count, but only the differences – only the fact that Slaby does not have "two hands"

as the trainers demanded.

Operating on facts, rather than assumptions, is one of the cornerstones of our nation's

laws against disability discrimination. *See*, *e.g.*, *U.S. Airways, Inc. v. Barnett,* 535 U.S. 391, 401

(2002) ("The statute seeks to diminish or to eliminate the stereotypical thought processes, the

thoughtless actions, and the hostile reactions that far too often bar those with disabilities from

participating fully in the Nation's life, including the workplace.") Congress sought to move

---

2        The claim in *Calef* was based on West Virginia's state law against disability discrimination, which
mirrors federal laws with respect to essential functions and job descriptions.

society beyond stereotypes and into evidence of a disabled person's actual abilities. *See Halperin v. Abacus Tech. Corp.*, 128 F.3d 191, 200 (4th Cir.1997) ("truly disabled, but genuinely capable, individuals will not face discrimination in employment because of stereotypes about the insurmountability of their handicaps.")

The fact that a federal agency is involved must also be considered. In passing the Rehabilitation Act, Congress wanted to "ensure that the Federal Government plays a leadership role in promoting the employment of individuals with disabilities." 29 U.S.C. § 701(b)(2). Unfortunately, facts and reality did not guide the FBI's decisions in this case and the Federal Government failed to live up to its obligation to be a "model employer." 29 C.F.R. § 1614.203.

The plaintiff in *Taylor v. Hampton Roads Regional Jail Authority*, 550 F.Supp.2d 614, 616-617 (E.D.Va. 2008), experienced the same type of prejudice by assumption. The plaintiff, Taylor, was born without a right-hand, but did not let that deter her from applying for a job as a correctional officer. First she had to pass a written test and a physical agility test. The physical agility test was "designed to simulate typical work related situations that require the ability to perform specific physical activities," and measured, in part, "how fast you can run a certain distance, ... how fast you can drag a dummy over a certain distance, and ... how fast you can fire the trigger of a gun in both hands." Taylor passed both tests, scoring a seven out of ten on the agility portion. *Id.* at 615.

Next, Taylor passed a polygraph, and received a perfect score on an interview that assessed her communication skills. Taylor was offered a job, subject to her passing the physical exam. *Id.* But before Taylor could be examined, the superintendent of the jail authority learned

18

she only had one hand – and everything changed. The superintendent wrote the examining physician to "make sure that [he] ... was aware of the fact that you needed to have two hands in order to perform the duties of a jail officer." *Id.* at 616. The physician then decided, without ever examining Taylor, that she was "not fit for duty" because she "lacked manual dexterity in both hands." *Id.*

In litigation, Taylor established her ability to prove each of the jail authority's listed essential functions. In response, the jail authority offered nothing more than the "generalized, conclusory statements of its employees," which were not determinative.  *Id.* at 618.

Like Taylor, Slaby has established his ability to perform the essential functions. And like Taylor, the only thing standing in his way are stereotypical assumptions and a concerted effort to rig the process in a way that keeps the person with a disability on the outside looking in.

### The FBI's Training Standards
### Prove that Non-Dominant Hand Techniques are Not Essential Functions

After more than ten years of operating under the list of 247 essential functions, the FBI now attempts to add items to the list after encountering Slaby. The FBI admits this is improper and prohibited. (Ex. 4, Delaney Dep. p.  99). The law does not allow for that either. To the extent the FBI claims non-dominant hand techniques are essential functions, it is up to the FBI to prove it. *Ward v. Massachusetts Health Research Institute, Inc,*  209 F.3d 29, 35 (1st Cir.  2000) (*citing Benson v. Northwest Airlines, Inc.*, 62 F.3d 1108, 1113 (8th Cir.1995)); *Monette v. EDS Corp.*, 90 F.3d 1173, 1182 n. 8, 1184 (6th Cir.1996) *(abrogated on other grounds by Lewis v. Humboldt Acquisition Corp., Inc.*, 681 F.3d 312, 314 -315 (6th Cir. 2012)); *Stone v. City of Mount Vernon*,

118 F.3d 92, 99-100 (2d Cir.1997) (reversing because there was insufficient evidence to support claimed essential function).

The omission of any requirement for off-hand shooting on the FBI's list of essential functions is further explained by the FBI's method of training agents. First, when it comes to shooting with the non-dominant hand, agents do not have to show any proficiency whatsoever. (Ex. 8, Williams Dep., p. 106). ("Nobody grades their proficiency with the non-dominant hand in the context of the qualification course.")   The accuracy score for pistol qualification tests is based on all the rounds taken together.  That means that an agent can completely miss the target with the five non-dominant hand shots and still achieve a score of 90%. (Ex. 8, Williams Dep., pp. 103).  Only 80% is required to pass.

Other agents did not have to prove any proficiency or effectiveness in these techniques, only Slaby. Other agents do not even have to hit the target when shooting with their non-dominant hand.  (Ex. 8, Williams Dep., pp. 103-104).  And, since the government removed Slaby from the Academy, it has dramatically changed its pistol qualifications course in a way that further minimizes the importance of off-hand shooting. When Slaby was at the academy, the pistol qualification course required the shooting of 50 rounds, 5 with the non-dominant hand. Now, the course has 60 rounds, with only 3 to be shot with the non-dominant hand. (Ex. 9, Crider Dep., pp. 25-26). And, as FBI firearms instructor Mark Crider testified, no one has ever even suggested that instructors should verify that anyone shoots those rounds or does so proficiently. (Ex. 9,  Crider Dep., pp. 27-28).

Further evidence that off-hand shooting is not an essential function is the fact that a number of FBI agents cannot shoot a weapon with their non-dominant hand or perform any task with their non-dominant hand for that matter. That is because either a temporary or permanent hand or arm injury left them unable to do so.  Yet the FBI allowed each of those agents to keep their jobs and remain weapons bearing. One agent worked for years with a "non-functioning" "paralyzed right arm." (Ex. 12, FBI 8631, 8685).  The FBI also allowed another agent to continue working as a special agent after he suffered a "severe blast injury to the right hand" (Ex. 12, FBI 8936, 8891, 9377) that left him with a "93% loss of function in his right upper extremity." (Ex. 12, FBI 8943). Pictures in the file show that his injuries were very severe. See, e.g., (Ex. 12, FBI 8876). Yet another active agent's file states he is "unable to use rt. hand at all." (Ex. 12, FBI 10110, 9993). Another agent continues to work for the FBI and has been unable to use her dominant hand for several years because of "severe nerve damages." (Ex. 12, FBI 9681, 9824-9825).

While off-hand shooting is not a requirement for other agents, even when Slaby proved that he could shoot with his off hand, the Agency still refused to train him.  They demanded more – an ability to demonstrate to their satisfaction that he could do everything in a 21 week course before he went through that course.  (Ex. 4, Delaney Dep., pp. 49, 52; Ex. 2, FBI 101).  That is further evidence of discrimination and unequal treatment.  Notably, as FBI medical officer Dr. James Yoder admits, during his 15 years at the FBI Headquarters where he performs thousands of fitness for duty evaluations, many with arm or hand injuries, no one ever told him that

shooting with one hand was important – until Slaby arrived at the academy. (Ex. 10, Yoder Dep. (May 2013), pp. 233-234).

## The Government's Affirmative Defense

To try to avoid liability under the Rehabilitation Act, the FBI has pled the affirmative defense of "direct threat." Under this affirmative defense, an employer may – upon proper proof – be excused from liability for the kind of discrimination that the disability laws otherwise condemn.  Because this is an affirmative defense, the government has the burden of proof.  29 C.F.R. § 1630.15(b)(2); *See Montalvo v. Radcliffe*, 167 F.3d 873, 876-877 (4th Cir. 1999)(in a public accommodation case, direct threat burden is on the defendant); *Darcangelo v. Verizon Communications, Inc.,* 292 F.3d 181, 188 (4th Cir. 2002); *see also Branham v. Snow*, 392 F.3d 896, 906 (7th Cir. 2004) (same, collecting cases).

### There is no Evidence of Direct Threat

Direct threat means a "significant risk of substantial harm" that "cannot be eliminated or reduced by reasonable accommodation." 29 C.F.R. § 1630.2(r).  A speculative risk will not suffice.  It must be a significant risk, or a "high probability, of substantial harm; a speculative or remote risk is insufficient." 29 C.F.R. § 1630, Appx.  Evidence of a significant threat must be strictly based on <u>valid medical analyses or the best available objective evidence</u>. *Id.* at § 1630.2(r) (emphasis supplied).   The FBI relied on no medical evidence at all, eschewing any help from experts in prosthetics, rehabilitative medicine and the like.   To be sure, the only medical input it had regarding Slaby was from its own doctors, Drs. Yoder and Wade, who determined that he was not a direct threat at all and was fit for duty.  (Ex. 2, FBI 118-120).

The FBI simply *assumed* (with no medical or objective evidence) that Slaby should not be an FBI agent since he does not have two hands, and assumed he would present a safety risk if he was even allowed to try some of the training exercises. It made no such assumptions for his classmates with their untested abilities, having come from careers as accountants or lawyers or Jazzercise instructors. (Ex. 3, Slaby Dec. at 3).

But as Congress explained:

A person with a disability must not be excluded ... based on stereotypes or fear. Nor may a decision be based on speculation about the risk or harm to others. *Decisions are not permitted to be based on generalizations about the disability but rather must be based on the facts of an individual case ... The purpose of creating the standard is to eliminate exclusions which are not based on objective evidence about the individual involved.*

H.R. Rep. No. 101-485(III), at 45 (1990), *reprinted in* 1990 U.S.C.C.A.N. 445, 468 (emphasis added). *See also Bragdon v. Abbott,* 524 U.S. 624, 649 (1998) (good faith not enough).

Once again, the FBI has failed to live up to the high standards Congress has set for the federal government as a model employer. A legitimate assessment of direct threat should take into account: (1) the duration of the risk, (2) the nature and severity of the potential harm, (3) the likelihood that the potential harm will occur, and (4) the imminence of the potential harm. 29 C.F.R. § 1630.2(r); *see also Chevron,* 536 U.S. at 86. *Kapche v City of San Antonio*, 176 F.3d 840, 844 (5th Cir. 1999). Finally, the employer must show that no reasonable accommodation would mitigate the risk that is asserted.

The defendant is not entitled to a guarantee that no injury or incident will ever happen, and a slight or remote risk is not sufficient to support a direct threat determination. *In Jackson v. City of N.Y.*, 2011 WL 1533471 (E.D. N.Y. Mar. 3, 2011), the court found insufficient

defendant's claim that plaintiff might experience seizures related to her diabetes in the future. "While the defendants are correct that 'there is no guarantee that [plaintiff] will continue to be seizure free,'... more than a remote risk is required to constitute a 'direct threat' within the meaning of the ADA." *Id.* at *16. *See also Hatzakos v. Acme American Refrigeration*, 2007 WL 2020182, *9 (E.D. N.Y. July 6, 2007) (rejecting employer's claim that its direct threat determination was valid because plaintiff's doctor could not guarantee the absence of risk); *EEOC v. Chrysler Corp.*, 917 F. Supp. 1164, 1170 (E.D. Mich. 1996); *rev'd on other grounds*, 172 F.3d 48 (6th Cir. Nov. 25, 1998) (unpublished) (slightly increased risk not sufficient).

        The FBI's Own Doctors Confirm Slaby is Medically Fit For Duty

        Dr. Yoder was not alone in his view that Slaby was qualified. Dr. Thomas Gross, the training academy's physician, acknowledges only that he was "notified by firearms that participation in firearms was prohibited due to a performance limiting condition." (Ex. 2, FBI 5083). But Gross did not judge him a direct threat.  Quite the contrary, Gross objected to treating Slaby's removal as a medical issue when he had already been found fit for duty and been medically cleared. (Ex. 2, FBI 5373-5374, 7024) (two other FBI doctors, Yoder and Fabbri, concur); (see also Ex. 10, Yoder Dep., pp. 196-198 (Slaby remains medically qualified)). One would have thought that the FBI, because none of its own physicians thought he was a direct threat, would have found some other physician or other objective evidence.  It did not. (Ex. 4, Delaney Dep., pp. 28-29).

        The FBI Chose Not to Gather Objective Evidence

Neither did the FBI gather "the best available objective evidence." No objective evidence was gathered. Consider the evidence that the FBI steadfastly ignored.

<u>Duration: Any Risk was Limited to the Training Program</u> In order to justify not allowing Slaby to complete the same 21 week training program that non-disabled agents are allowed to complete, the FBI would need to prove that there was some danger in the training itself that made Slaby too dangerous to complete the training.  But it cannot do so because when other agents engage in unsafe practices, it does not dismiss them from the Academy as happened with Slaby. Instead it counsels them to allow them to improve their performance. (Ex. 8, Williams Dep., pp. 97-104).  And, as explained below, this happens even when the unsafe practices happen repeatedly during live fire drills on the firing range.

<u>Nature and Severity: The FBI Accepted Greater Potential Harm from Other Agents</u> The FBI speculated that Slaby would be a direct threat. (Ex. 2, FBI 55).  But admittedly this was not based on fact. (Ex. 8, Williams Dep., p. 262) ("It does include speculation because he had not had the benefit of completing the training at the time the comments were made."); (Ex., Delaney Dep., p. 101) (emphasis added) ("It's not that [Slaby] was unable to perform the essential functions of the special agent position, but more of **an opinion** ... that he **would be – would probably not** be able to do that[.]")

Meanwhile, it accepted a real risk from another agent in Slaby's training class who repeatedly committed safety violations on the firing range. (Ex. 8, Williams Dep, p. 117; Ex. 2, FBI 7801, 10234-10235). But that was acceptable to the FBI, apparently because that agent had two hands.

This agent engaged in unsafe practices on many occasions during multiple sessions and in front of multiple instructors. (Ex. 2,  FBI 7800; 10234-10235). This agent repeatedly violated the "second Cardinal Safety Rule of Firearms," leaving your finger on the trigger when moving from one firing position to the next.  He was reminded to correct this problem several times to no avail, creating a risk that his weapon would go off and hurt another trainee or an instructor. (Ex. 8, Williams Dep., pp. 117-120). The FBI documented this repeated failure with a "suitability notation," finding that the agent, "greatly increased the possibility for an Accidental Discharge [sic] and therefore an injury to himself and others." (Ex. 2, FBI 10234). This agent committed the same safety violation on many occasions, yet was never removed from the academy as a safety threat. (Exhibit 8, Williams Dep., pp. 121-123). The instructor described this as creating an "unsafe environment," that could have "dire consequences." (Ex. 2, FBI 10235). This agent was deemed to have "failed to show proper judgment," that reflected poorly on his "conscientiousness." (Ex. 2, FBI 10234-35).

Instead of labeling this agent a direct threat after repeatedly exhibiting life threatening behavior, the FBI gave him chance, after chance, after chance to try again. *Id.* Two supervising trainers admonished this agent on separate occasions on the same day, yet the agent went out and created the same "unsafe environment" once again. (Ex. 2, FBI 10235).   But they did not remove him from the class and dismiss him as an FBI agent.  That was reserved only for Slaby.

Likelihood: The FBI has No Evidence of a Likelihood of Danger The FBI records on Slaby reveal repeated, negative expectations about Slaby. But none of them are based in reality. One trainer writes about what would happen "if" Slaby's weapon were to slip off his hip, then

proceeds to speculate that, "it would most likely result in the weapon being pointed in an unsafe

direction," and "[i]f" the weapon were dropped it "may" result in accidental discharge. (Ex. 2,

FBI 247-264 at 253). Yet the reality is that the weapon did not slip off Slaby's hip, it was never

pointed in an unsafe direction, it was never dropped, and it never got discharged accidentally.

(Ex. 8, Williams Dep., pp. 242-244).

This type of generalized fear does not establish a direct threat. 29 C.F.R. § 1630, Appx;

U.S.Code Cong. & Admin.News 1990, pp. 303, 356 ("Generalized fear about risks from the

employment environment ... cannot be used by an employer to disqualify a person with a

disability.") After all, the appropriate question is not whether any risk exists, but whether that

risk is significant. *Branham v. Snow*, 392 F. 3d 896, 906 (7th Cir. 2004) (*quoting Bragdon v.

Abbott*, 524 U.S. 624, 649 (1998)).

In order to assess whether Slaby is an unacceptable risk, the question is not whether a risk

can be imagined, but whether Slaby is a greater risk than the FBI tolerates with other agents.

This includes special agents with limited or no use of a hand or a limb, not to mention other

agents with other health conditions that cause risk. The FBI does not operate in a vacuum. The

relevant question is whether Slaby poses an increased risk above and beyond those that the

employer tolerates in its working population. *LaCorte v. O'Neill*, 139 F. Supp. 2d 45, 49 (D.D.C.

2001) (rejecting direct threat defense for refusing to hire a person with diabetes as a Secret

Service agent in light of evidence that non-diabetic officers have experienced different disabling

physical conditions while working, including heart attacks, falling asleep, common maladies, and

generally poor physical fitness). Even agents who develop serious injuries to their hand are able

27

to perform their duties with no complaints from the FBI, without needing to use their non-dominant hand. See p. 20-21 *supra.*

The FBI cannot prove a direct threat defense by making up new job functions only for Slaby.  In *Hamlin v. Charter Township of Flint*, 165 F.3d 426 (6th Cir. 1999), a fire department tried a similar approach and failed.  It tried to rely on its subjective perceptions of the duties of an Assistant Fire Chief to deny that job to a man with a heart condition. 165 F.3d at 432. But that was insufficient. The Department argued that fire-fighting is unpredictable and that an Assistant Chief could be called upon to run into a burning building. *Id.* at 431-432. But the plaintiff presented evidence that, while front-line firefighters certainly enter burning buildings, the job of an Assistant Chief is different, and more supervisory and administrative in nature. *Id.* The Sixth Circuit found the Department's perceptions to be speculative and the risk of danger remote. *Id.*

Even in jobs that can be dangerous at times, the employer must establish a genuine likelihood of a substantial risk. In *Taylor*, *supra*, the court acknowledged that being a corrections officer is "inherently risky," but that is not an automatic justification for excluding an applicant solely because she had one hand. 550 F.Supp2d at 618.  The employer relied on a doctor who disqualified the one-handed applicant in *Taylor*, but that doctor had no medical basis for doing so. *Id.* at 619. Instead, the employer had only "generalizations" about potential dangers of the job and "after-the-fact rationalization" in its defense, and the court found that to be inadequate to carry the direct threat defense. *Id.*

Imminence: The FBI has No Evidence that Slaby Has or Will Endanger Safety When speculation and prejudice are taken out of the picture, nothing remains.  Slaby did not create any

28

unsafe condition on the range as his fellow agent did.  And his marksmanship scores were high. (*See*, *e.g.* Ex. 8, Williams Dep., p. 56). And, if the FBI had let Slaby proceed through the training regimen, his familiarity with the techniques would only have improved. That is the goal of the training process to begin with, to take every new agent and gradually expose them to new skill sets and help them get better and better. All of the FBI trainers attest to this principal, and acknowledge that it would be unfair not to let Slaby have the same opportunity as every other trainee. (Ex. 8, Williams Dep. pp. 46-47; Ex. 4, Delaney Dep. pp. 37-38, 83-84).

Slaby's solid safety record, coupled with the additional training he should have received along with the other trainees, means that any level of risk that did exist would grow smaller and smaller each day. *See Branham*, 392 F.3d at 908 (applicant for position as IRS criminal investigator shows lack of an "imminent threat" with evidence that his medical condition had not incapacitated him in the past and that his health regimen will keep it that way in the future). Thus, no threat is imminent.

In sum, the FBI cannot establish this affirmative defense.  The generalizations and speculation voiced by the FBI are simply not evidence at all and thus not sufficient to carry its burden of proof.

**Conclusion**

For the reason set forth above, the Court should grant partial summary judgment to the plaintiff.

Respectfully submitted,

_   /s/ John R. Ates_____
John R. Ates, Esquire (VSB # 71697)
Ates Law Firm, P.C.
1800 Diagonal Road
Suite 600
Alexandria, Virginia 22314
(703) 647-7501 (telephone)
(703) 229-6430 (facsimile)
j.ates@ateslaw.com

John W. Griffin, Jr. (pro hac vice)
203 North Liberty Street
Victoria, Texas 77901
jwg@lawmgk.com
(361) 573-5500 – Telephone
(361) 573-5040 – Telecopier

Katherine L. Butler (pro hac vice)
1007 Heights Boulevard
Houston, Texas 77008
kathy@butlerharris.com
(713) 526-5677
Fax: (888) 370-5038

Attorneys for Plaintiff

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on June 10, 2013, I filed the foregoing using the CM/ECF system which will send a notice of electronic filing through the Court's electronic filing system to the following:

Kevin J. Mikolasheck
Lauren A. Wetzler
Sosun Bae
Bernard Kim
Assistant United States Attorney
2100 Jamieson Avenue
Alexandria, VA 22314
(703) 299-3809
Fax: (703) 299-3983
Email: kevin.mikolashek@usdoj.gov
Email: lauren.wetzler@usdoj.gov
Email: sosun.bae@usdoj.gov
Email: bernard.kim@usdoj.gov
Attorneys for Defendant

_____/s/___John R. Ates_____
John R. Ates (VSB #71697)
Ates Law Firm, P.C.
1800 Diagonal Road
Suite 600
Alexandria, Virginia 22314
703-647-7501 Telephone
703-229-6430 Fax
j.ates@ateslaw.com