1            UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF VIRGINIA
2                ALEXANDRIA DIVISION

3   JUSTIN SLABY,              )  Case 1:12-cv-01235
                               )
4            Plaintiff,        )
                               )
5       v.                     )  Alexandria, Virginia
                               )  July 29., 2013
6   ERIC HIMPTON HOLDER, JR.,  )  1:09 p.m.
                               )
7            Defendant.        )  Day 1
                               )  Pages 1 - 177
8   _____

9                 TRANSCRIPT OF TRIAL

10       BEFORE THE HONORABLE ANTHONY J. TRENGA

11          UNITED STATES DISTRICT COURT JUDGE

12                    AND A JURY

13

14

15

16

17

18

19

20

21

22

23

24

25      COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

        Rhonda F. Montgomery   OCR-USDC/EDVA   (703) 299-4599

```
 1   APPEARANCES:

 2   FOR THE PLAINTIFF:

 3        JOHN GRIFFIN, JR., pro hac vice
          MAREK, GRIFFIN & KNAUPP
 4        203 North Liberty
          Victoria, Texas  77902
 5        (361) 573-5500

 6        KATHERINE L. BUTLER, pro hac vice
          BUTLER & HARRIS
 7        1007 Heights Boulevard
          Houston, Texas  77008
 8        (713) 526-5677

 9        JOHN R. ATES, ESQUIRE
          ATES LAW FIRM, PC
10        1800 Diagonal Road, Suite 600
          Alexandria, Virginia  22314
11        (703) 647-7501

12   FOR THE DEFENDANT:

13        LAUREN A. WETZLER, ESQUIRE
          KEVIN J. MIKOLASHEK, ESQUIRE
14        BERNARD G. KIM, ESQUIRE
          SOSUN BAE, ESQUIRE
15        OFFICE OF THE UNITED STATES ATTORNEY
          2100 Jamieson Avenue
16        Alexandria, Virginia  22314
          (703) 299-3700
17
          MATTHEW RIZZO, ESQUIRE
18        FBI OFFICE OF GENERAL COUNSEL

19

20

21

22

23

24

25
```

1                          **I N D E X**

2                                                          PAGE

3   Opening Statement by Mr. Griffin                       25

4   Opening Statement by Ms. Bae                           51

5

6   WITNESS                        EXAMINATION             PAGE

7   James Yoder                    Direct                  69
                                   Cross                   151
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (A jury is duly impaneled and sworn.)

2              THE COURT:  Ladies and gentlemen of the jury,

3  I'm going to give you an idea of how we are going to

4  proceed at this point.  We're going to recess for lunch

5  at this time.  We'll resume at 2:15.  As we go forward

6  in the case -- and I'll give you more detail when we

7  reconvene.  This afternoon we will proceed until

8  between 5:00 and 6:00.  We typically will, depending on

9  where the evidence is, break around 5:30.

10             You'll find in the jury room that there's a

11  telephone in there.  Those are for the purpose of

12  allowing you to let friends and employers know that

13  you'll be occupied for the next few days and to let

14  them know what your schedule is.  It's not for the

15  purpose of conducting any business or any social

16  conversations.  So it's in there solely for the purpose

17  of letting you let people know what your schedule is.

18             This afternoon, after we reconvene, I will

19  provide to you preliminary instructions, and then we'll

20  proceed with opening statements, first, by the

21  plaintiff and then by the government.  We'll take a

22  break probably around 3:30, quarter to 4:00.

23             So with that, you're excused to the jury room

24  until 2:15.  I will tell you now for the first time

25  what I'll tell you every time that we recess, and that

1  is that you are not to discuss this case among

2  yourselves.  Even though you know very little about it,

3  you should not even speculate about what the case is or

4  what the evidence may show or what the issues are.

5  So with that, you're excused until 2:15.

6  (The jury exits at 1:10 p.m.)

7  THE COURT:  Please be seated.

8  We'll reconvene at 2:15, at which time we'll

9  have opening statements.  As I recall, both parties

10  think 20 minutes is sufficient.

11  MR. GRIFFIN:  Your Honor, I thought we had

12  told you 30.

13  THE COURT:  Thirty is fine.

14  MR. GRIFFIN:  Okay.

15  THE COURT:  With respect to the request for

16  use of the demonstrative, I reviewed it.  It's been

17  objected to, and over objection, I'm not going to allow

18  you to use it.  I think there's too much in there

19  that's either argumentative or may be contested or not

20  in evidence.  To the extent there are exhibits that

21  have already been admitted, you are free to use those,

22  as well as, obviously, to tell the jury what you expect

23  the evidence to show.  But I'm not going to let you use

24  the demonstrative as tendered.

25  MR. GRIFFIN:  Any of them?

1                THE COURT:  Any of them.

2                MR. GRIFFIN:  Okay.

3                THE COURT:  Okay.  Anything else?

4           (No response.)

5                THE COURT:  We'll stand in recess until 2:15.

6                Yes.

7                MS. BUTLER:  Your Honor, is it possible that

8    we could address something just right before we come

9    back, like at 2:10 or whatever?

10               THE COURT:  Sure.  Give me a heads-up.  What

11   do you want to know about?

12               MS. BUTLER:  Okay.  I have two issues.  One

13   relates to this issue of whether the defendant is

14   allowed to present all of these extraneous issues.  I

15   would like to present to the Court an affidavit that

16   one of the decision makers did before litigation --

17   although, it was in the process, the EEO process -- for

18   you to look at.

19               The other thing that we would like to raise

20   for Your Honor is that Mr. Slaby was actually hired as

21   a special agent with no conditions.  The conditional

22   offer part comes earlier, and I heard the Court say

23   that he was hired conditionally upon completing the

24   academy.

25               We have the hiring letter which is in

1  evidence as Exhibit 3, and we would ask that you look

2  at it.  We could talk about it because there were no

3  conditions at that point.  He was appointed as an FBI

4  agent.  He was sworn in the first day that he was at

5  the academy.  So we just don't want the jury to be

6  under the misapprehension he was not yet an FBI agent.

7          THE COURT:  Right.  But it was a condition of

8  employment that he complete the academy?  No?

9          MR. GRIFFIN:  No.

10          THE COURT:  Tender the exhibit.  I'll look at

11  it.

12          MR. GRIFFIN:  Okay.  Perfect.

13          THE COURT:  If you do that before the

14  luncheon break, I'll look at it.

15          Anything else?

16          MR. GRIFFIN:  No, Your Honor.

17          THE COURT:  We'll stand in recess.

18      (Recess from 1:14 p.m. until 2:14 p.m.)

19      (The jury is not present.)

20          THE COURT:  All right.  Ms. Butler, I've

21  reviewed what you've given me.  What is it that you are

22  specifically asking at this point?

23          MS. BUTLER:  Your Honor, we're asking for two

24  things.  One is regarding his hiring, that the jury be

25  instructed that he was hired -- we don't know how else

1   to do it because he was hired as a special agent -- and

2   please ignore previous comments or something to that

3   effect.  I don't know.

4          THE COURT:  Well, I'll tell them just as a

5   matter of course that nothing the Court has said is

6   evidence in the case or nothing that I do say should

7   indicate anything concerning the merits of the case.  I

8   just think getting more into it is going to complicate

9   things.  But I'll make a general statement like that.

10          MS. BUTLER:  Could we ask that the defense

11   not say anything as the judge told you it was all

12   contingent?  Could we at least ask for that as a

13   relief?

14          THE COURT:  Well, I don't know what evidence

15   they're going to present.  So I don't think they should

16   say as the judge told you, but they have a right to

17   preview the evidence as they think they can prove it.

18          MS. BUTLER:  No problem.

19          THE COURT:  All right.

20          MS. BUTLER:  I just don't want that to be

21   relied on.

22          THE COURT:  All right.

23          MS. BUTLER:  The other thing is as

24   Ms. Moyet-Treretola's affidavit says, there was one

25   reason and one reason alone, and he, Mr. Mikolashek,

1   said he wanted to introduce many different reasons.  As

2   I said --

3          THE COURT:  Based on what I've seen, I'm not

4   going to restrict the scope of the evidence that they

5   think they can prove as to what reasons they gave and

6   why they dismissed him.  Maybe you can impeach the

7   witnesses if they say something that's inconsistent

8   with these documents, but I'm not going to restrict the

9   scope of proof at this point.

10          MS. BUTLER:  We would also, following up on

11   that -- my cocounsel has reminded me we don't have any

12   order on our motion in limine.  We would just ask the

13   Court for such an order.

14          THE COURT:  As to which aspect?

15          MS. BUTLER:  About expert witnesses, not

16   speculation.

17          THE COURT:  Well, I think I have ruled on

18   that.  I'm going to take it up as it comes on the

19   stand, but as a general proposition, I'm going to allow

20   people to testify as to what they said and why they

21   said it even if the substance of that would reflect

22   some specialized knowledge on their part.

23          MS. BUTLER:  And about speculation of future

24   events, since these people were not designated as

25   expert witnesses --

1          THE COURT:  Well, if it was part of their

2    current thinking at the time and it was part of what

3    motivated whatever they said -- again, I don't think

4    it's within the general rules that you've been talking

5    about concerning expert testimony.  But again, I'll

6    rule definitively on that as it is presented.  If you

7    have objections, you can make them, and I'll rule on

8    them during the trial.

9          MS. BUTLER:  All right.  Maybe he should be

10   up here.  He is pointing out that we had many areas

11   that we agreed on in the motion in limine and the Court

12   still has not ruled on that.

13         THE COURT:  Again, to the extent there are

14   specific objections, I think you should take them up at

15   the time that the evidence is presented.  It was hard,

16   frankly, to rule in a vacuum based on the motion in

17   limine that listed a whole range of things in terms of

18   you wanted rulings on no speculation and things like

19   that.  But again, I'll take those up as the evidence is

20   presented.

21         MS. BUTLER:  Well, things like hiring of the

22   lawyer, not saying, well, you know, the lawyers are all

23   behind this.  There's just a variety of really kind of

24   standard things.

25         THE COURT:  Right.  And there was a general

1  response that agreed, I think, in concept with a lot of

2  the things that you said.  But to the extent there is

3  something that comes up in a specific context -- it is

4  going to be difficult to rule now unless it is within

5  the context of a specific witness.

6           Anything else before we bring the jury out?

7       (No Response.)

8           THE COURT:  Let's bring the jury out.

9       (The jury enters at 2:19 p.m.)

10          THE COURT:  Please be seated.

11          Members of the jury, now that you've been

12 sworn, I will give you some preliminary instructions to

13 guide you in your participation in the trial.

14          Before I do, I want to tell you that what I

15 say now is intended to serve as an introduction to the

16 trial of the case.  It is not a substitute for the

17 detailed instructions on the law that I will give you

18 at the close of the case and before you retire to

19 deliberate on your verdict.

20          As I indicated to you in terms of the

21 logistics of the trial, we'll begin trial every day at

22 9:30.  So you should make whatever arrangements you

23 need in order to arrive at the jury room no later than

24 9:15.  Please reflect on what traffic challenges you

25 may run into and allow yourself sufficient time in

1  order to get here so we can start promptly.

2         We will recess at the end of the day between

3  5:00 and 6:00.  As I say, typically around 5:30,

4  depending on how the evidence -- where we are in the

5  evidence.

6         We will take a morning break at approximately

7  11:30.  We will break for lunch between 1:00 and 2:00,

8  and we'll take an afternoon break at approximately

9  3:30.  We'll take a break a little later this afternoon

10 given our lunch hour is a bit later than normal.

11        If there's some reason that any of you need a

12 break other than our scheduled break times, just raise

13 your hand, and I'll try to accommodate you as best I

14 can.

15        With respect to your duties as jurors, your

16 purpose and duty as jurors is to determine the facts

17 and the inferences arising from such evidence.  In

18 doing so, you must not engage in guesswork or

19 speculation.  Under our system of civil procedure, you

20 are the sole judges of the facts.

21        If at any time I make any comments or with

22 respect to any comments I may have already made, you

23 are at liberty to disregard it totally.

24        It is especially important that you perform

25 your duties diligently and conscientiously for

1  ordinarily there's no means of correcting an erroneous

2  determination of fact by the jury.

3          You will then have to apply those facts to

4  the law as the Court will give it to you.  With equal

5  emphasis, I instruct you that the law, as given by the

6  Court in these and other instructions, constitutes the

7  only law for your guidance.  It is your duty to accept

8  and follow the law as I give it to you even though you

9  may disagree with the law.

10          The evidence from which you will find the

11  facts will consist of the testimony of the witnesses,

12  documents, and other things received into the record as

13  exhibits and any facts that the lawyers agree to or

14  stipulate to or that the Court may instruct you to

15  find.

16          There are two kinds of evidence that you may

17  consider, direct evidence and circumstantial evidence.

18  Direct evidence is direct proof of a fact, such as

19  testimony of an eyewitness.  Circumstantial or indirect

20  evidence is proof of facts from which you may infer or

21  conclude that other facts exist.  I will give you

22  further instructions on these as well as other matters

23  at the end of the case, but keep in mind that you may

24  consider both kinds of evidence.

25          Certain things are not evidence and must not

1  be considered by you, and I will list them for you

2  briefly now:

3          First, the statements, arguments, and

4  questions by the lawyers are not evidence.

5          Secondly, testimony that the Court has

6  excluded or told you to disregard is not evidence and

7  must not be considered.  In this regard, objections to

8  questions are not evidence.  Lawyers have an obligation

9  to their clients to make objections when they believe

10 evidence being offered is improper under the Rules of

11 Evidence.  You should not be influenced by the

12 objection or by the Court's ruling on it.

13         If the objection is sustained, that is, if

14 the Court agrees with the objection, ignore the

15 question.  If it is overruled, that is, if the Court

16 disagrees with the objection, treat the answer like any

17 other.  If you are instructed that some item of

18 evidence is received for a limited purpose only, you

19 must follow that instruction.

20         If a lawyer has an objection to make, the

21 lawyer will stand and say objection during the course

22 of the witness' testimony.  The witness will then stop

23 speaking, and then I'll decide whether or not to allow

24 the witness to complete that answer.

25         At times, as I indicated, I'll sometimes

1   sustain the objection.   Other times I will overrule the

2   objection, and you'll be instructed as to how to treat

3   those rulings if any special instructions are needed.

4              Finally, anything you may have heard or seen

5   outside the courtroom is not evidence and must be

6   disregarded.   You are to decide this case solely on the

7   evidence presented here in the courtroom.   You are not

8   to discuss the case with anyone outside the courtroom

9   or even among yourselves until it is submitted to you

10   at the end of the case.

11             During recesses and overnight, you should not

12   do any research or any Internet searches about anything

13   you've heard in the courtroom or communicate in any way

14   through any electronic or social media, such as

15   Facebook or Twitter or anything of that nature.

16             During trial and beginning with these

17   preliminary instructions, you will hear me use a few

18   terms that you may not have heard before.   Let me

19   briefly explain a few of them most common to you.   You

20   will sometimes hear me refer to counsel.   Counsel is

21   simply another way of saying lawyers or attorneys.   I

22   will sometimes refer to myself as the Court.   The

23   plaintiff and the defendant are called the parties to

24   this case.   Here I may also refer to the defendant as

25   the United States or the FBI since the FBI is, in

1   effect, the real party here.

2           When we say "admitted into evidence" or

3   "received into evidence," we simply mean that this

4   particular exhibit is now part of the trial and may be

5   considered by you when making decisions you must make

6   in this case.

7           The term "burden of proof" or "sustaining the

8   burden of proof" refers to the legal requirement that a

9   party prove what it has the obligation to prove.   The

10  Court will instruct you further concerning the burden

11  of proof.   But as a general matter, a party who has the

12  burden of proof with respect to a particular issue must

13  prove that issue by what we call the greater weight of

14  the evidence or the preponderance of the evidence.

15          A "preponderance of evidence" means evidence

16  that produces the belief in your minds that what is

17  sought to be proved is more likely than not.   This is a

18  civil case, not a criminal case.   Those of you who have

19  sat on criminal trials or otherwise may have heard the

20  term "proof beyond a reasonable doubt."   That's the

21  standard of proof in a criminal case.   That is not the

22  standard of proof in this case.   The standard of proof

23  here is a preponderance of the evidence, and you simply

24  should put the criminal standard of proof out of your

25  mind.

1          In considering this case, you will have to
2    make judgments about the believability of witnesses'
3    testimony.  It will be up to you to decide which
4    witnesses to believe, which witnesses not to believe,
5    and how much of any witness' testimony to accept or
6    reject.
7          In considering the weight and value of the
8    testimony of any witness, you may take into
9    consideration all the facts and circumstances in
10   evidence.  And in particular, you may consider the
11   appearance, the attitude, and behavior of a witness;
12   the interest of that witness in the outcome of the
13   trial; the relationship of the witness to any party in
14   the case; the inclination, as you judge it, of the
15   witness to speak truthfully or not; and the probability
16   or improbability of the witness' statements.  Thus, you
17   may give the testimony of any witness such weight and
18   value as you may determine the testimony of such
19   witness is entitled to receive.
20         Pay careful attention to the testimony of
21   witnesses because contrary to what you may have heard
22   or seen on television, witnesses will not be called
23   back into the courtroom to repeat their testimony while
24   you are deliberating.
25         The Court will give you complete instructions

1    at the end of the case before you deliberate, but I do

2    want to now tell you briefly, in brief summary, what

3    the issues are so you might better appreciate the

4    evidence as it comes in.

5           In this case, the plaintiffs claim that the

6    defendant violated the Rehabilitation Act and that he

7    was damaged as a result of that violation.  The Court

8    will provide you detailed instructions at the close of

9    the evidence concerning the requirements of that act,

10   but briefly summarized, the act prohibits federal

11   employers from discriminating against qualified

12   individuals because they have a disability.

13          In order to prove his case, the plaintiff

14   must prove by a preponderance of the evidence that he

15   is disabled within the meaning of the Rehabilitation

16   Act; secondly, that he is qualified, he was a qualified

17   individual within the meaning of the Rehabilitation

18   Act; and third, that he was subjected to an adverse

19   employment action because of his disability.  On these

20   issues, the plaintiff carries the burden of proof.

21          Here the parties have made your job a bit

22   easier because they've stipulated, that is, they've

23   agreed that the plaintiff is a disabled person under

24   the meaning of the Rehabilitation Act.  Under the Act,

25   to be a qualified individual means that the plaintiff

1   can perform either without reasonable accommodation the

2   essential functions of the job.  And a reasonable

3   accommodation means some plausible or feasible

4   accommodation that will let a person with a disability

5   perform the job or be eligible for the job.

6          The FBI contends that it would have been an

7   undue hardship to reasonably accommodate the

8   plaintiff's disabilities, but that in any event, based

9   on an individualized assessment of the plaintiff, the

10  plaintiff either with or without a reasonable

11  accommodation presented a direct threat or risk to the

12  public health or safety of the plaintiff -- I'm

13  sorry -- either a direct threat or risk to the health

14  or safety of the plaintiff or some other person that

15  cannot be eliminated by a reasonable accommodation.

16  And the FBI bears the burden on that issue.

17         Let me explain to you a little bit about how

18  the trial will proceed in this case.  First, at the

19  beginning of the trial, the parties will have an

20  opportunity to make opening statements to you.  The

21  plaintiff will go first and summarize for you their

22  theory of the case, what evidence will be, and what

23  they expect the witnesses to say.  Following the

24  plaintiff's opening, the defense will make an opening

25  statement explaining to you what they expect the

1  evidence to show.

2           As I indicated to you, what is said in

3  opening statement is not evidence.  The opening

4  statement simply serves as an introduction to the

5  evidence which the party making the opening statement

6  intends to produce during the trial.

7           Second, after the opening statements, the

8  plaintiff will introduce evidence that he feels support

9  his case.  They will call witnesses.  The witnesses

10  will come into the courtroom and take the stand.  There

11  may be other testimony presented by way of depositions.

12  Following questioning by the plaintiff, the defense

13  will question the witnesses.  It's called

14  cross-examination.  After the plaintiff has presented

15  its case, the defendant will present its case.

16           After all the evidence has been received,

17  after all the witnesses have testified, and after all

18  the exhibits have been admitted, then I will instruct

19  you on the law you must apply in reaching your verdict.

20  I will give you orally and in writing the final jury

21  instructions concerning the law on which you must apply

22  the evidence received during trial.

23           Following being instructed on the law, each

24  party will present their closing argument to you to

25  support their case.

1            Please bear in mind that no statement,

2    ruling, remark, or comment which I have made or may

3    make during the course of this trial is intended to

4    indicate to you my opinion as to how you should decide

5    the case or is intended to influence you in any way in

6    your determination of the facts.

7            At certain times during the trial, I will

8    need to confer privately with the lawyers and others

9    about various evidentiary procedural issues.  During

10   these conferences, which would take place here at the

11   side of the bench, it is not our intention to hide

12   anything from you but simply to determine how some

13   issues will be handled and to allow us to proceed in an

14   orderly fashion.  Please be patient with us during

15   these conferences.  We're simply taking care to ensure

16   that the trial is being conducted fairly.

17           It's also important to the Court that your

18   time be used efficiently and not to have you spend

19   significant amounts of time outside the courtroom

20   during the trial.  There may be developments that

21   require matters to be heard outside of your presence,

22   but I'll simply do everything I can to keep those to a

23   minimum and move things along as smoothly and as

24   efficiently as possible.

25           Let me say a few words about your conduct as

1  jurors, some of which I have already mentioned but

2  deserve repeating.  First, I instruct you that during

3  the trial you are not to discuss the case with anyone

4  or permit anyone to discuss it with you.  Until you

5  retire to the jury room at the end of the case to

6  deliberate on your verdict, you are simply not to talk

7  about the case.  Even after it is submitted to you, you

8  must discuss the case only in the jury room with your

9  fellow jurors.

10         Second, do not read or listen to anything

11 touching on this case in any way.  If anyone tries to

12 talk to you about it, please bring it to the Court's

13 attention immediately.

14         Third, do not try to do any research or make

15 any investigations about the case on your own.  Do not

16 use the Internet to see if you can find anything about

17 the case or anyone in the case or anything that you

18 have heard about in the case.

19         Do not engage in any social networking about

20 the case, and that includes anything from simple

21 e-mails to, as I indicated, any Facebook postings and

22 so on.

23         Each of you has or will be given a notebook.

24 If you want to take notes during the course of the

25 trial, you may do so.  However, it is -- please

1  appreciate it is sometimes difficult to take detailed

2  notes and pay attention to what the witnesses are

3  saying at the same time.  If you do take notes, be sure

4  that your note taking does not interfere with your

5  listening to and considering all of the evidence.

6          Also, if you do take notes, do not discuss

7  your notes with anyone before you begin your

8  deliberations.  Do not take your notes with you at the

9  end of the day.  Please be sure to leave them in the

10 jury room where they will be secured and not reviewed

11 by anyone.

12         If you choose not to take notes, please

13 remember that it is your own individual responsibility

14 to listen carefully to the evidence.  You cannot simply

15 give this responsibility to anyone who is taking notes

16 or expect to rely on anyone's notes.  We depend on the

17 judgment of all members of the jury, and you all must

18 remember the evidence in this case.

19         I have already instructed the attorneys and

20 the parties not to speak with you.  Again, it simply

21 doesn't look appropriate for anyone to be having

22 contact with you during the trial.  So if during one of

23 the recesses or as you come or leave the courthouse, if

24 you see one of the lawyers take actions to avoid having

25 any contact with you, don't think that they're being

1  discourteous or disrespectful.  They're simply

2  following my instructions.

3          Finally, please keep in mind, again, that

4  your job is to decide all of the factual information in

5  the case, like who should be believed, who should not

6  be believed.  I'll decide all the legal questions in

7  the case, like what testimony or exhibits are received

8  into evidence and which are not.  Please do not concern

9  yourself with any of the legal questions that the Court

10  decides.

11          It is important that you keep an open mind

12  and not decide any issue or form any opinion in the

13  case until the entire case has been submitted to you

14  and you have received the final instructions of the

15  Court regarding the law which you must apply to the

16  evidence.

17          At the close of the evidence, I will be able

18  to give you your complete and final instructions, which

19  will be much more detailed than these preliminary

20  instructions, in which you must use to guide you in

21  reaching your decisions.

22          We're now going to proceed with the opening

23  statements.

24          Mr. Griffin.

25                  OPENING STATEMENT

1          MR. GRIFFIN:  Thank you, Your Honor.  May it

2    please the Court.

3          Initially, thank you for being a part of an

4    important service, as Judge Trenga has mentioned, as

5    jurors in this case.

6          A fair chance to succeed at the job you're

7    hired to do, that's what the law you will be using in

8    this case says everybody deserves, a fair chance to

9    succeed in doing their job.  Judge Trenga has told you

10   a little bit about why we're here today and the law

11   under which this case is brought.  If a person is

12   qualified for the job, a special agent, and they have a

13   disability, they're entitled to be judged on their

14   abilities, not their diagnosis.  Second, they're

15   entitled to reasonable accommodations if they need them

16   to make them successful in their job.

17         At the end of this case, you're going to

18   answer some questions and be guided by the instructions

19   from Judge Trenga.  The instructions he gives you are

20   going to be much like what he just told you, that

21   people with disabilities are entitled to be judged on

22   their ability to perform the essential functions of the

23   job and that employers have to work with them to make

24   reasonable accommodations if they need those in order

25   to be successful in the job.

1          There is an exception to this rule that Judge
2   Trenga mentioned, that if it is too unfair and it has
3   an undue hardship on the employer, then they don't have
4   to make accommodations.  You're going to hear from
5   Judge Trenga later that if the employer here wants to
6   say that a qualified person with a disability is a
7   direct threat or dangerous to people, that's a burden
8   on this side.

9          They will have the burden of proving that to
10  you to show that they used the most objective medical
11  information, the most current standards, and a good,
12  reasonable judgment about risks, how imminent it was,
13  how much risk there was, whether it was going to come
14  up soon or whether there was any risk at all.  You will
15  find at the end of this case that the FBI cannot do
16  this for they had no doctors, no experts at any time to
17  evaluate Justin Slaby.

18         You will hear that all Justin Slaby asked the
19  FBI to do was to treat him fairly and base him on his
20  abilities to perform the 247 essential functions of the
21  special agent position that the FBI hired this man to
22  do.

23         You'll soon hear that the FBI has lots of
24  experience in making an accommodation for those who
25  have hands that have been injured or lost.  You'll find

1   that there are agents -- you will hear from them in

2   this trial.  There are at least six of them who have

3   lost the use of one of their hands, and they need

4   accommodations because they have lost the use of their

5   hands.  They didn't have any prosthetic devices to

6   mitigate and correct the situation that Justin faced.

7         They had to learn -- some of them, they lost

8   their strong hand.  One agent had a grenade blow up in

9   his hand.  He only has a finger and a thumb left.  He

10  was asking an accommodation not to shoot with that hand

11  on his firearm.  He was granted it.  As you'll hear

12  repeatedly in this trial, Justin needed no

13  accommodation because he has a strong, good left hand.

14        Five others had problems with their dominant

15  hand -- with their other hand, I should say.  One in

16  her dominant hand had a tragic accident at the

17  hospital.  She suffered breast cancer.  She is in the

18  hospital.  They have got an IV in her right dominant

19  hand administering chemotherapy agents.  At the

20  hospital while she was asleep, the hospital let it

21  leak, the toxic chemicals in her hand.  When she woke

22  up, her hand was swollen.  You'll hear from her.

23        And she's got a permanent, severe injury in

24  her dominant hand, and she almost lost her job.  But

25  the FBI allowed her to learn how to shoot with her weak

1  hand, and she did.  And she, too, doesn't do the

2  firearms testing with her severely injured right hand.

3         Now, there are three others -- let me count

4  them -- at least three others, one with internal brain

5  injury where he had seizure disorder and paralysis in

6  the hand.  Another -- yet another was in a terribly

7  tragic car wreck where he severed the ulnar nerve and

8  can't move one arm at all.  Not weapons restricted.

9         Finally, we have the sixth one who had carpal

10  tunnel, needing carpal tunnel surgery in two hands.

11  And yet, she was able to get a trial period even though

12  she needed surgery for carpal tunnel syndrome.

13         And finally, one gentleman had a shoulder

14  injury that you'll hear that he could not lift his arm

15  passed here, 45 out of 180 degrees.  And while he had

16  that limitation, he was not weapons restricted.

17         Yes, you'll hear that these agents needed

18  accommodations.  They were granted it by the FBI.  You

19  will hear that Justin Slaby did not ask for an

20  accommodation and that the FBI, when it hired him as a

21  special agent with full knowledge of his left hand,

22  they didn't think he needed an accommodation either.

23         Because when Justin was hired for this job,

24  he asked people:  I have a new left hand.  Is this

25  going to be in the way?

1          He was told two things.  If you pass the
2  fitness-for-duty examination, you will be a special
3  agent; and number two, even if you couldn't shoot with
4  your left hand, you can still pass the firearms
5  qualification because you can miss all the shots --
6  three, five shots -- with your left hand, and you still
7  can get way enough points to pass the test.

8          So yet, when he went, though, to the Training
9  Academy, it was a different sorry.  In other words, he
10 was hired as a special agent.  You may see the letter
11 that he received on that important day, on December 9,
12 2010, that he was hired as a special agent, grade 10,
13 step 1.  He had -- there was conditions to it.  He had
14 to pass his PFT, physical fitness test.  He had to pass
15 his updated background information.  But as you can
16 imagine, that was a great day for Justin Slaby.

17         And you may ask why did the FBI hire him?
18 How did he get this letter?  Well, he got this letter
19 because the FBI has a fitness-for-duty process and an
20 application process that takes between one and two
21 years.  In this case, it took a year-and-a-half for the
22 FBI to decide that Justin Slaby was the right man for
23 this job.

24         Of course, you may ask, why is he the right
25 man for this job?  Well, he's the right man for this

1  job not just because of his shooting skills.  He is an

2  expert marksman, and he is -- or was an Army Ranger.

3  And he did serve three tours in Iraq and Afghanistan.

4  But they also chose him for his brain, his mental

5  strength, his physical strength, and his emotional

6  strength.  All of these were evaluated.

7          But the FBI went one step further for Justin

8  Slaby because he has a prosthetic left hand.  They

9  said, We want to be doubly sure and verify that he is

10 qualified to perform the essential functions of this

11 job.  And you are going to hear Dr. Yoder explain to

12 you, the FBI medical officer, that they had him go

13 through an extra battery of tests just to make sure his

14 left quadrant hand did not interfere with the essential

15 functions of this job.

16          You know, they had a PhD rehabilitation

17 person do it, and they had two FBI special agents to

18 witness it, including one who is actually a firearms

19 trainer.  They told Justin the truth:  Even if you

20 don't shoot with your left hand, you will pass the

21 course.  You are good to go.

22          That's why the FBI hired him, because he was

23 evaluated before he was hired to make sure that he was

24 qualified to perform all of the essential functions of

25 the job.

1         So you ask -- and you have every right to

2  ask, and you will find out in this trial -- what

3  happened to Justin's left hand?  Well, you are going to

4  hear that he has a state-of-the-art prosthetic left

5  hand.  It is different from yours and my hands, but you

6  are going to find out that in some ways, it is strong.

7  He's a more accurate shooter and has better

8  self-defense with his left hand now than he did before

9  what happened to it.

10         I'm going to tell you what it was.  He was an

11  Army Ranger and was in training, and a faulty grenade

12  blew up in his left hand.  He got state-of-the-art

13  help, good doctors, good physical therapists.  And he

14  actually battled the long road back to recovery, but

15  recover he did.  Recovery to the point where he got to

16  December 9, 2010, when he was appointed as a special

17  agent in the FBI.

18         That was important day, you'll hear.  It was

19  an important date for this family because by this time,

20  he was married and had small children.  This would be

21  his career.  But it was also a big day in the life of

22  the FBI because Justin was the first person the FBI had

23  ever hired who had -- was a wounded warrior with a

24  prosthetic left hand.  You will hear from numerous

25  witnesses in this courtroom:  He was the first special

1    agent ever hired with a prosthetic left hand.

2            But when he got -- when the FBI made this
3    decision, they had full knowledge of his left hand.
4    But when he got to the Training Division, it was a
5    little bit of a different story.  I'll tell you what I
6    mean by that.  When he got to the FBI Training
7    Division, they already knew he was coming.  They had
8    heard that the first person with a prosthetic hand was
9    coming to the Training Division.

10           The trainers went and got very, very busy.
11   When they got busy, they had meetings.  They wanted to
12   put extra scrutiny on him just because he had a
13   prosthetic left hand.  During these meetings, we are
14   going to show you they had a blizzard of paper, even
15   before he got there to the -- when he got to the
16   Training Academy.

17           We will show you that at the time Justin
18   arrived at the Training Academy with the trainers, he
19   was just as qualified then as when the FBI had
20   determined he was qualified and deemed him fit for duty
21   and hired him as a special agent.

22           You will find in this case and we will prove
23   that Justin Slaby is better qualified than many of the
24   agents in the field who have lost one hand, lost the
25   ability to use a hand, have severe hypertension,

1  history of heart attack, seizure disorder, all kinds

2  cardiac situations.  I say that because qualified

3  means -- and Judge Trenga shared this with you -- able

4  to perform the essential functions of the job.

5        But Justin Slaby's qualities and

6  qualifications are such that the Army in which he

7  served those three tours, they asked him back for a

8  fourth tour.  But for his wife and small children, he

9  would have taken that fourth tour and served his

10  country in that way.  But he wanted to serve in the FBI

11  and was hired by the FBI.

12        Now, you are going hear many witnesses in

13  this case.  You will hear in a moment that this case is

14  really about two FBIs.  You'll hear about the war

15  within itself at the FBI between the Training Division

16  and between the fitness-for-duty people.

17        But you'll hear Chuck Pierce.  Unlike any of

18  these trainers who made the decision to remove Justin

19  Slaby after only 6 out of 21 weeks of the Training

20  Division, Chuck Pierce, the head of firearms training

21  at the elite Hostage Rescue Team of the FBI, has worked

22  with Justin Slaby on a daily basis.  Because after they

23  demoted him from special agent and removed him from his

24  special agent job, he is now a support person with the

25  Hostage Rescue Team.  You are going to hear Chuck

1   Pierce tell you about his skills and how important that

2   he be evaluated on his skills and not prejudged on

3   speculation before people even met him.

4            You will also hear how Justin got to that

5   point, how he ended up being removed.  That is because

6   the FBI trainers, when they got there, they had two

7   choices.  They had already decided that they were going

8   to get lawyers, and they did get lawyers before he ever

9   got there.  They had decided he was going to have

10  problems and had all kind of questions.  But what they

11  did -- what they had a choice to do, they took the

12  position from the very beginning, aha, you have

13  something wrong with your left hand.  You have to be

14  able to shoot well with your weak hand, your left hand.

15           Granted, his good, strong hand that he used

16  in Iraq and Afghanistan is the hand he's always used,

17  and there is nothing wrong with his hand.

18           In a moment, I'll tell you his right-hand

19  shooting is better now than before the injury.  But for

20  what we need to know now, what he asked him to do, Let

21  me be trained like everybody else.  I'll take every

22  shot you'll make two people with two regular hands

23  take.  I'll shoot with my left hand.  I'll shoot with

24  my right hand.

25           You will find repeatedly not once would they

1  let him on the range with his left hand to prove he

2  could shoot with it.  Not once.  And if they didn't

3  want him to shoot with his left hand, the evidence is

4  going to show you the choice they had, treat him like

5  these other agents who can't shoot with their left

6  hand.  There is plenty of those.

7          You're going to hear from a couple of them.

8  They can't shoot with their left hand, but they go

9  through firearms and they serve America every day.  A

10 different standard was applied to Justin Slaby.

11         You're going to hear that during the training

12 before they ran him off, his classmates mishandled

13 weapons.  They had lethal force errors, numerous lethal

14 force errors.  What happened to them?  They graduated.

15 He never has had a lethal force error.  He never has

16 put anybody at risk of injury in his entire life.  His

17 role as a soldier and as a special agent would be to

18 take people away from injury, to take them away from

19 here, to prevent injury.

20         The evidence is going to show, though, two

21 FBIs.  One is the good FBI who hired him after this

22 year-and-a-half fitness-for-duty examination, which

23 Dr. Yoder will tell you today that he is as qualified

24 when the trainers removed him as he was when he got

25 there.  And he sticks by his guns that he was qualified

1  and fit for duty.

2          You're also going to find that the other FBI

3  trainers, however, did something completely different.

4  When they first heard Justin was coming, what they did

5  -- who did they reach out to first?  Not to Justin when

6  they heard he had a prosthetic left land.  They hired

7  lawyers.  They hired lawyers before they ever met him.

8  They hired lawyers and anticipated -- they anticipated

9  a suit by a man they were going to make force to file

10  it.  They lawyered up for the case that they were

11  forcing to be brought because they wanted him out of

12  the Training Academy.

13          You are going to hear from Judge Trenga later

14  in the week about accommodations.  You are going to

15  hear that before Justin ever got there, there was a

16  meeting around a table, 10 or 15 people.  Multiple

17  people will tell you about it.  Ms. Hoffman, who is

18  supposed to be the expert on people with disabilities,

19  she tells every trainer around that table, and I quote,

20  You may not suggest accommodations to him, being Justin

21  Slaby.

22          Can you imagine an executive person coming

23  into the training room before he gets there and says,

24  You will not suggest any accommodations to him at all?

25  You see, when agencies, instead of protecting the

1  rights of people to be judged on their abilities and

2  not on the basis of assumptions, she would never have

3  told them that.

4          The facts are going to show you that the FBI

5  didn't just deprive itself of one of the most qualified

6  special agents they had ever hired, they sacrificed

7  some principles, the principles of adherence to the

8  law.  Because, as Judge Trenga just shared with you,

9  employers have a duty to make accommodations where they

10 are necessary.  You will hear repeatedly in this case,

11 Justin didn't think he needed an accommodation.  The

12 people who hired him at the FBI who found him fit for

13 duty didn't think he needed an accommodation.  But the

14 trainers did.

15         So when he says, how about you just let me

16 shoot with the rest of my class, they said no.  They

17 ran him through a whole bunch of assessments by

18 himself, assessments they told him were to help him:

19 We are going to help you get through the 21 weeks.  We

20 are going to show you what you have to prove.  This is

21 not pass/fail.  It will not be used against you.  It is

22 for one purpose and one purpose only, to help you later

23 in the curricula so you can succeed.

24         You may hear in this courtroom from my

25 friends over to the left that those assessments were

1  used against him, that those assessments were actually

2  going to be used in front of you to justify removing

3  him.  You will find each witness when they take the

4  stand:  Why did you remove him six weeks into the 21

5  weeks when he had not failed anything?  He was a good

6  marksman.  He was great at firearms.  Why did you

7  take --

8          Oh, we just had a concern over his left-hand

9  shooting.

10          Well, you wouldn't let him do it.

11          Oh, yes, we think he is unsafe.

12          But you wouldn't let him try it.

13          No, we wouldn't.  We weren't going to let him

14  try it.

15          That's exactly what you have here.

16          So how did they do this?  And I want you to

17  count during this trial how many times either witnesses

18  or the lawyers for the FBI tell you all of this:  We

19  were only trying to help him.  The assessments were

20  supposed to help him.  We weren't going to hold them

21  against him.  It was just going to help him get ready.

22  That we were trying to help him by kicking him out of

23  the Training Academy by sending him to a medical

24  recycle.

25          But you'll find in the evidence the FBI has

 1  rules and regulations.  You'll get them.  There are

 2  only three ways under the FBI's regulations special

 3  agents can be removed once they are in the academy:

 4          Suitability, that is, honesty.  People steal,

 5  insubordinate.  That's suitability.  They can get run

 6  off for that.  They are going to tell you Justin Slaby

 7  was suitable.  That wasn't an issue.

 8          There's another section in here called

 9  proficiency.  That is when you fail exams, when you

10  drop your guns, you can't get past the segments.

11  There's a method in here where they actually can remove

12  people for proficiency problems.  They didn't remove

13  Justin Slaby from the academy for proficiency problems

14  either.  They called it a medical recycle.

15          You'll find when you read this and when the

16  witnesses tell you about it, it is for people who have

17  a temporary injury, that they can come back and get

18  back into the academy.  You'll find that when the

19  trainers decided to remove this man on the basis of

20  medical recycling, the fitness-for-duty people said no.

21  The doctors objected.

22          The doctor said, You cannot do this.  He is

23  as fit today as when we declared him fit.  You will

24  have to find some other way to get him out of the

25  academy.  Yet, the trainers insisted, overruled the

1  doctors, and managed to get approval from somebody to

2  remove him from the academy even though everybody who

3  will testify will admit it was improper and absolutly

4  against this training regulation to call this man a

5  medical recycle.  He has got a left hand.  He doesn't

6  have a temporary injury.  He is able to do the job now.

7           So instead of making successful a man who

8  already was successful, the FBI tried to block at every

9  stage his attempt to show that success.

10          And I say that for this reason:  When they

11  kicked him out six weeks into the course, they told

12  him, You're out.  But they brought him back one time,

13  and what they told him then you may hear.  Depending on

14  what the judge does in terms of the evidence, you may

15  hear they told him, If you can do everything all the

16  other trainees get taught in their 21-week course

17  before you are taught, we might let you back in.

18          But the decision had been made he was

19  removed.  So when he had not been taught anything, when

20  they brought him back, he did prove what they said he

21  couldn't do.

22          Mike, if you could show the notation when

23  they removed him in March.

24          In March, this is what they wrote down as the

25  justification to remove him:  Unable to complete

1  one-hand shooting because he could not aim and fire the
2  pistol when held with only his left hand.

3        I don't know how to say this in any other way
4  but to tell you that was a lie.  You will hear even
5  from FBI witnesses that they did not let him shoot left
6  handed.  He asked to shoot left handed.  They told him,
7  You will not shoot with your left hand.  You will shoot
8  only with your right hand.  And that afternoon they
9  forced him out because they wrote that down.

10        Unfortunately for them, later on when they
11  looked at him again, they -- I won't say accidentally
12  but at one point, they admitted, yes, he can shoot with
13  his left hand.  And there you see it.  He demonstrated
14  the ability to safely fire the weapon when controlled
15  by his prosthetic left hand.  And that's the truth.  He
16  can do that.

17        Well, what we have, though, is a catch-22,
18  pure and simple.  They wouldn't let him on the range to
19  fire and said he was unsafe.  He said, Let me try it.

20        They said, No, we won't let you.  Then they
21  say he's unsafe.  That's the catch-22.

22        So for the first time in the history of the
23  FBI you'll hear in this case, as we move toward the
24  finish, for the first time, they claim that left-hand
25  shooting is an essential function of the job.

1            And Judge Trenga is going to tell you to use

2    your common sense and give you some factors.  Essential

3    functions are the ones that are written down.

4    Essential functions are the ones people do.  Essential

5    functions, you determine that by how often it's done.

6    Is it done in the real world?  Are other special agents

7    doing it?  Are past special agents doing it?

8            You are going to find in this case, there is

9    not a single document in this entire full of boxes in

10   this courtroom that says shooting with your weak hand

11   is an essential function.  But you will find in a

12   600-page report that the FBI compiled of what is not an

13   essential function.  And you know what's not in there?

14   Left-hand shooting.  I mean -- excuse me.  Indulgence

15   to my left-handed friends -- weak-hand shooting because

16   I'm right-handed.  So not anywhere in those

17   documentations do you find that.  That is just what we

18   had.

19           But we did ask this question:  Well, tell us:

20   Does this ever happen in the real world where people

21   are actually shooting a gun with their weak hand?  And

22   late in the game here come records.  The FBI dug up the

23   only times in the history of this agency when people

24   are actually shooting a gun with their left hand alone

25   by itself.

1          Seven of them.  In not a single one of the

2   seven did anything good happen.  They were accidental

3   shootings.  And the lesson learned was don't have the

4   gun in your weak hand.  It's a sympathetic reflex.  The

5   chief firearms trainer in Cleveland, Ohio, wrote in the

6   lessons learned, If I had my gun in my strong hand,

7   this accident where the bullet went through the wall

8   would never have happened.  Another special agent with

9   the gun in his weak hand shot off part of his strong

10  hand because he was holding the weapon in the weak

11  hand.

12          You see this, and we think the evidence is

13  going to show you that weak-hand shooting is not an

14  essential function.  It is a dangerous one, and it is

15  not done.  And the only time it is done, no good comes

16  of it.

17          You'll hear from the witness from the

18  Shooting Incident Response Group, and you'll hear him

19  say -- is that good or bad when they're putting the gun

20  in their weak hand?  And you'll hear him say that's

21  bad.

22          You'll find in this case that there are three

23  fictions.  One is that left-hand shooting is an

24  essential function.  It's not under the law.  Under the

25  law that Judge Trenga gives you, the evidence is going

1    to show not a single witness from this side of the

2    table -- and they are going to bring you some, and we

3    are going to call some -- none of them have ever shot

4    with their weak hand in the line of duty.  So those

5    seven times it has happened wasn't good, but the folks

6    who are going to testify have never done it.

7           The second fiction in this case is that

8    Justin can't shoot with his left hand.  He can shoot

9    with his left hand.  He asked to do it many times, and

10   they would not allow him to.  He is able to do it, and

11   he will show you exactly how he is able to do it.

12          Does he prefer, like most agents, to use

13   their best hand when they are shooting one hand?  Of

14   course he does, and he is an expert marksman.  But I

15   want to tell you one other thing that I learned in this

16   case and that you will learn perhaps:  When we see a

17   person who has lost part of a hand because of their

18   service, you think how tragic.

19          But you are going to hear in this courtroom

20   that tragedy sometimes brings odd advantages.  And here

21   is the advantage he got by his prosthesis.  Would he

22   rather not have had that explosion?  Yes.  He would

23   never wish that to happen again.  But he learned he is

24   a better defender in combat with that hand than his

25   previous left hand.

1          And the other thing he learned, even though

2    he was an expert marksman as an Army Ranger, he is a

3    better firearms shooter today.  Because he has a

4    prosthetic left hand instead of the hand he used to

5    have, he doesn't suffer recoil.  Guns -- I'm no expert

6    in firearms.  They don't have any either, by the way.

7    But guns have recoil.  And that is not an expert term.

8    I understand guns blow back, and the second shot is not

9    so accurate.  You will hear Justin say now that he has

10   that prosthetic left hand, when he's using his strong,

11   able right hand, he is a better firearm shooter today

12   than before the injury.  But the FBI did not care about

13   that.

14          The third fiction, as I move to the close, is

15   this:  That they were trying to help him.  They will

16   say, We wanted him to come back.  We recycled him for

17   his own good.  You will even have some of their

18   witnesses saying it was Justin's idea to leave the

19   academy.  You'll be the judge of the truthfulness of

20   that testimony.  But what I can tell you is the

21   evidence is going to establish that when they hired

22   lawyers and doctored up papers to remove him and then

23   defrauded him into doing these demonstrations and then

24   using them against him after they promised him that

25   they would not -- you will see in this courtroom

1  whether they honor the promise they made to him or

2  whether they will try to use those demonstrations

3  against him to say, Well, he might have failed if we

4  had left him in the class.

5          Our answer, which you will find in the

6  evidence, is if you wanted to see how he could do, let

7  him serve with his classmates.  Let him graduate to the

8  finish.  If he passes the test, pass him.  If you don't

9  like the way he did the test, fail him.  But don't

10 remove him in the middle of the class.

11         They would not allow him to demonstrate that.

12 So you will decide whether -- and count the number of

13 times they say they were trying to help him.  They can

14 tell that to the family who lost more than 25 percent

15 of their family income because of his demotion from

16 special agent down to support staff.

17         Now, finally, I want to share with you the

18 order of the witnesses just for a moment before I sit

19 down and turn the floor over to my adversary,

20 Mr. Mikolashek over here.

21         You're going to hear first from the man who

22 decided Justin Slaby was qualified and fit for duty and

23 that he was not a direct threat to anyone.  That's

24 Dr. Yoder.  Dr. Jim Yoder, you will hear, I have

25 probably spoken with him five or six times.  He is

1 going to tell you why he declared him fit for duty and

2 why he never changed his mind.

3       We are going to follow that with some of the

4 training people, why they decided to try to overrule

5 the doctors and try to start this fight within the FBI

6 of whether they could remove him or not.  But the

7 doctors did not give up on him.  Dr. Yoder, Dr. Fabbri,

8 you will see their -- you will hear the testimony.

9 They were absolutely opposed to this because he was fit

10 for duty.  They knew he was fit for duty.  They

11 determined him fit for duty, and nothing had changed.

12       But you are going to hear those special

13 agents, both the executive managers of the training

14 division and those they say were the ones who

15 participated.  In other words, there's two people we're

16 going to put on the stand.  Ms. Moyet-Treretola and

17 Mr. Delaney they claim to be the decision makers, but

18 they claim not to know anything about Justin Slaby.

19 They claim they relied on their -- they called them

20 subject matter experts but they're not experts.  They

21 will not be experts in this trial.

22       But when we talked to those, quote, people,

23 they say we didn't know they were going to kick him

24 out.  We thought we were helping him.  We thought we

25 were trying to get him ready for week 18.  We didn't

1  know they were going to pull the plug on him in week 7.

2  Don't blame us for this.   Talk to executive management.

3  You will hear that that's what they say.

4          You're also going to hear from Mark Crider

5  and from Mr. Pierce.   Mr. Pierce, who works with Justin

6  today at the elite Hostage Rescue Team.   Mr. Crider's

7  one of the two special agents who eyewitnessed part of

8  the fitness-for-duty exam.

9          You're going to hear in one of the best

10  evidence of bias in this case is what happened to those

11  two men.   Because Mr. Pierce demanded to be at some of

12  these, quote, demonstrations assessments, the trainer

13  said, You will not -- you will not help him.   You will

14  not try to suggest any accommodations to him.   We won't

15  even allow you to be there to observe it.   He wanted to

16  be there because he believed him.

17          You will hear Mr. Pierce tell you from that

18  stand, as an FBI trainer, Hostage Rescue Team boss,

19  that the Training Division let him down.   He should

20  have been allowed to succeed instead of pushed down by

21  prejudice.

22          Mr. Crider, he did support this application

23  by eyewitnessing the demonstration of shooting, not

24  live shooting, but shooting.   And when he did that, you

25  will find that he got called into the office and got

1  the third degree.  You'll hear him tell how when he got

2  back to Milwaukee, he was called into his SAC's office

3  and given the third degree for his role, even for

4  having lunch with Justin Slaby at the Training Academy.

5      He was given the third degree and accused of

6  trying to help him.  That's what they said to Mark

7  Crider:  You shouldn't be trying to train him.  What

8  are you doing training him?  Because you will see in

9  the memos they wanted to limit the number of people who

10 could help him.

11     They'll tell you:  We didn't want to treat

12 him any better than anybody else, a man they had

13 already removed from the academy where he was not being

14 trained with his classmates.

15     So at the end of the case, you are going to

16 get three questions, at least, in the case.  When you

17 hear from the witnesses -- and yes, you will hear from

18 Mr. Crider and Mr. Pierce.  You will hear from FBI

19 people who made these decisions.  You will also hear

20 from Jennifer and Justin Slaby, who will tell you what

21 they have endured, who will tell you he is not a man

22 who likes to talk about himself because he is not a

23 very talkative person.  But he is going to share with

24 you his experience.

25     At the end of the day, we think the evidence

1   is going to show he was well more than qualified and

2   that the FBI fitness-for-duty people were exactly right

3   when they hired him for this job.

4          Finally, you will be asked a question about

5   how to make this right.  In other words, Judge Trenga

6   will ask you questions about whether Justin was

7   qualified, whether they proved he was a direct threat,

8   whether it would have been an unreasonable

9   accommodation to allow him to be trained like everybody

10  else or whether it would have been a reasonable

11  accommodation to treat him like the other people who

12  have hand problems, even though he didn't need it.  He

13  can shoot with his left hand.

14         But if they thought he did need an

15  accommodation, you will get asked a question about

16  that.  But at the end of the day, you will be asked to

17  decide what it takes to put this family back to where

18  they would have been had this not happened.  And that's

19  a difficult question to answer, but you'll hear the

20  evidence.  You'll hear what the FBI has to say on that.

21         You will decide whether or not he was

22  qualified and whether his hand was why they removed him

23  from the Training Academy, and you will get to answer

24  whether they can prove that he was a direct threat to

25  people.  And at the end, you will decide what is to be

1  paid back, what was lost, what was taken from this
2  family in this long journey to get where we are today.
3          At the end of the case, we will all thank you
4  again, but it is our belief that the evidence that we
5  present to you will allow you to make the right verdict
6  for you, for the public, for the FBI, both the good FBI
7  and the trainers who decided to remove him better.  If
8  we do that, we can all be proud of the work we do in
9  this courtroom this week and perhaps early next week.
10          We very much look forward to putting our
11  first witness on later this afternoon.  So thank you
12  again for your service to our country in serving as a
13  juror in this case.
14          Thank you, Judge.
15          THE COURT:  Thank you, Mr. Griffin.
16          Mr. Mikolashek -- Ms. Bae.
17                    OPENING STATEMENT
18          MS. BAE:  Good afternoon.  My name is Sosun
19  Bae, and I represent the FBI on behalf of the U.S.
20  Attorney's Office.  With me this afternoon are my
21  colleagues, Kevin Mikolashek, Bernard Kim, and Lauren
22  Wetzler, also from the U.S. Attorney's office, as well
23  as Matthew Rizzo, FBI Assistant General Counsel, and
24  Julie Johnson of the FBI's Training Division.  Special
25  Agent Johnson is not a witness in this case but a

1  current section chief at the Training Division.  Also

2  with us is Tabitha Fuelling, who will be helping out

3  with technology matters.

4        It is the mission of the FBI to protect this

5  country and its citizens.  It is the unique duty of the

6  FBI special agents to carry out this mission, and this

7  is what the case boils down to:  One simple idea with

8  which you are all familiar, the idea of duty.

9        You will hear from the plaintiff, Justin

10  Slaby, and his attorneys about Mr. Slaby's strong sense

11  of duty to our nation.  No one contests that.  But the

12  duty of the FBI is to protect this country and all of

13  its citizens, and that duty includes protecting the

14  safety of its own agents.

15        It is the ultimate responsibility of the

16  FBI's Training Division to ensure that every single

17  trainee who enters the FBI Academy can safely and

18  effectively perform all the skills that the academy has

19  deemed essential to fulfilling an agent's duties before

20  that trainee graduates from the FBI Academy and becomes

21  a special agent.

22        You will hear testimony that the reason new

23  agent trainees must be able to accomplish all the tests

24  that the Training Division has deemed essential is

25  because all special agents must be capable of

1   performing every one of those functions no matter what

2   specific field or division they end up in.  This is

3   because when trainees are at the academy, they don't

4   know where they are going when they leave or exactly

5   what they will be doing.

6          The evidence will also show that sometimes

7   events arise that call for all hands on deck, and every

8   agent in the region, regardless of whether the agent

9   works gangs or white collar or Internet fraud, must be

10  available and capable of fully participating in

11  whatever way the situation calls for.

12         Over the next few days, the evidence will

13  show that the plaintiff, while possessing many

14  admirable qualities that led the FBI to give him the

15  opportunity to enter the academy in the first place,

16  simply could not meet the very same standards that

17  every single member of his training class and, for that

18  matter, every single trainee that has come through

19  Quantico in modern memory is required to meet in order

20  to graduate and become a special agent.

21         Specifically and most significantly, you will

22  hear from witnesses, including Nate Williams of the

23  academy's Firearms Training Unit, that Mr. Slaby could

24  not safely and in accordance with the long-established

25  standards handle a firearm with each hand individually.

1   You will hear from Agent Williams and others

2   specifically why the ability to safely and effectively

3   handle a firearm with each hand is essential.

4            Now, you may hear throughout the course of

5   this trial the parties and witnesses refer to the

6   dominant hand or the offhand or the weak hand, but

7   don't get confused.  They all mean the same thing.  And

8   you may hear the parties and witnesses refer to the

9   academy or Training Division or Quantico, and those all

10  mean the same thing too.

11           The bottom line, ladies and gentlemen, is

12  that the evidence will show that Mr. Slaby simply could

13  not accomplish several of these essential functions

14  required by the Training Academy, including the ability

15  to safely and effectively handle a weapon with his

16  nondominant hand, and that all new agent trainees are

17  required to accomplish those very same functions in

18  order to graduate.

19           And you may hear plaintiff's attorney say,

20  Well, didn't the FBI have a duty not to discriminate

21  against Mr. Slaby?  Of course it did.  But what you

22  will not see or hear is any actual evidence that the

23  FBI even harbored any discriminatory feelings toward

24  him, much less actually acted in a discriminatory way

25  toward him.

1          What you will hear is testimony from Training

2   Division witnesses, like Diana Moyet-Treretola and

3   Timothy Delaney, that they were actually excited for

4   the arrival of Mr. Slaby to Quantico.

5          What you will see are the efforts that the

6   FBI took to make sure it complied with the law once it

7   knew a disabled trainee was coming to the academy.

8          What you will see is that to the extent that

9   the FBI treated him at all differently from the other

10  students, that they actually treated him more favorably

11  than the other trainees.  What will become clear in the

12  next few days is that the FBI wanted Mr. Slaby to

13  succeed.  Now, Mr. Griffin called it a fiction that the

14  FBI was on Mr. Slaby's side and wanted him to succeed,

15  but you will see that it is actually fact.

16         Mr. Slaby's lawyers may also say, Well,

17  didn't the FBI have a duty to give Mr. Slaby a fair

18  shake?  Again, you will not see or hear any evidence

19  that the FBI did not give Mr. Slaby a fair chance.

20  Instead, you will see that the FBI went far and above

21  its obligations and maximized its efforts within the

22  scope of its rules in order to give Mr. Slaby his best

23  chance for success.

24         You will also see that the FBI valued

25  Mr. Slaby enough to offer him a professional nonagent

1  position with the prestigious Hostage Rescue Team after

2  Mr. Slaby left the training program, a job which he

3  still holds with the FBI today.

4         You will see that even to this day, the FBI

5  is giving Mr. Slaby the option to return to the academy

6  if prosthetics technology evolves enough to allow him

7  to demonstrate that he can perform the essential

8  functions.

9         Now, you may notice that most of the

10 witnesses in this case will be called by the plaintiff.

11 Because the plaintiff has the burden of actually

12 proving his claim to you, he has the right and the

13 obligation to go first.

14        Just remember this:  Because they are the

15 ones who put the witness on the stand does not mean

16 that what the witness says will help them.  Many of the

17 witnesses that will be called by the plaintiff are also

18 witnesses for the FBI, and we will make our case to you

19 from the very first witness that they call to the very

20 last witness that we call.

21        We will see the story of Justin Slaby and the

22 FBI unfold in three stages:

23        The first stage predates Mr. Slaby's arrival

24 at Quantico and will show you how Mr. Slaby made it to

25 the academy, as well as the Training Division's

1   positive reaction to Mr. Slaby's entry as the first

2   ever new agent trainee with a prosthetic hand.

3          The second stage will show evidence of his

4   time at the academy in Quantico, how the FBI not only

5   didn't discriminate against him but actually gave him

6   the tools to try to succeed.

7          The third stage will show the circumstances

8   of Mr. Slaby's leaving the academy and how the FBI made

9   the effort to place Mr. Slaby, a highly valued

10  employee, in a professional position within the FBI at

11  the location and unit of Mr. Slaby's choice.

12         The plaintiff will try to bring in all sorts

13  of evidence about different people, other agents, and

14  events that have nothing to do with Mr. Slaby or his

15  time at the FBI Academy.  So I urge you not to get

16  distracted by all this extra information.  But instead,

17  remember that in this case it is only about Justin

18  Slaby and how rather than discriminate against him, as

19  the plaintiff alleges, the FBI made clear efforts to

20  facilitate his success but in the end could not shirk

21  its duty to the country by compromising its standards

22  which apply to everyone for one individual.

23         So let's start by talking about what happened

24  at the academy before Mr. Slaby's arrival.  Before

25  Mr. Slaby arrived at Quantico, you will hear testimony

1  that members of the management team at the FBI Training

2  Division were excited at the prospect of the first ever

3  new agent trainee to enter with a prosthetic hand and

4  that they looked forward to seeing what Mr. Slaby could

5  do with his prosthesis.

6          To be sure -- the FBI had some concerns since

7  this was the first person with a prosthetic hand to

8  enter the academy, but the FBI's doctors noted those

9  concerns and prepared for them in the hopes that

10  Mr. Slaby would succeed.  And because they knew a

11  trainee with a prosthesis was going to be coming to

12  Quantico, the Training Division, in light of this new

13  situation they had not encountered before, held a

14  meeting to ensure that the academy was prepared to

15  address the reasonable accommodations that Mr. Slaby

16  might request.  In short, the FBI held a meeting to

17  make sure that it complied with the disability laws.

18          Mr. Slaby's attorneys may tout the fact that

19  he passed a functional capacity test in Milwaukee

20  before he entered the academy.  But when the plaintiff

21  shows you that an FBI doctor named Dr. Yoder declared

22  Mr. Slaby fit for duty, Dr. Yoder himself will tell you

23  that fit for duty does not mean that Mr. Slaby could

24  adequately perform the essential functions, but only

25  that there was a determination that he should have the

1   opportunity to demonstrate that he could perform these
2   essential tasks.  We will show you that once Mr. Slaby
3   arrived at Quantico, the academy made concerted efforts
4   to give him just that opportunity.

5          Now we'll move on to the second stage,
6   Quantico.  When we talk about Mr. Slaby's time at the
7   academy, you will hear testimony about different units
8   in the Training Division, and three in particular, the
9   Firearms Training Unit; the Physical Training Unit,
10  which includes defensive tactics; and the Practical
11  Applications Unit.

12         The Firearms Training Unit teaches new agent
13  trainees how to handle and shoot the various weapons
14  they may be required to use as a special agent.  The
15  defensive tactics part of the instruction teaches
16  trainees, among other things, how to defend themselves
17  when they need to and how to apprehend suspects who
18  might resist them.  The Practical Applications Unit
19  puts all of that other training together and includes
20  instructions on how to plan and execute raids and how
21  to search and clear rooms.

22         You will hear that a few days after Mr. Slaby
23  arrived at the FBI Academy, the Training Division gave
24  him the opportunity to watch and try out the essential
25  tasks that he would be expected to safely and

1    effectively perform before graduating from the academy
2    and becoming a special agent.
3           When you look at the documents describing the
4    assessment for yourselves, you will see clearly that
5    they are labeled safety assessments and preview of
6    skills.  And indeed, safety and the chance to preview
7    the essential skills are the very reasons the FBI gave
8    Mr. Slaby the opportunity to have these nonmandatory,
9    nongraded sessions.
10          Multiple witnesses will testify that
11   Mr. Slaby was given the rare advantage through this
12   preview of skills to look down the road and know weeks
13   ahead of time exactly what skills he would be required
14   to perform and to learn the proper techniques for how
15   to accomplish them.
16          You will also hear testimony that Mr. Slaby
17   was given the opportunity to suggest reasonable
18   accommodations and find alternative ways for
19   accomplishing such tasks if he could not perform them
20   in the traditional way due to his prothetic hand.  In
21   other words, he was given the opportunity to suggest
22   ways he might effectively perform some of the skills
23   differently than the standard way without jeopardizing
24   the safety of himself or others or altering the
25   fundamental point of that skill.

1          The evidence will show that Mr. Slaby

2    interacted extensively with the instructors during

3    these sessions to come up with several reasonable

4    accommodation requests, many of which were granted by

5    the Training Division because they were safe and did

6    not fundamentally alter the FBI's ability to carry out

7    its mission.

8          In addition to the opportunity to preview the

9    essential skills he would need to perform in class, the

10   other reason for these assessments, as shown by the

11   very titles of these documents, were so that the

12   instructors and management at Quantico could determine

13   whether Mr. Slaby posed a safety hazard to himself or

14   those around him when he was performing these tasks.

15   Safety is a critical part of the FBI's mission, and the

16   academy needed to know that Mr. Slaby could perform his

17   duties without unnecessarily endangering himself or

18   others.

19          You will hear testimony from Diana

20   Moyet-Treretola of the Training Division that at the

21   time these safety assessments occurred, Mr. Slaby was

22   actually relieved that the FBI had taken proactive

23   steps on his behalf.

24          And Ray Flannagan, an instructor who

25   administered some of the safety assessments, will

1  testify that Mr. Slaby was engaged in the process of

2  collaborating with the instructors on possible

3  reasonable accommodations.  And even though he could

4  not safely or effectively perform several of the skills

5  during this preview, even though Mr. Slaby himself

6  admitted that he was unable to fire a weapon with his

7  prosthetic hand, the FBI Training Division still gave

8  him the chance to continue through the program for

9  several more weeks until he reached the point in the

10 curriculum where he, along with all the other students,

11 was required to fire the weapon safely and effectively

12 with his left hand and could not do it.

13         Now, at that point, the FBI could simply have

14 brought Mr. Slaby in front of a panel for trainees who

15 could not meet the academy's requirements, the New

16 Agent Review Board or NARB for short, in order to

17 disqualify him from the training program altogether.

18 Instead, the FBI gave him the best opportunity it could

19 for future success by labeling Mr. Slaby's removal as a

20 medical recycle, which essentially gave him the chance

21 to come back to the academy if he could modify his

22 prosthesis enough that he could demonstrate that he was

23 able to safely and effectively perform the essential

24 tasks set out by the academy.

25         Rather than sending Mr. Slaby back to the

1  Milwaukee office during his medical recycle, which is

2  the standard practice because it was his originating

3  office, Mr. Slaby's class counselor, Melinda Casey,

4  will show you that the FBI allowed him to stay in this

5  local area so that he would have access to the best

6  prosthetics experts and the most state-of-the-art

7  prosthetics in the country.

8          Now, after a few weeks, you will hear that

9  Mr. Slaby attempted to return to the New Agents

10 Training Program with a modified prosthesis.  This new

11 prosthesis or modified prosthesis had what could be

12 called a trigger finger or a mechanical digit on it

13 which Mr. Slaby hoped would allow him to pull the

14 trigger of a firearm with his prosthetic hand.

15         Because Mr. Slaby wanted to come back to the

16 training program, he was required to demonstrate that

17 he would be able to safely and effectively shoot a

18 firearm with his nondominant hand because he had been

19 unable to do so with the earlier version of his

20 prosthesis.

21         So the Training Division administered the

22 safety assessments again, this time with an eye toward

23 letting him back into the program if he could be safe

24 and effective.  With this modified prothesis, Mr. Slaby

25 could technically pull the trigger of a firearm with

1  his prosthetic hand.  But as multiple witnesses and

2  common sense will tell you, the ability to pull the

3  trigger is not the same as the ability to safely and

4  effectively handle a weapon, which also includes the

5  capacity to transition the weapon from one hand to the

6  other and to pick up the gun with one hand in case the

7  other one becomes incapacitated.

8          The firearms instructors, who have the duty

9  to implement the FBI's firearm standards, determined

10  that Mr. Slaby could not safely and effectively handle

11  the firearm.

12          Mr. Slaby's modified trigger finger

13  prosthesis also presented safety issues to those around

14  him. Ray Flannagan and Diana Moyet-Treretola will both

15  testify that Mr. Slaby inadvertently scratched the face

16  of an instructor with his mechanical digit right near

17  the eye during a close-contact exercise.

18          You will also hear that Mr. Slaby, in the

19  course of demonstrating the skill of disarming someone,

20  got his prosthetic digit caught in the trigger area of

21  an unloaded gun he was trying to take from the person

22  playing the suspect.

23          Because Mr. Slaby could not demonstrate he

24  could safely and effectively perform the essential

25  tasks of shooting a firearm with his nondominant hand

1 and because the instructors determined other safety

2 issues with a trigger finger prosthesis, the FBI could

3 not violate its own standards and let him back into the

4 academy.

5         Now, again, at this point, the FBI could have

6 brought Mr. Slaby in front of NARB and disqualified

7 him.  But instead, they kept the door open for him to

8 return to the new agent program one day by keeping him

9 in medical recycle status.

10        And further, you will see documents and hear

11 testimony showing the FBI not only kept him on as an

12 employee but valued his skills and his dedication

13 enough to secure him a rewarding and challenging job

14 that he wanted, which is a professional nonagent

15 position with the Hostage Rescue Team in this local

16 area where he wanted to stay.  Mr. Slaby presently

17 still holds this position with the FBI's prestigious

18 Hostage Rescue Team.  Contrary to what plaintiff's

19 lawyers might represent, Mr. Slaby has not been chased

20 out by the FBI but remains a valued employee.

21        Most importantly, the FBI has ensured that

22 the door is still open to Mr. Slaby being able to

23 return to the academy and trying to become an agent if

24 technology evolves to the point that he can safely

25 perform the special agent essential tasks and, in doing

1   so, be able to effectively carry out the FBI's mission.

2           Now, the other side, as you may have noticed

3   in their opening, plans to shower you with a lot of

4   documents and get testimony from witnesses on topics

5   which may make you scratch your head as to what they

6   could possibly have to do with this case.  They may

7   show you a list with the phrase essential tasks across

8   the top which has a bunch of tasks listed on it and

9   then point to the fact that nondominant shooting is not

10  specifically mentioned on that list.

11          But our witnesses will show you that this

12  list is not an FBI training document and that it is the

13  FBI's Training Division who holds the responsibility

14  for determining what standards new agent trainees must

15  meet in order to graduate and fulfill their duties as

16  agents.  The evidence will show you that

17  nondominant-hand shooting was encompassed on the skills

18  listed on that list of essential tasks.

19          They may also show you that a couple of

20  special agents with injured hands were not required to

21  shoot with those hands during some periodic firearms

22  qualification.  We will show you that those agents,

23  unlike Mr. Slaby, are long-term, active special agents,

24  not a trainee.  And that unlike Mr. Slaby, they did not

25  have prosthetic hands and could use their injured

1    hands.   You will see these agents testify that they can

2    and have demonstrated that they can actually shoot

3    effectively with those injured hands alone.

4              Plaintiff's lawyers may also show you a few

5    instances, like Mr. Griffin mentioned, where agents,

6    while holding weapons in their nondominant hands

7    accidentally discharged those weapons.   But what you

8    will hear is that the overwhelming majority of

9    accidental discharges happen when the weapon is in the

10   agent's dominant hand, not the nondominant hand.

11             So through all the witnesses, all of the

12   documents, all of the various issues raised by the

13   parties, I ask you to just remember these three things:

14   One, the FBI wanted Justin Slaby to succeed; two,

15   Mr. Slaby could not meet the standards set out by the

16   FBI Academy, the same standards that every single other

17   new agent trainee has to meet; and three, the FBI's

18   duty, its mission as the nation's premier law

19   enforcement agency, is to protect the United States and

20   the people who live here.   The FBI would not be

21   fulfilling its duty to the citizens of this country if

22   it were to ignore its own standards and allow anyone to

23   become a special agent who cannot perform all of the

24   essential tasks of that position for any reason.

25             This case is not about the fact that

1    Mr. Slaby is disabled, but rather about the fact that

2    he could not meet the standards that every single

3    trainee must meet in order to become an FBI special

4    agent.

5              Thank you for your service.

6              THE COURT:  Thank you, Ms. Bae.

7              Plaintiff will call its first witness.

8              MR. GRIFFIN:  Your Honor, our first witness

9    will be Dr. Jim Yoder.

10             THE COURT:  Dr. Yoder, please come forward.

11             MR. GRIFFIN:  I think the parties have agreed

12   to invoke the rule as well, Your Honor.

13             THE COURT:  All right.  Are there any

14   witnesses in the courtroom?

15        (No response.)

16             THE COURT:  The parties will instruct their

17   respective witnesses to remain outside of the courtroom

18   and to not discuss their testimony before or after

19   their testimony with any other witness in the case.

20             MS. BUTLER:  Your Honor, could we approach

21   for just a second?

22             THE COURT:  Yes.

23        (Conference at the bench, as follows:)

24             MS. BUTLER:  Your Honor, we had an agreement

25   that Jennifer Slaby says she's only going to talk about

Yoder - Direct

1  his mental suffering to be excluded from the rule.  So

2  there is going to be one witness --

3           THE COURT:  No objection?

4           MR. MIKOLASHEK:  No, Your Honor.

5           THE COURT:  Okay.  That's fine.

6           MR. MIKOLASHEK:  Thank you, Your Honor.

7      (Proceedings continued in open court, as follows:)

8           MR. GRIFFIN:  All right to get started, Your

9  Honor?

10          THE COURT:  Please.

11          MR. GRIFFIN:  Great.

12      JAMES YODER, PLAINTIFF'S WITNESS, AFFIRMED

13               DIRECT EXAMINATION

14 BY MR. GRIFFIN:

15 Q    Dr. Yoder, would you please introduce yourself.

16 A    My name is James Yoder.  I'm a medical officer at

17 FBI headquarters.

18 Q    All right.  And, Dr. Yoder, you and I have met on

19 several occasions in the past and have been able to

20 communicate effectively, I think.  Have we not?

21 A    If you say so.

22 Q    Thank you for that.  I appreciate that.

23      Tell the jury, if you would, how many years you

24 have been a medical officer with the FBI.

25 A    Almost 15.

Yoder - Direct

1  Q     All right.  And would you mind sharing with the

2  ladies and gentlemen of the jury your description of

3  the FBI's application process.

4  A     For special agents?

5  Q     Yes, sir.

6  A     The applicants go through a selection process that

7  is involved with interviews and various tests and a fit

8  test to make sure they are physically capable of

9  performing essential duties and the final -- when they

10  receive what's called a conditional job offer, then

11  they are set up to do a fitness-for-duty examination,

12  which is where we take part in the process.

13      And so we review their ability to meet hearing and

14  vision and other aspects of the minimum capabilities

15  that we think are required to perform the essential

16  duties, and then we would give them medical

17  qualification determination.  Then they would have a

18  class date set up.

19  Q    Great.  Let's talk first about the application

20  process.  Because as I understand it, the FBI does not

21  extend a conditional offer to an individual until it

22  has already gone through an application process that

23  takes months and sometimes years.

24  A    I believe that's correct, yes.

25  Q    Okay.  And after the FBI decides whether or not

Yoder - Direct

1  they will offer a person a conditional offer, they will

2  send a letter --

3          MR. GRIFFIN:  And if it's all right, Your

4  Honor, is the practice for this gentleman to have the

5  exhibits near him so that he can examine them?

6          THE COURT:  Yes.

7          MR. GRIFFIN:  Then at this point, I'll ask

8  him to make available the volume with the first parts

9  of Exhibits 1 through whatever they are, and then we'll

10  go through the application process.

11  BY MR. GRIFFIN:

12  Q    Doctor, let me start it this way:  After the

13  months or years that the FBI takes to decide whether to

14  make an offer to a person, at the conclusion of that

15  process, does the FBI send a letter which is called a

16  conditional offer?

17  A    Yes, that's correct.

18  Q    All right.  And if you don't mind looking at

19  Exhibit 4, I'll ask if you can identify that as the

20  conditional offer that was extended to Justin Slaby on

21  March 9, 2010.

22  A    Looks like it is, yes, March 8, 2010.

23  Q    Okay.  And in other words, this is not the letter

24  that actually hires someone as a special agent.  This

25  is just the letter that gives them a conditional offer,

Yoder - Direct

1  if I'm right.

2  A    That's right.   It is contingent on them passing

3  their physical examination.

4  Q    Sure.   Exactly.   And you read my mind.   So thank

5  you for that.

6      The conditional offer is contingent on them

7  passing their fitness-for-duty examination and their

8  background examination; is that right?

9  A    Correct.

10 Q    Okay.   And your life over the last 15 years has

11 been part of the fitness-for-duty examination process

12 for the FBI?

13 A    Yes.

14 Q    Okay.   Would you characterize the FBI's selection

15 process as one that's thorough and arduous?

16 A    I believe it is good, yes.

17 Q    Okay.   Great.

18      Let me ask you this:   In terms of the

19 fitness-for-duty process, does this take place only

20 after a person has received a conditional offer as a

21 special agent?

22 A    Yes.   The exam is scheduled after they receive

23 that letter.

24 Q    All right.   And if you don't mind looking at

25 Exhibit Number 9, page 3, I'm going to ask you a little

Yoder - Direct

1  bit about the fitness-for-duty process that you go

2  through before you make the decision to declare a

3  person as qualified for the job, if that's all right

4  with you.  So let me know when you are at Plaintiff's

5  Exhibit Number 9.

6  A    The page says fitness-for-duty examinations.

7  Q    Great.  And Exhibit 9, for the ladies and

8  gentlemen of the jury, is this the official FBI

9  fitness-for-duty policy implementation guide?

10 A    It is.

11 Q    So if you don't mind going with me to page 5.

12         MR. GRIFFIN:  We have got page 5 up; do we

13 not?

14 BY MR. GRIFFIN:

15 Q    Let me just ask you this:  Does page 5 determine

16 how thorough the fitness-for-duty process is at the

17 FBI?

18 A    It tells what positions require it and how it is

19 performed, yes.

20 Q    Sure.

21         MR. GRIFFIN:  And if we don't mind, if you

22 are able, Mike, to zoom in on the second to the last

23 paragraph of the exhibit on page 5 to share what

24 happens at the FBI.  And if you can, zoom in just a

25 little more.  That would be great.  There we go.

Yoder - Direct

1  Great.

2  BY MR. GRIFFIN:

3  Q    And, Dr. Yoder, is it true that the

4  fitness-for-duty process has multilevel reviews by

5  nurses, physicians, and health care program managers,

6  and each applicant's medical history will be reviewed

7  on a case-by-case basis as it pertains to the essential

8  job functions of the position for which the person is

9  being considered?

10 A    Yes.

11 Q    Okay.  And the purpose of the fitness-for-duty

12 process is to make sure on a case-by-case basis that

13 the person is able to perform the essential functions

14 of the job; is that right?

15        MR. KIM:  Objection, leading.

16        THE COURT:  All right.  I'm going to sustain

17 the objection absent some requested finding by the

18 Court.

19        MR. GRIFFIN:  I beg -- I couldn't hear you.

20        THE COURT:  Absent some requested finding by

21 the Court, I'm going to sustain the objection.

22        MR. GRIFFIN:  Your Honor, I'll ask permission

23 to lead the witness as an adverse witness.

24        THE COURT:  All right.  He is currently an

25 employee of the FBI?

Yoder - Direct

1           MR. GRIFFIN:  He is, Your Honor.

2           THE COURT:  All right.  I'll permit you some

3    latitude.

4           MR. GRIFFIN:  Thank you.

5    BY MR. GRIFFIN:

6    Q    I'm just asking:  Is this true in the policy

7    implementation guide that the purpose of this is to

8    review each person as it pertains to their ability to

9    perform the essential functions of the job?

10   A    Yes.

11   Q    Okay.  And in your review -- you review thousands

12   and thousands of applicants and special agents every

13   year for the special agent's position; do you not?

14   A    On a typical year, it would vary but anywhere from

15   700 to 2,000 would be the estimate depending upon a

16   hiring year.

17   Q    So 700 to 2,000 a year?

18   A    Yes.

19   Q    Okay.  And that includes both applicants and

20   incumbents?

21   A    That would just be applicants.  It depends on how

22   many are hired.  If we hire 700 agents, it would be

23   twice that number, probably, exams that we would do.

24   Q    Wow.  For the ladies and gentlemen of the jury,

25   for either case, whether it's an incumbent or an

Yoder - Direct

1  applicant, your job is to make sure when you are doing

2  a fitness-for-duty examination that the person is able

3  to perform the essential functions of the job?

4  A    To the extent that an exam will do that, yes.

5  Q    Yes.  In other words, that's what it says in terms

6  of why you're doing it; it's to make sure that they can

7  perform the essential functions of the job?

8  A    That's correct.

9  Q    Okay.  And if we look at page 3, if we might.

10 Page 3, does it describe a visual representation of the

11 fitness-for-duty process at the FBI?

12 A    It mainly shows the positions that require it.

13 Q    All right.  And at the FBI, the department that

14 makes a decision in terms of qualified or not or fit or

15 not is the HCPU of the HRD; am I right?

16 A    That's correct.

17 Q    Okay.  And for the ladies and gentlemen of the

18 jury, the HCPU is the Health Care Programs Unit?

19 A    Correct.

20 Q    And that's part of the Human Resources Division,

21 the HRD?

22 A    It is.

23 Q    All right.  Good.

24      And so even though you gather information from

25 lots of different sources, the decision that's made

1   about whether a person is qualified and able to perform

2   the essential functions is a decision that's made by

3   the HCPU and you and your colleagues?

4   A     That's correct.

5   Q     Okay.  Great.

6         Let me ask you this:  Describe whether or not you

7   feel that those decisions in terms of deciding who is

8   fit for duty and qualified and those who are not, how

9   seriously do you take that obligation in terms of

10  making that determination of whether they're fit and

11  qualified or not fit and rejected?

12  A     Well, there are several levels in which we

13  would -- most people, over 90 percent, we may need

14  additional information.  But normally, they're

15  qualified at first look.  They may need new glasses or

16  something of that nature or additional information on

17  an illness or injury in the past.

18        There are a number that we would call a gray zone

19  area in which we believe there's an increased risk, but

20  it is not sufficient to deny them an opportunity to go

21  on to a training environment.  Those get written up

22  usually by me and approved by the chief medical

23  officer.

24        And then there's a small number, usually 2 to

25  4 percent, which we believe the risk is significant,

Yoder - Direct

1    and those would be recommended for denial and

2    discontinuation of the applicant process.

3    Q    Sure.  And we'll get to this in a moment.

4         But in this case, in your determination of Justin

5    Slaby, you declared him fit for duty and not a direct

6    threat under the risk assessment you just described; am

7    I right?

8              MR. KIM:  Objection, Your Honor, leading.

9              THE COURT:  Overruled.

10   A    He was what we'd call one of those gray zone cases

11   recognizing that there was an increased risk, but it

12   wasn't sufficient to deny him an opportunity to move

13   forward to train.

14   Q    So he was declared fit for duty?

15   A    He was.

16   Q    Because he was not in that 2 to 4 percent risk

17   that you just described?

18   A    That's correct.

19   Q    Okay.  Great.

20        Do you know anybody but you at the FBI who has

21   ever made an analysis of the relative risk of letting

22   Justin Slaby graduate from the academy?

23   A    I'm not sure I understand your question.

24   Q    Maybe it wasn't a good one, and I apologize.

25        Has anybody else but you at the FBI ever done any

Yoder - Direct

1  kind of risk assessment on Justin Slaby?

2  A    I don't imagine so.  I think Dr. Wade, the chief

3  medical officer, would have participated on that, but

4  he's mainly signing off on my logic and conclusion.

5  Q    Sure.  In other words, Dr. Wade approved of the

6  fitness-for-duty determination that you made that

7  allowed Justin to actually be appointed as a special

8  agent, right?

9  A    Correct.

10 Q    Okay. Fair enough.

11      In terms of the fitness-for-duty examination,

12 describe the amount of information you gather in order

13 to make that decision.

14 A    It is what most people would know as a typical

15 physical examination with additional areas of vision,

16 color vision, pulmonary function, chest X-ray,

17 electrocardiogram.  And if there are special needs for

18 issues that need to be resolved, we'd go back to the

19 person's own specialist or physician to answer some of

20 those questions about stability of a condition.  But it

21 is fairly thorough, yes.

22 Q    Good.

23      Let me ask you:  Is Exhibit Number 5 part of the

24 fitness-for-duty file that you generated as part of

25 your work in declaring that Justin Slaby was fit for

Yoder - Direct

1  duty?

2  A    Yes, it is.

3  Q    Okay.  Great.

4       And for the ladies and gentlemen of the jury, you

5  gathered not only medical information but you gathered

6  functional information about his abilities; did you

7  not?

8  A    We did.

9  Q    Okay.  And if I understand the fitness-for-duty

10  process, when a person has a potentially limiting

11  condition that might or might not interfere with their

12  ability to do the job, you, as a thorough examiner, dig

13  deeper than on a person who doesn't have a potentially

14  limiting condition like diabetes or hand injuries or

15  seizure disorders; am I right?

16            MR. KIM:  Objection, compound, Your Honor.

17            THE COURT:  Overruled.

18  A    Yes.

19  Q    Okay.  In other words, when somebody -- for

20  Justin, for example -- we'll cut to the chase for him

21  in a minute.  But just because of the fact that he had

22  a prosthetic left hand, you dug deeper to verify his

23  ability in his case; did you not?

24  A    Yes.

25  Q    Okay.  Great.  We'll talk about it in a minute.

Yoder - Direct

1       But the first page of the exhibit is actually part

2  of the report by the rehabilitation counselor that

3  determined that Justin's functional assessment was that

4  he could perform the essential functions of the job,

5  right?

6              MR. KIM:  Objection, Your Honor.  It calls

7  for a legal conclusion.

8              THE COURT:  Overruled.  That's, in fact, what

9  he decided.

10  A     Yes.

11  Q     Okay.  Great.

12             THE COURT:  Mr. Griffin, we're going to take

13  our afternoon break at this time.

14             Ladies and gentlemen, we'll take our

15  afternoon recess at this time.  We'll reconvene at

16  4:05.  During the recess, please do not discuss your

17  testimony among yourselves or the case among

18  yourselves.

19             You're excused to the jury room.

20        (The jury exits at 3:48 p.m.)

21             THE COURT:  All right.  Will counsel come to

22  bench, please.

23        (Conference at the bench, as follows:)

24             THE COURT:  Mr. Griffin, I want you to stop

25  reacting to the answers.  Almost every answer you

Yoder - Direct

1  either react with great, okay, wow.  I just want all of

2  that out.  So don't react to the answer.  Just ask your

3  next question.  All right?  I know it's habit.

4          MR. GRIFFIN:  It is habit.

5          THE COURT:  It is habit, but try to be more

6  disciplined about it.

7          MR. GRIFFIN:  I will try to be more

8  disciplined.  I have people to come elbow me if it

9  happens again.  I appreciate Your Honor sharing that

10  with me outside the presence of the jury.

11          THE COURT:  All right.  Did you want to make

12  any other -- do you want to elaborate on any objection

13  to the Court's allowing him to lead an adverse witness?

14          MR. KIM:  Yes, Your Honor.  Dr. Yoder is not,

15  I believe, accused of any discriminatory animus.  He is

16  simply an employee of the FBI as are many of these --

17  as are 90 percent of the witnesses.  We don't think

18  that they've established any adversity between them,

19  and so I don't think that he should be allowed to be

20  treated as an adverse witness.

21          THE COURT:  I'm going to give you some

22  leeway.  I would try to really make your -- to the

23  extent you're going to lead, make them very succinct.

24          MR. GRIFFIN:  Shorter questions you mean?

25          THE COURT:  Shorter.

Yoder - Direct

1              MR. GRIFFIN:  Okay.  Fair enough.

2              THE COURT:  All right.  I may require you to

3    ask not nonleading questions at some point depending on

4    what the subject matter is.

5              MR. GRIFFIN:  I think he'll become more

6    adverse as we go forward, but thank you, Your Honor.

7              THE COURT:  All right.  We'll stand in

8    recess.

9         (Recess from 3:50 p.m. until 4:06 p.m.)

10         (The jury is not present.)

11              THE COURT:  Ready to proceed?

12              MR. GRIFFIN:  Yes, Your Honor.

13              THE COURT:  All right.  Dr. Yoder.

14              All right.  Let's bring the jury in.

15         (The jury enters at 4:07 p.m.)

16              THE COURT:  Please be seated.

17              You may proceed, Mr. Griffin.

18              Dr. Yoder, you remain under oath.

19              THE WITNESS:  Yes, sir.

20    BY MR. GRIFFIN:

21    Q    Dr. Yoder, do you mind sharing with the jury what

22    the results can be of a fitness-for-duty examination

23    once your office completes that analysis?

24    A    What are results?

25    Q    What are the different kinds of results that

Yoder - Direct

1  happen, they pass, they don't pass, what happens.  I'm

2  asking you --

3          THE COURT:  What are the possible outcomes?

4          MR. GRIFFIN:  Well, thank you, Your Honor.

5  Bless you for that.  Bless the Court for that.

6  A    Yes.  As mentioned earlier, there are 90 plus

7  percent that will pass without additional concerns

8  about their risk profile, which is what we're most

9  concerned about, the operational safety risk.  There

10  are those which we write up recognizing some increased

11  risk but believe that it is not sufficient to deny them

12  the opportunity to train.  Then there are 2 to 3 to

13  4 percent per year who we believe exceed that safety

14  margin and should be discontinued for whatever reason.

15  Q    Okay.  So if I understand the outcomes, they

16  can -- as I hear what you're saying, most of the

17  outcomes are that the people pass the fitness-for-duty

18  exam?

19  A    That's correct.

20  Q    And there is a small percentage who do not pass?

21  A    That's correct.

22  Q    For agents who don't pass, they are removed from

23  the position of special agent?

24  A    They are.

25  Q    Okay.  And the applicants who are applying for the

Yoder - Direct

1  jobs, the ones they don't pass, they are discontinued

2  in processing and their conditional offer revoked?

3  A    The ones that don't pass?

4  Q    Yes, sir.

5  A    Yes.

6  Q    Okay.  Great.

7      Can you please share with the jury what Exhibit 5

8  is.

9  A    Exhibit 5 looks like the medical package that was

10  reviewed for Applicant Slaby.

11  Q    Okay.  Great.

12      If we could look at the second page.  The jury

13  will hear about this, but I just want to get you to

14  tell us:  What is the second page of Exhibit 5, the

15  fitness-for-duty file for Justin Slaby?

16  A    That's the special agent essential tasks list.

17  Q    Okay.  You are well familiar with the special

18  agent essential tasks list that had been developed by

19  the FBI for the special agent position?

20  A    Yes.

21  Q    Okay.  And this list of the essential functions of

22  the special agents jobs, do you disseminate that to

23  physicians who actually help you with your

24  fitness-for-duty examinations?

25  A    We do.

Yoder - Direct

1  Q     All right.  Has this list changed in any way since

2  the date that you declared Justin Slaby fit for duty?

3  A     No, it has not.

4  Q     Okay.  At any point in time has there been any

5  effort that you know of to add to this list any tasks

6  that require the use of the weak or nondominant hand?

7  A     No.

8  Q     Okay.  Now, in your fitness-for-duty examination,

9  I'm going to ask you whether or not this information

10 was received and reviewed by you, that you knew in the

11 fitness-for-duty examination that Mr. Slaby had been an

12 Army Ranger.  Is that right?

13 A     It sounds right, yes.

14 Q     And that he had served tours in Iraq and

15 Afghanistan?

16 A     I don't remember specifically, but yes, he had a

17 military record to some distinction, yes.

18 Q     Right.  And you understood that he had had a

19 grenade accident -- or faulty grenade explode in his

20 left nondominant hand?

21            MR. KIM:  Objection, Your Honor, hearsay.

22            THE COURT:  Overruled.  It is based on what

23 information he was provided.

24 A     The writeup and his quote was in there.  He was

25 prepping a stun grenade when it went off in his hand,

Yoder - Direct

1  yes.

2  Q    In other words, that's part of the

3  fitness-for-duty file that you gathered to understand

4  what happened to his left hand?

5  A    Correct.

6  Q    The left hand in Mr. Slaby's case is his weak

7  hand, not his strong hand; is that right?

8  A    I believe that's right.

9  Q    And share with the jury how Justin had compensated

10 for the injury to his left nondominant hand.

11 A    The VA, the Veterans Administration, had fit him

12 with a number of protheses to try to return his

13 function to as close to normal as could be with a

14 prothesis.

15 Q    Okay.  At the end of the day, with his

16 state-of-the-art prosthetic left hand, he compensated

17 for this injury to the extent of a fitness-for-duty

18 finding by your office?

19 A    That's correct.

20 Q    And when you were doing your analysis, did you

21 actually have information and photographs of the

22 prosthetic devices that Mr. Slaby uses himself?

23 A    Yes, we did.

24 Q    Was your goal, in making this decision of whether

25 or not he would be declared fit for duty, to base it on

Yoder - Direct

1   his actual ability to perform the essential functions

2   of the job?

3   A    What we try to do is make sure that they meet the

4   minimum physical abilities to perform the essential

5   duties, yes.

6   Q    And the essential duties you're referring to are

7   the special agent essential tasks that we referred to a

8   moment ago?

9   A    Yes.

10  Q    This is the only version of any task list that the

11  FBI has ever given you for assessing whether an agent

12  is qualified to perform the job of special agent,

13  right?

14  A    This is the one we developed, yes.

15  Q    And it is the only one?

16  A    It is.

17  Q    Okay.  In connection with your fitness-for-duty

18  evaluations, Dr. Yoder, do you review fitness-for-duty

19  packages for special agents and applicants with

20  disabilities?

21  A    Yes.

22  Q    And in connection with fitness-for-duty

23  examinations, are you asked occasionally to discuss the

24  area of accommodations that would allow successful

25  performance of the job?

Yoder - Direct

1  A    Yes.  That's a whole program in and of itself, a

2  reasonable accommodation process.

3  Q    Right.  In other words, you were assessing special

4  agents with not only hand issues but people with

5  diabetes, cardiovascular issues, seizure disorders, and

6  things like that.  Am I right?

7  A    Yes.

8  Q    When it comes to accommodations, I'd like you to

9  share with the jury, if you would, whether you ever

10 believed that Mr. Slaby needed any accommodations in

11 order to perform the essential functions of the special

12 agent position.

13 A    Well, our conclusion was that he deserved an

14 opportunity to demonstrate his capability in training,

15 yes.  He was passed.

16 Q    Let me object respectfully as not responsive.

17      I know you did that, but my question was did you

18 identify any accommodations that he would need to be

19 able to perform the essential functions of the job.

20 A    No.  Just his prostheses that he already had.

21 Q    And during that process, did Mr. Slaby or Justin

22 ever ask you or tell you that he needed any

23 accommodations to perform the special agent task list?

24 A    No.

25 Q    Okay.  So if I understand it, he was declared fit

Yoder - Direct

1  for duty without the need of any accommodations?

2  A    Correct.

3  Q    Now, if you don't mind looking through the PX5 a

4  little bit further.  Further on in, in addition to the

5  247 essential functions that are listed, if we go to

6  page -- let me make sure I have my pages -- page 125 of

7  the exhibit in the bottom right-hand corner -- he's

8  found it.  Great.  Great.  Great.

9  A    Okay.

10 Q    I'd like, if you don't mind, Dr. Yoder, to share

11 with the ladies and gentlemen of the jury what this

12 form is.

13 A    It's entitled New Agent Physical Activities and

14 asks the treating -- or rather not the treating, the

15 examining physician who we would contract with to go

16 through the examination findings and determine whether

17 there's any problem that they would see in performing

18 these critical duties of the training situation.

19 Q    And on this form, it appears -- well, let me ask

20 you:  Which physician actually signed this form and

21 answered the questions?

22 A    I did.

23 Q    Okay.  You did that when, Dr. Yoder?

24 A    July 26, 2010.

25 Q    And my mind is a little faded.  At the bottom,

Yoder - Direct

1    underneath your signature -- but if I'm reading your

2    handwriting, did you say based upon fitness-for-duty

3    exam and functional capacity evaluation performed

4    5-10-10 that Justin Slaby was fit for duty?

5    A    Correct.

6    Q    Okay.  And in terms of the activities that are

7    listed there, are they divided into subject matters of

8    actual physical activities that you are evaluating

9    whether or not Justin can do?

10   A    Yes.  These are critical arrest techniques.

11   Q    And if we start with number 1, it talks about

12   takedowns; does it not?

13   A    Yes.

14   Q    And section 2 talks about personal weapons

15   attacks; am I right?

16   A    Yes.

17   Q    And the third section deals with officer survival

18   techniques, right?

19   A    Correct.

20   Q    And if you don't mind sharing with the ladies and

21   gentlemen of the jury, when you certified that Justin

22   was able to perform a carotid restraint, what does that

23   mean?

24   A    That's a type of hold around the neck, but we

25   wouldn't actually measure that.  We would just say

Yoder - Direct

1   there's no evidence that would interfere with the

2   person being able to do that.

3   Q    And the next section is handcuffing?

4   A    Correct.

5   Q    We move to -- jump ahead to number 7.  It contains

6   the elements of climbing and vaulting, jumping from

7   high obstacles, and net rope climbing.  Do you see

8   that, sir?

9   A    Yes.

10  Q    As I read it here, you have certified that Justin

11  was qualified and able to perform those three as well,

12  right?

13  A    He was medically qualified, yes.

14  Q    Right.  Where the form asks yes or no, you have

15  answered yes?

16  A    Yes.

17  Q    And that was truthful?

18  A    Correct.

19  Q    And when it asks about number 8, Yellow Brick

20  Road, what is that, Dr. Yoder?

21  A    As it says below, a 7.2 mile run which includes

22  various obstacles along the path, rope climbs,

23  obstacles, natural and manmade.

24  Q    Finally, we get to the bottom, number 9, the

25  section is firearms; is that right?

Yoder - Direct

1  A    Yes.

2  Q    In firearms, the description here -- well, let me

3  ask you:  Is the description taken a paraphrase of the

4  essential tasks list that actually deals with firearms,

5  the 247?

6  A    It should be equivalent to that, yes.

7  Q    As I understand it, when I ask you where this came

8  from, you thought that it came from the Training

9  Division, if I'm right.

10 A    Yes.  All the firearms information would tend to

11 be verified by the Firearms Training Unit.

12 Q    Right.  The information in this form -- when I

13 asked you about -- let me just ask you:  The

14 information that's in this form that was asked about

15 was developed from information you got from the

16 Training Division?

17 A    I believe so.

18 Q    Right.  Let me just jump ahead.  Is it true, sir,

19 Dr. Yoder, that you first heard of the trainer's claim

20 that left-hand shooting was an essential function of

21 the special agent job only after the Training Division

22 had removed Mr. Slaby?

23 A    Yes.  It had not come up to me before that time,

24 no.

25 Q    In other words, you learned of their claim for the

Yoder - Direct

1    first time about this weak-hand shooting only in

2    connection with Mr. Slaby; is that right?

3              MR. KIM:  Objection, asked and answered.

4              THE COURT:  Overruled.

5    A    To my knowledge, yes.

6    Q    Now, let's look at Plaintiff's Exhibit 1 if you

7    don't mind.  Let me know, Dr. Yoder, when you're there.

8    A    Yes.

9    Q    If we look at this, are the special agent

10   essential functions listed from 1 to number 247?

11   A    Correct.

12   Q    Are they grouped in subjects?

13   A    They are.

14   Q    How detailed would you say this list is in terms

15   of the subject matter that's covered here?

16   A    It's intended to be as thorough as possible.

17   Q    And is it -- in terms of the subject matter, for

18   example, does it have a separate subject matter for

19   climbing?

20   A    For -- what was the question?

21   Q    Climbing.

22   A    Yes.

23   Q    And are there -- let me count them.  Are there

24   approximately ten of the essential tasks list on

25   page -- Bates 10 that deal with the subject of

Yoder - Direct

1  firearms?

2  A    About 13 it looks like.

3  Q    Okay.  And at any point in time in the 15 years

4  you've been at the agency have trainers ever complained

5  in any way that none of these essential functions have

6  anything to do with shooting a weapon with the weak

7  hand?

8  A    It has not come up to me.

9  Q    And you have in terms of the fitness-for-duty

10 examinations -- we are going to talk about these in a

11 moment, but you have reviewed fitness-for-duty

12 examinations of other people who have had hand

13 injuries; have you not?

14 A    Yes.

15 Q    And in terms of Exhibit 1, is this still the

16 official FBI list of essential functions?

17 A    It is.

18 Q    There's no other list?

19 A    We're developing a new one, but it is not yet

20 finished.

21 Q    And you have no criticism of this list?

22 A    No.

23 Q    It's the list you use for determining fitness for

24 duty, right?

25 A    Correct.

Yoder - Direct

1  Q    And, Dr. Yoder, is it true that the trainers

2  themselves participated in the study that published

3  this list of essential functions?

4  A    I'm sure they did, yes.

5  Q    And those folks, the trainers, had the opportunity

6  of giving input to tasks that they felt were important,

7  right?

8  A    They were required to give input, yes.

9  Q    And in connection with left-hand shooting, to your

10 knowledge, the trainers never asked that anything

11 having to do with left-hand shooting be included in the

12 official essential functions of the FBI position?

13 A    This is the list.

14 Q    Now, turning to -- back to the fitness-for-duty

15 packet that you had for Justin, Exhibit 5, when you

16 conducted this fitness-for-duty examination on

17 Mr. Slaby --

18           MR. KIM:  Objection, Your Honor.

19           THE COURT:  Yes.

20           MR. KIM:  May we approach?

21           THE COURT:  Yes.

22      (Conference at the bench, as follows:)

23           THE COURT:  Yes.

24           MR. KIM:  Your Honor, they just published to

25 the jury a document that was not in evidence.

Yoder - Direct

1          THE COURT:  What was it?

2          MR. GRIFFIN:  I didn't see it.  I didn't

3 know --

4          MR. KIM:  It was a picture of Mr. Kolbye's

5 hand.  It was one that we specifically were very

6 concerned about the jury seeing.  It is basically a

7 graphic picture of a hand that had exploded.

8          THE COURT:  I missed it.

9          MR. GRIFFIN:  I missed it too, and I'm not --

10          MS. BUTLER:  It was a mistake.  It did come

11 up.  He was trying to find another exhibit.  He brought

12 it up.

13          MR. GRIFFIN:  We don't object if Your Honor

14 says for them to disregard whatever was on the screen.

15 I didn't see it.

16          THE COURT:  Let's not let it happen again.

17          MS. BUTLER:  Yes, Your Honor.

18          MR. GRIFFIN:  Thank you, Your Honor.  I'm

19 trying to do better.

20     (Proceedings continued in open court, as follows:)

21          THE COURT:  Ladies and gentlemen of the jury,

22 I'm advised that there may have been published briefly

23 on your screen an image that's not in evidence.  You

24 are to disregard whatever you saw.

25          Yes.

Yoder - Direct

1      MR. GRIFFIN:   Thank you, Your Honor.

2  BY MR. GRIFFIN:

3  Q     And, Dr. Yoder, I've been told sometimes I

4  paraphrase left-hand for weak-hand shooting.   So if you

5  notice me using left hand instead of weak hand because

6  I'm right-handed, you can correct me or know that I'm

7  talking about weak-hand shooting if I ever put out my

8  left hand and say left-hand shooting.   Is that okay

9  with you?

10 A     Okay.

11 Q     Now, where I was going before we had our break,

12 Dr. Yoder, when you were conducting the

13 fitness-for-duty examination, you had the Training

14 Division's training materials, correct?

15 A     I'm not sure what you mean.

16 Q     Well, let me just ask you straightaway:   Did you

17 have the Training Division's training materials when

18 you conducted the fitness-for-duty examination for

19 Justin Slaby?

20 A     I'm not sure what materials you're speaking of.

21 We had the essential tasks list, which is what we

22 normally use.

23 Q     Let me ask it in this way:   Do you have the

24 training materials available to you if you want to see

25 the kinds of things that the trainers want them to do,

Yoder - Direct

1  that the trainers are going to want them to do when

2  they're at Quantico?

3  A    We would normally leave that up to the Training

4  Division, the Firearms Training Unit.  I wouldn't ask

5  for it normally.

6  Q    Dr. Yoder, do you mind looking at your deposition

7  that's before you at page 70, line 20?  Let me know

8  when you're ready, Dr. Yoder.

9  A    I am.

10 Q    Does this refresh your memory about the fact that

11 you had the training materials available to you if you

12 want to see what the trainers are going to want them to

13 do at Quantico?

14 A    If I had requested it, yes.

15 Q    In other words, it's available to you?

16 A    Yes.  It would be if I'd ask for it, correct.

17 Q    All right.  In Justin's case, there was no issue

18 presented to you that asked you to have the Training

19 Division send you anything; is that right?

20 A    Well, I wouldn't know what to do with the material

21 in detail because it's very meticulous about how they

22 want them to use firearms.  That's why we don't get

23 involved in that part.  But I could have asked for it

24 if I wanted it, yes.

25 Q    But what I'm trying to establish, I just want to

Yoder - Direct

1  make sure the jury -- you didn't feel the need to ask

2  the trainers for anything during your fitness-for-duty

3  examination of Justin Slaby?

4  A    No.   That was not my role.

5  Q    Right.   You had enough information to make the

6  decision to declare him fit for duty as a special

7  agent?

8  A    I had enough.

9  Q    So if you don't mind, take a look at Exhibit

10  Number 3.

11  A    Okay.

12  Q    And if you don't mind -- and Mike may be able to

13  publish this to the jury so that they can see it as

14  well.   But is what we're looking at in this letter of

15  December 9 --

16         MR. GRIFFIN:   And if we can zoom into the

17  first paragraph or the first couple of paragraphs.

18  BY MR. GRIFFIN:

19  Q    Dr. Yoder, is this the actual appointment letter

20  that an applicant gets hiring them as a special agent

21  following the fitness-for-duty certification?

22  A    It does look like that, yes.

23  Q    All right.   In other words, they enter as a

24  special agent, grade GL-10, step 1?

25  A    Correct.

Yoder - Direct

1  Q    All right.  And as I understand it, when they are

2  hired as a special agent, they have two contingencies

3  that they have to satisfy.  Is that right?

4  A    Actually, it's three.  It is background

5  investigation, fit test, and physical examination.

6  Q    Yes, exactly.  Okay.  Thank you.

7       My next question is in order to get to Quantico,

8  they have to pass these contingencies?

9  A    Correct.

10 Q    So Justin did that?  These contingencies were met?

11 A    He did.

12 Q    And in terms of the due diligence that's done by

13 the fitness-for-duty folks, how many people are there

14 in the Health Care Programs Unit that participate in

15 the process for making a decision whether a person is

16 fit for duty as a special agent?

17 A    It would normally go to the nurse that covers the

18 office, the nurse that is in our office that reviews

19 the results of the test, myself, and then it would go

20 through our unit chief to the chief medical officer.

21 So it would be four or five levels of review.

22 Q    When the team who's making a decision on fitness

23 for duty is making that decision, it is thorough; is it

24 not?

25 A    Yes.

Yoder - Direct

1  Q     And it is thorough because it impacts on the FBI's

2  decision whether or not to hire a person as a special

3  agent?

4  A     Correct.

5  Q     In other words, whether they're hired or not

6  depends on the success of the fitness-for-duty

7  examination?

8  A     That's part of it, yes.

9  Q     And as we move through Exhibit Number 5 -- it is a

10  rather thick exhibit -- we see, do we not, on Bates

11  stamp page number 118 your analysis and documentation

12  of your decision to declare Justin Slaby fit for duty?

13  A     Yes.

14  Q     And if we look up in the -- at the top right

15  corner of the exhibit on page 118 -- I'm not a doctor.

16  So if you don't mind reading what your section chief

17  wrote about your decision to certify Justin Slaby as

18  qualified and fit for duty.

19  A     Dr. Wade, the chief medical officer, wrote that he

20  concurred.  However, we need to carefully follow the

21  issues of PTSD -- that's post-traumatic stress

22  disorder -- and his cardiac murmur still pending a

23  cardiology evaluation.

24  Q     And, Dr. Yoder, the HCPU did rule out PTSD, as

25  well as cardiological problems before he was hired; is

Yoder - Direct

1  that right?

2  A    Yes, we evaluated those favorably.

3  Q    Okay.  In other words, if we read Dr. Wade's

4  concern, he wanted to make sure PTSD wasn't an issue

5  and make sure that cardiac issues were not an issue?

6  A    Correct.

7  Q    And in this process, Dr. Wade did not question or

8  discuss in any way on the document any potential

9  concern about Justin Slaby being able to be qualified

10  with the use of his prosthetic left hand; am I right?

11  A    Well, he concurred with my comment that additional

12  risks are difficult to anticipate but have been

13  successfully evaluated to the extent that it is

14  possible.  That was my closeout line on that.

15  Q    Right.  But I'm saying his notes don't have

16  anything to do with Justin's left hand, right?

17  A    No.

18  Q    Okay.  And what you've done for the ladies and

19  gentlemen of the jury -- we don't have to read it word

20  for word because they can see it at some point.  But

21  you go through an analysis of all of the tasks that you

22  determine that Justin was able to do?

23  A    We looked at the results of the functional

24  capacity evaluation, yes.

25  Q    In other words, you describe on page 2 at the

Yoder - Direct

1   bottom a description of the essential functions of the

2   job; do you not?

3   A    Yes, the selected ones that were of concern.

4   Q    Right.  And in your due diligence to verify that

5   Justin was qualified to perform all of the essential

6   functions for him, you asked that certain of the 247 of

7   those functions be verified by a functional assessment.

8   And those were the ones that involved potentially the

9   use of the nondominant left upper extremity; is that

10  right?

11  A    Are you reading somewhere?

12  Q    Well, was the purpose of the functional assessment

13  to make sure that there were no issues with his upper

14  left -- well, let me ask you:  What do you call this?

15  A    Yeah, you're right, the left upper extremity.

16  Q    Thank you, left upper extremity.

17       Was the purpose of this functional assessment to

18  make sure nothing with this left upper extremity would

19  interfere with his being a special agent?

20  A    That was one of the goals, yes.

21  Q    Your report goes through and explains that; does

22  it not?

23  A    Yes.

24  Q    All right.  And on the final page of your report,

25  page 120, you give a summary of your opinion; do you

Yoder - Direct

1  not?

2  A    Yes.

3  Q    And you point out that you'd had a detailed

4  functional capacity evaluation from a highly qualified

5  physical therapist with a doctoral degree in biomedical

6  engineering with the help of special agent volunteers

7  during the process; is that right?

8  A    Correct.

9  Q    And you point out that they concluded that Justin

10 Slaby is able to perform successfully the special agent

11 essential tasks, right?

12 A    That's right.

13 Q    And you relied on that and agreed with that?

14 A    Yes.

15 Q    And then you actually pointed out some things that

16 might be an issue in training in your next sentence.

17 You say that problems might be anticipated in the

18 performance of -- let me make sure -- defensive tactics

19 for use of the prosthesis and protection in boxing and

20 wrestling.  Do you see that?

21 A    Yes.

22 Q    Okay.  Was your concern with boxing and wrestling

23 that perhaps Justin might hurt someone with his new

24 prosthetic left hand?

25 A    Yes.  That was part of it, yes.

Yoder - Direct

1  Q     All right.  We agreed nothing in this analysis, in

2  the entire analysis events as any even potential

3  concern with his inability to comply with firearms?

4  A     There is not.

5  Q     And you alluded to one of the sentences.  You

6  alluded to additional risks are difficult to anticipate

7  but have been successfully evaluated to the best extent

8  as possible; is that right?

9  A     That's correct.

10  Q     And it's true that you would not have declared him

11  fit for duty if you felt he were a direct threat or a

12  significant risk?

13  A     That's correct.

14  Q     And then your recommendation was that he should be

15  provided the opportunity to demonstrate the essential

16  tasks and that the post-traumatic stress disorder

17  should be ruled out; is that right?

18  A     Yes.

19  Q     And therefore, you concluded that he was fit for

20  duty?

21  A     We recommended he continue, yes.

22  Q     And this is dated -- let's see -- May 26, 2010?

23  A     Yes, it is.

24  Q     So on December 9, that is the day that he was

25  hired as a special agent?

Yoder - Direct

1  A    I believe it was.

2  Q    If I asked this, I apologize.  Do you have any

3  criticism whatsoever of the special agent essential

4  functions list?

5  A    It has served our purpose for over ten years.

6  Q    And in other words, this particular list of the

7  247 tasks was prepared in 2000; was it not?

8  A    Actually, 1999, but close enough.

9  Q    And that report, Dr. Yoder, was more than 600

10  pages?

11  A    It was extensive, yes.

12  Q    All right.  And hundreds of special agents around

13  the country, at Quantico, and elsewhere were asked to

14  determine whether specific tasks were essential or

15  nonessential; am I right?

16  A    That's correct.

17  Q    And in the report that tabulated all the things

18  that special agents actually do in the field, they use

19  the word N for not essential and E for the word

20  essential?

21  A    I believe that's right, yes.

22  Q    And the report that was delivered to the FBI was

23  done by a highly regarded firm who assists

24  organizations to generate the essential functions of

25  the job for their clients?

                              Yoder - Direct

1    A     Yes.

2    Q     And one of the purposes of the list is to comply

3    with the Rehabilitation Act; am I right?

4    A     Yes.

5    Q     In other words, you at the agency want to have a

6    list that people can go to and know what the essential

7    functions of the job are?

8    A     Yes.

9    Q     Now, if we cut to the chase here for a moment, so

10   the jury follows us, what happened within approximately

11   90 days of when Justin was hired as a special agent is

12   the trainers had removed him from the training class.

13   Is that right, Dr. Yoder?

14   A     I believe it is, yes.

15   Q     And, Dr. Yoder, did you find out after the fact

16   that the trainers were unhappy that the HCPU had

17   cleared him for duty?

18   A     I'm sure that was part of it but only because what

19   they had to go through to perform the evaluation

20   probably.

21   Q     You learned after the fact that they were unhappy

22   with Dr. Starsky's evaluation that he did with the two

23   special agents, right?

24   A     I don't have any direct knowledge of that, no.

25   Q     If you don't mind looking at page 116, line 17 of

Yoder - Direct

1   your deposition, and I'll ask if that refreshes your

2   memory that the trainers were unhappy with Starsky

3   because they felt his evaluation was inadequate.

4   A     What page again?

5   Q     Page 116, line 17.

6   A     See, I'm not sure that's the right page.  Would

7   you read what you have?

8   Q     Sure.  Page 116, line 17.  Let me go to mine.

9   A     Your assessment whether or not he was a direct

10  threat is the question?

11  Q     Let me find it.  Thank you.

12        On line 7, I'm told.  I beg your pardon,

13  Dr. Yoder.  In other words, does this refresh your

14  memory that it got reported to you that the trainers

15  felt that the functional assessment done by Dr. Starsky

16  was inadequate?

17  A     Okay.  I guess Dr. Wade had reported that to me

18  according to this.  That may be correct, yes.

19  Q     Right.  From your standpoint, if we look at the

20  first page of Exhibit 5, that actually is the fax cover

21  sheet of Dr. Starsky's report that was submitted to you

22  during the fitness-for-duty process, if I'm right.

23  A     Yes.

24  Q     And you felt then that he was a highly qualified

25  person to conduct this assessment; did you not?

Yoder - Direct

1   A    That was my opinion based upon his credentials,

2   yes.

3   Q    And that is your opinion today as well; isn't it?

4   A    Yes.

5   Q    And is his report and cover sheet in Plaintiff's

6   Exhibit 5?

7   A    I believe it is, yes.

8   Q    And if you'll look at the first page --

9           MR. GRIFFIN:  Mike, if you don't mind pulling

10  up the first page of Exhibit Number 5.

11  BY MR. GRIFFIN:

12  Q    We'll follow along.  If I understand the first

13  page, this is the fax that the FBI sent to Dr. Starsky

14  to ask him to conduct this functional assessment of

15  Justin Slaby's skills.

16  A    Yes.

17  Q    And this was done before you declared him

18  qualified for the job?

19  A    Correct.

20  Q    And the person who filled out the form, share with

21  the jury who Gretchen Devins is.

22  A    Ms. Devins is one of our nurses in charge of that

23  field division.

24  Q    Is she a highly qualified person in the HCPU

25  insofar as fitness-for-duty process goes?

Yoder - Direct

1  A    Well, that would be reserved to me, but she has a

2  fair amount of knowledge of it, yes.

3  Q    Does she on the form actually give Dr. Starsky

4  instructions as to what the FBI wants him to do?

5  A    Just furnishes the task list it looks like here.

6  Q    She identifies the people who need this

7  information is the FBI fitness-for-duty people; am I

8  right?

9  A    Yes.

10  Q    Okay.  And the fax that she sent to Dr. Starsky

11  says that the essential job tasks that you were

12  concerned about were the essential job requirements

13  that may require the use of the upper extremities?

14  A    Correct.

15  Q    And that's what Dr. Starsky evaluated along with

16  the two special agents?

17  A    Yes.

18  Q    And one of the special agents was a firearms

19  trainer from Milwaukee?

20  A    I believe that's true, yes.

21  Q    You would expect firearms trainers to know what's

22  required of a special agent in terms of firearms,

23  right?

24  A    I would.

25  Q    Now, getting back to the trainers, was there ever

Yoder - Direct

1  any reaching out by the trainers to you to figure out

2  any way to help make sure that Justin succeeds and

3  completes the Training Academy?

4  A    No.

5  Q    Has anybody explained to you why none of the

6  trainers ever reached out and talked to you about their

7  opinions that Justin Slaby should be removed from

8  training 90 days after he had been hired as a special

9  agent?

10  A    Well, once we qualify them, the Training Division

11  has an independent responsibility to determine whether

12  they meet the essential duties of the position.  So

13  that's a different process.  They don't normally come

14  back to us unless there is a new injury or an illness

15  that causes a problem.

16  Q    I know.  But has anyone explained to you why no

17  one reached out to you to try to talk about ways to

18  make sure Justin succeeded and finished the training as

19  opposed to being removed?

20  A    No.

21  Q    We agree, do we not, Dr. Yoder, nobody over the

22  trainers -- none of the trainers have any expertise in

23  prosthetics or mitigation of hand injuries like Justin

24  has accomplished, right?

25  A    I don't believe they do.

Yoder - Direct

1  Q    You're not aware of any effort on the part of the

2  trainers before removing him from the academy to

3  involve the expertise of anyone in the area of

4  prosthetics and the benefits that they can provide to a

5  person with a hand injury?

6  A    I don't believe so.

7  Q    And in terms of the ultimate decision that was

8  made by the trainers, you did not have anything to do

9  with that decision, right?

10  A    No.

11  Q    You learned about it after the fact?

12  A    In process.  I think Dr. Wade mentioned the

13  difficulty they were having evaluating his firearms

14  capability.

15  Q    And, Dr. Yoder, you're aware, are you not, of the

16  dispute between the physicians who felt that Justin

17  should not have been medically recycled and the

18  trainers who wanted to medically recycle him; aren't

19  you?

20  A    Yes.

21  Q    And you and I have been over the e-mails where the

22  doctors did not think it was appropriate to medically

23  recycle this man from the Training Academy, right?

24  A    Correct.

25  Q    I would like for you to share with the ladies and

1   gentlemen of the jury why it was inappropriate to

2   categorize this man's removal as a medical recycle.

3   A    Well, my opinion was the same as Dr. Fabbri, who

4   wrote his, that a medical recycle is based upon an

5   injury or an illness that prevents a person from going

6   forward.  We would normally return them to their field

7   division sponsor until whatever condition was treated,

8   resolved, and then evaluate them for return.

9        In this case, there was no change in his

10  condition.  So there was nothing to treat, you know.

11  To us the prosthetic issue was a performance issue and

12  not a medical one.  That was the reason for the

13  disagreement.  I might say on the side of the Training

14  Division when they did force that medical recycle, that

15  did open the possibility that other prosthetic changes

16  might allow him to return.  So if they had done the

17  normal performance route, he would not have had an

18  opportunity to return.

19  Q    You mean if they had kicked him out on another

20  basis other than medical recycling?

21  A    That's right.

22  Q    However, you and I have been over the FBI's own

23  official training regulation booklet; have we not?

24  A    I believe we did.

25  Q    We've agreed that the trainers have never insisted

Yoder - Direct

1  that Justin was unsuitable; have they?

2  A    Unsuitable?

3  Q    Yeah.  In other words, if we looked -- when we

4  looked through this, we found three different grounds

5  for removing a special agent from training.  One was

6  suitability, the other was proficiency, and the other

7  one was medical recycling.  Do you remember?

8  A    I believe that's right.

9  Q    None of the trainers ever, you've heard, insisted

10  that Justin was not proficient or unsuitable, right?

11  A    I don't know what their final analysis was on

12  those issues, but it turned out to be medical.

13  Q    Right.  And that's what you and Dr. Fabbri reacted

14  to and objected to; am I right?

15  A    That's correct.

16  Q    And --

17  A    The other thing that would have happened -- I

18  mean, he was reassigned to a support role.  So if he

19  had been not proficient, they would have just released

20  him from service.  So...

21  Q    In other words, if they had had grounds to remove

22  him for proficiency, then he might not have kept his

23  support job?

24  A    Correct.

25  Q    I see what you're saying.

Yoder - Direct

1    But they have never insisted that he failed in any

2  way in terms of the proficiency requirements of the

3  regulation; have they?

4  A    I'm not sure I can answer that.

5  Q    If they did, you don't know about it?

6  A    I don't.

7  Q    Fair enough.

8    What happened on this medical recycle, though, if

9  we cut to the chase, the medical folks and the

10  fitness-for-duty folks were overruled; were they not?

11  A    Yes.  I guess you would say that.

12  Q    And when we talk about -- let me go to my notes

13  here for a second, Dr. Yoder.

14    The objection that you and Bill Fabbri had to what

15  the trainers were doing was because -- as Dr. Fabbri

16  put it at one point -- people who have disabilities

17  manage to correct them and make themselves better,

18  right?

19  A    Yes.

20  Q    And your and Dr. Fabbri's argument to the trainers

21  was that just as a person who has vision problems can

22  improve their vision, people can mitigate a hand injury

23  to the point of fitness for duty and that should not be

24  a basis for removal from the academy, right?

25  A    That sounds right.

Yoder - Direct

1  Q    Okay.  And you agreed with Bill Fabbri that

2  Mr. Slaby had mitigated the hand injury he had to the

3  point he had compensated and improved to the point

4  where he was fit for duty and qualified, right?

5  A    He was medically qualified, correct.

6  Q    And he was just as qualified when they wanted to

7  remove him from the academy as he was when you declared

8  him qualified, right?

9  A    There was no change in his medical condition.

10 Q    Right.  And because he was just as fit when they

11 wanted to remove him as when the HCPU had found him

12 qualified, you guys objected?

13 A    Yes.

14 Q    And somewhere in management you guys were

15 overruled, right?

16 A    Yes.

17 Q    And the Training Division people got to remove him

18 on the basis of his medical recycle?

19 A    Yes.

20 Q    Even though the training regulation does not

21 support it?

22 A    Well, we often -- in the normal injury and illness

23 categories, sometimes the Training Division acts

24 without telling us until it's already done.  So it's

25 not uncommon for this to happen this way.

Yoder - Direct

1  Q     Well, I'm not asking you how common it is they

2  would disregard the regulation.  I'm asking you in this

3  case by declaring that he would be removed under

4  medical recycling, they violated their own training

5  regulations; didn't they?

6          MR. KIM:  Objection, Your Honor, leading and

7  argumentative.

8          THE COURT:  I'll let him answer based on his

9  own assessment and opinion.

10 A     I'm not sure how to answer that.

11 Q     Well, you explained to the ladies and gentlemen of

12 the jury why it should not have been called a medical

13 recycling.

14 A     Correct.  I'm not sure which of the others they

15 should have used, but we just did not feel there was a

16 change in his medical condition.  It should have been

17 based on performance.

18 Q     But they didn't use any basis for removing him

19 except for the medical recycle, right?

20 A     That's right.

21 Q     And what I'm saying is that by calling it a

22 medical recycle, they acted inconsistently with their

23 own training regulation?

24 A     Well, I guess you could say that.

25 Q     Dr. Yoder, is it true that to your knowledge that

Yoder - Direct

1  Justin was the first young man with a prosthetic hand

2  to ever be declared fit for duty as a special agent?

3  A    In my 15 years, certainly.

4  Q    Let me ask you this:  As we sit here today, are

5  you proud and stand by your role in certifying Justin

6  Slaby as fit for duty as a special agent?

7  A    He's medically qualified, but no physical

8  examination can predict whether somebody is going to

9  successfully complete the FBI Academy.  But yes, we

10  would call him medically qualified.

11  Q    And you stand by that and are proud of that

12  decision you made?

13  A    We made it, yes.

14  Q    I want to now turn our attention to other special

15  agents who have had catastrophic and severe hand

16  injuries, if that's okay with you.  Is that all right

17  with you, Dr. Yoder?

18          MR. KIM:  Objection, Your Honor, relevance.

19          THE COURT:  I'm going let him proceed until I

20  hear some more questions.

21  BY MR. GRIFFIN:

22  Q    Dr. Yoder, you and I spent a few hours a couple of

23  months ago talking about several special agents who'd

24  had catastrophic hand injuries; did we not?

25  A    We did.

1  Q    I want to go through some of them one by one, and

2  I would like to start with a gentleman by the name of

3  Robert Drdak.  And I'll ask you, first, to confirm with

4  me that he had suffered a catastrophic car wreck

5  resulting in a severed ulnar nerve that left his entire

6  arm completely paralyzed.

7           MR. KIM:  Objection, Your Honor, relevance.

8  May we approach?

9           THE COURT:  Yes.

10       (Conference at the bench, as follows:)

11           THE COURT:  Yes.

12           MR. KIM:  My understanding is that the

13  plaintiff intends to elicit testimony regarding former

14  special agents, agents that --

15           THE COURT:  Can't use one or the other arms.

16           MR. KIM:  Well, I mean, that's in dispute.

17  But the position of the FBI is that that's not relevant

18  to this case.  They're all on board special agents.

19  Some of them don't have amputated hand -- I believe

20  none of them have amputated hands.

21           THE COURT:  Right.

22           MR. KIM:  And then all of them -- or many of

23  them were eventually passed the fit for duty

24  qualifications, and they're not new agent trainees.

25  And so they're not relevant.  They're not similarly

Yoder - Direct

1   situated to Mr. Slaby.

2          And specifically, I just wanted to point out

3   medical records of Agent K.K. -- the pictures that went

4   up were his hand pictures, and they're basically

5   pictures that show what his hand looked like soon after

6   a grenade had gone off in his hand.  We think that they

7   are completely misleading and shocking and prejudicial

8   because he had multiple surgeries.  That is not what

9   his hand looks like now.  In fact, we're going to have

10  deposition testimony that's going to be shown on video

11  of Agent K.K. that shows what his hand looks.  It is

12  clearly very different and misleading.

13         THE COURT:  What do you want to get out of

14  this witness?

15         MR. GRIFFIN:  I'm not going to show any

16  pictures, Your Honor.

17         THE COURT:  I know.  But what do you want to

18  get out of this witness?

19         MR. GRIFFIN:  The work experience of past

20  incumbents with the job.

21         THE COURT:  What does he have personal

22  knowledge about, Dr. Yoder?

23         MR. GRIFFIN:  He has personal knowledge of

24  the injuries.  These others got fit for duty despite

25  the fact that they have a paralyzed hand.

Yoder - Direct

1    THE COURT:  He evaluated them?

2    MR. GRIFFIN:  Some of them he evaluated.

3  Some of them he identified the records and, as a

4  30(b)(6) witness, told me about these agents.  They're

5  clearly relevant.

6    THE COURT:  Putting aside relevance, I'm

7  going to allow you to put in evidence that there were

8  other agents who had injuries that impaired their

9  ability to shoot because I think it goes to whether or

10  not it was a nonessential function or an essential

11  function.  That doesn't mean you can ask this witness

12  about him unless he has some involvement in assessing

13  those people or has some personal knowledge of who

14  these people were and whether it, in fact, affected

15  their ability to shoot.

16    Why would you ask this witness questions

17  unless he has some personal knowledge?

18    MR. GRIFFIN:  Because they served him up as a

19  30(b)(6) witness.

20    THE COURT:  He was a 30(b)(6) on this?

21    MR. GRIFFIN:  Yes.  Yes, Your Honor.  This is

22  why he testified about the essential functions, about

23  each of their arms --

24    MR. KIM:  No, Your Honor.

25    I'm sorry.

Yoder - Direct

1          MR. GRIFFIN:  He testified about each of

2    their arms.

3          THE COURT:  If he were the 30(b)(6), I would

4    let him.

5          MR. GRIFFIN:  He is.  And the records he's

6    referring to are the files they keep on each of these

7    agents in connection with their fitness-for-duty

8    examinations.

9          MR. KIM:  Your Honor, he was not the 30(b)(6)

10   witness designated for these topics.

11         THE COURT:  I'm sorry?

12         MR. KIM:  My understanding is he was not a

13   30(b)(6) witness designated for these topics.

14         MR. GRIFFIN:  Dr. Wade, his boss was.  He

15   testified about it.

16         THE COURT:  All right.

17         MR. GRIFFIN:  But he was questioned about it.

18   And then they used this with Judge Davis saying you

19   questioned Dr. Yoder about this.  So you don't get to

20   ask Dr. Wade about it.  But he is the medical

21   officer --

22         THE COURT:  Right.

23         MR. GRIFFIN:  -- who testified that on the

24   records that the FBI has, that he couldn't use his

25   hands to shoot.  That's the evidence.  That's what he's

Yoder - Direct

1  going to say.

2       THE COURT:  But when did he have involvement

3  with these records?  Was it part of his regular duties,

4  or were these records that were shown to him for the

5  purposes of this litigation by someone?

6       MR. GRIFFIN:  FBI counsel showed him the

7  records.  He studied them.  He testified as to four of

8  them.  They gave us two more later.  Then they served

9  up Dr. Wade to testify about the other two who couldn't

10 use their hands.

11      The records they have produced from their

12 Sub-M files are admissible records already.  We have

13 offered them.  They have objected to them.  We will

14 offer them at the appropriate time.  They are records

15 of the FBI.  They show that they could not use their

16 hand and they were still not restricted from firearms.

17 That's what the records show.

18      And that is the absolute evidence that Your

19 Honor absolutely was right to seize on, that the

20 regulation requires the jury to be able to know whether

21 or not these agents were able to shoot and qualify and

22 were restricted in the manner in which this man was

23 restricted.

24      THE COURT:  My only issue is whether this is

25 the appropriate witness for you to ask these questions

Yoder - Direct

1   to.  I understand if they were the 30(b)(6).  As I

2   understand it, he was not the 30(b)(6) witness on

3   whether these other agents were impaired in some

4   fashion that affected their ability to shoot.  So if he

5   wasn't the 30(b)(6) and he doesn't have any personal

6   knowledge, then how should he be allowed to answer

7   these questions?

8          MR. GRIFFIN:  Your Honor, I don't believe

9   legally he needs to have personal knowledge of the

10  injuries these agents --

11         THE COURT:  Then on what basis would it be

12  permissible for him to give any testimony about these

13  other individuals?

14         MR. GRIFFIN:  Because he is the FBI's medical

15  officer.  He deals with these records all the time.

16         THE COURT:  Well, that was my question.  Did

17  he deal with these medical records as part of his

18  ordinary duties?

19         MR. GRIFFIN:  When?

20         THE COURT:  As part of his ordinary duties.

21         MR. GRIFFIN:  He did.  He was asked by the

22  FBI counsel to study these records --

23         THE COURT:  As part of the litigation?

24         MR. GRIFFIN:  Yes.

25         MS. BUTLER:  He does requalify people, Your

Yoder - Direct

1   Honor, and as to Agent Kolbye, he actually did a

2   physical exam of him with only two fingers and said he

3   was fit for duty.  So he actually did that one because

4   the man was at headquarters, and he sat on the Medical

5   Mandates Board for some of these other people, like

6   Ryan.

7          THE COURT:  All right.  Well, I'm going to

8   require you to lay a foundation with him that he

9   actually evaluated these people or made some judgments

10  as part of his duties as a medical officer with the

11  FBI.

12         MR. GRIFFIN:  So let me make sure.  So I'll

13  need to know what proffer I need to make in case you

14  will not allow me to ask questions.  I want to ask him

15  first about Mr. Drdak, who he did not -- I don't

16  remember the details, but I don't think he did the

17  fitness-for-duty examinations for Drdak.  He didn't do

18  them.  He reviewed them and testified about them.  He

19  has testified with knowledge about them, and he has

20  offered opinions about the injuries.

21         THE COURT:  But he testified with knowledge

22  during what?  His deposition in this case?

23         MR. GRIFFIN:  When the FBI served him up to

24  us as a witness and prepared him by handing him and

25  giving him the records that Judge Davis ordered be

Yoder - Direct

1  produced on these agents.

2          MR. KIM:  Your Honor, we did not designate

3  him as a 30(b)(6) witness.  In discovery, obviously,

4  it's much more expansive about whether he has personal

5  knowledge.

6          THE COURT:  Right.

7          MR. GRIFFIN:  Well, why don't we at this time

8  offer the medical records for all six of the agents,

9  just offer them at this point and let them make their

10  objections.  They claim they're irrelevant.  Your Honor

11  is absolutely right that they are relevant under the

12  standard of what past incumbents of the job have done

13  under the reg.  And then, I think, everyone agrees we

14  can ask him questions about documents that are already

15  in evidence.

16          THE COURT:  Well, I'm not sure you can.

17  You're really asking him to function as an expert,

18  correct, for the purpose of this litigation?

19          MR. GRIFFIN:  No.  I'm asking him to simply

20  talk about the records that the FBI has maintained on

21  these six agents who could not use their other -- their

22  weak hand or their strong hand and were nonetheless

23  allowed to be weapons carrying and were not restricted

24  from weapons carrying in direct contrast --

25          THE COURT:  Do you intend to call these other

                              Yoder - Direct

1  agents?

2          MR. GRIFFIN:  Two of them only we could find.

3  Others we can't find.  The only two we could find were

4  Ryan and Kolbye.  The other four are either retired --

5  I can't remember all of them.  Dr. Yoder knows all of

6  them.  He's testified as to all of them.

7          I don't have long to go with these six.

8  We're not going to spend time.  I'm not going to show

9  them any pictures.  I'm just going to get my evidence

10  out there that these people had catastrophic hand

11  injuries and were allowed to be weapons qualified and

12  were never restricted at the time they couldn't shoot.

13  Everyone agrees that's relevant.  He's already

14  testified about it.  It's in the FBI records.  One way

15  or the other we just have to figure out a way to get

16  that evidence admitted or, hopefully not, but make our

17  proffer and move on.  So we don't want to waste time.

18          MR. KIM:  We don't agree that they're

19  relevant, first of all.  Second of all, these agents, a

20  couple of them had injuries from the 1980s.  One of

21  them, the one he just spoke about, retired, I believe,

22  in 1997 or 1998 before Dr. Yoder even was hired by the

23  agency, Your Honor.  He clearly has no personal

24  knowledge.  The only personal knowledge he has has to

25  deal with them showing him these documents in

Yoder - Direct

1  deposition in discovery.

2         To the extent that he actually evaluated

3  Agent K.K., Your Honor, we won't object to him

4  testifying about his evaluation of Agent K.K. because

5  he has personal knowledge about that.  But all of these

6  other things that he doesn't have any personal

7  knowledge about, we would object to that, Your Honor.

8         THE COURT:  I'm going to let you ask whether

9  he is aware -- just as a factual matter, whether it has

10  come to his attention during the course of his duties

11  as a medical officer that there are other agents that

12  have continued to serve as special agents after having

13  an impairment in their ability to shoot.

14         MR. GRIFFIN:  Sure.

15         THE COURT:  All right.  I'm not going to let

16  you go any further unless you can establish a more

17  direct foundation in terms of his actual involvement

18  with assessing these people.  All right.

19         MR. GRIFFIN:  I think, Your Honor, I will be

20  brief.  I'll be as brief --

21         THE COURT:  Or as I understand it, I guess

22  we're in agreement now that he wasn't the 30(b)(6)

23  designee as to this issue.

24         MS. BUTLER:  He was.  He was.

25         MR. GRIFFIN:  He was later, yes.

Yoder - Direct

1          THE COURT:  Go ahead.

2          MS. BUTLER:  He was, Your Honor.  Because

3  what happened is very late in the day they produced

4  these records.  And when Mr. Griffin talked to

5  Dr. Yoder about them, then they would not let us go

6  back to the 30(b)(6) witness, Dr. Wade, because they

7  said we had already talked to Dr. Yoder, he was

8  substituting in.

9          THE COURT:  All right.  Well, we're going to

10  just go as far as I've said, that you can establish --

11  we'll straighten out the 30(b)(6) issue during an

12  evening recess.  But I'll let you ask him whether it's

13  come to his attention in the ordinary course of his

14  duties as a medical officer that there were people who

15  have an impairment in their ability to shoot.  If you

16  want to get into anything beyond that, you have to

17  establish he was personally involved in assessing any

18  of these individuals.  All right.

19          MR. KIM:  So, Your Honor, just to clarify, in

20  the ordinary involvement of his medical duties outside

21  of this litigation and outside of the filing of this

22  complaint?

23          THE COURT:  Correct.

24          MR. KIM:  He needed to know that prior to

25  this complaint?

Yoder - Direct

1        THE COURT:  Right.

2        MR. KIM:  Thank you.

3        MR. GRIFFIN:  Let's cut this short then.  He

4   did not have any role in during these qualifications

5   because he had not been hired yet.  In other words,

6   when I asked him did you know about Drdak until the FBI

7   prepped you about your deposition and gave us you the

8   records to look at, he's going to say no.

9        THE COURT:  Right.

10       MR. GRIFFIN:  But he made admissions in his

11  deposition.  Even if he weren't a witness, they would

12  be admissions of a party opponent, in view of this very

13  important facet of the case, that six special agents

14  had serious hand injuries and were not restricted from

15  weapons.  So it's an admission.  It doesn't matter

16  whether he's a doctor.  It doesn't matter whether he's

17  a 30(b)(6).  It doesn't matter whether he's an agent.

18  He made these admissions.  In other words, I think --

19       THE COURT:  What admissions did he make?

20       MR. GRIFFIN:  He admitted that six times in

21  the agency -- with the agency, six agents had serious

22  catastrophic hand injuries.

23       THE COURT:  That's based on what?  Just

24  looking at the records he had?

25       MR. GRIFFIN:  Absolutely.  He made those

Yoder - Direct

1  admissions based upon their own official records.

2  THE COURT:  At this point, I'm only going to

3  allow you to do what I've said.  If he's aware that

4  these other individuals -- if it came to his attention

5  these other individuals had an inability to shoot, not

6  as part of this litigation, but if someone during the

7  course of their duties have said or brought these

8  people to his attention, I'll let you ask that.

9  Anything else I'm going to require you to lay a

10  foundation that he had personally assessed or was

11  somehow involved.

12  That will probably take us to the end of the

13  day.  Then if you want to bring these other issues to

14  my attention, then I'll reconsider opening it further.

15  MR. GRIFFIN:  Out of respect for the Court,

16  he did not have personal knowledge of some of these

17  agents.  If that's the bar Your Honor has set --

18  THE COURT:  It is.

19  MR. GRIFFIN:  -- then we just need to make

20  our proffer and have him testify about that agent.

21  MS. BUTLER:  The 30(b)(6) issue we could sort

22  out.  It might change the course of things.

23  THE COURT:  It sounds as though you can't

24  establish other than through his designation as a

25  30(b)(6) a foundation for him.

Yoder - Direct

1              MR. GRIFFIN:  That's not true, Your Honor.  I

2  disagree with you 100 percent.  It's an admission of a

3  party opponent, and he admitted these six agents did

4  that.

5              THE COURT:  Based on the medical records

6  which were provided to him as part of the litigation?

7              MR. GRIFFIN:  I don't know what the basis of

8  his admission was, but that's what he said as a medical

9  officer that was served up in place of the 30(b)(6)

10  witness.

11             THE COURT:  Well, that's the 30(b)(6) issue.

12             MR. GRIFFIN:  You said is that your only

13  basis, and it is not.

14             THE COURT:  Okay.  All right.

15             MR. KIM:  Your Honor, one thing.

16             THE COURT:  Yes.

17             How much more do you have other than this

18  issue with him on direct?

19             MR. GRIFFIN:  I'm only going over the six

20  agents.

21             THE COURT:  This is the last topic?

22             MR. GRIFFIN:  Yes.  I've got them all listed

23  here.  He knows about all of them.  I'm ready to get to

24  the end of the day and probably could have but for us

25  being up here.

Yoder - Direct

1          THE COURT:  All right.

2          MR. GRIFFIN:  I'm ready to finish up.

3          MR. KIM:  One housekeeping issue, Your Honor.

4   We would like to continue the practice that we had

5   during the evidentiary hearing calling the agents --

6   these are very personal medical files.  To the extent

7   they are coming in at all in the public record, we

8   would like to call them by their initials as we were

9   doing in our previous discovery hearings.  I don't know

10  if plaintiff has any objection to that.

11          MS. BUTLER:  One of the women is going to be

12  showing up.  It seems ridiculous to call her -- Why is

13  she afforded less --

14          THE COURT:  All right.  I'm going to take up

15  the medical issues after we release this jury at the

16  end of the day.  Let's finish this up.

17          MR. GRIFFIN:  Okay.

18      (Proceedings continued in open court, as follows:)

19  BY MR. GRIFFIN:

20  Q    Dr. Yoder, as part of your official duties at the

21  HCPU as a medical officer, have you become acquainted

22  with the Sub-M files of special agents who have

23  suffered severe hand injuries that precluded their use

24  of that hand for firearms?

25          MR. KIM:  Objection, Your Honor, the

Yoder - Direct

1  clarifying time period.

2          THE COURT:  Overruled.  I think it's part of

3  his official duties.

4  A    Yes.

5  Q    Share with the jury some of those situations of

6  special agents who have suffered severe or catastrophic

7  hand injuries that precluded their ability to use that

8  hand for firearms.

9  A    The two most recent cases that come to mind are a

10 special agent in the New York division who injured his

11 hand in an accident where a propeller struck his hand

12 when he was swimming and lost several of his fingers in

13 that he required firearms and raids and arrest critical

14 duty restrictions for the rest of his career

15 essentially, which was about an additional two years,

16 and recently retired.

17 Q    Let's work backward.  That's the first one.

18          Let's go to -- we will go one at a time.  You just

19 tell us those that you've been made aware of in your

20 official duties.

21 A    Another fairly recent one was a female special

22 agent, I believe again in the New York division, who

23 received an injury to her hand when chemotherapy was

24 used for her cancer treatment and actually what's

25 called extravasated on the dorsum of her hand, meaning

Yoder - Direct

1  it went into the tissue outside the vein.  It's A very

2  caustic type substance.  So it prevented healing and

3  injured the nerve in that hand.  So that she was taken

4  to our Medical Mandates Evaluation Board to review her

5  ability to continue as a special agent because it

6  looked like her firearms restrictions would be

7  indefinite.

8      And she appealed that determination that she was

9  not qualified and was allowed an additional six months

10  to see if she could train with the other hand in her

11  weapons bearing requirements.  She was successful in

12  that and was returned to her full duty.

13  Q    So that's number two.  What is the third one

14  moving backward in time?

15  A    There was an agent -- let's see.  These are fairly

16  old cases from the '80s who -- I think his was a motor

17  vehicle accident.

18          MR. KIM:  Objection, Your Honor, lack of

19  personal knowledge.

20          MR. GRIFFIN:  Let me object to the sidebar

21  when he's in the middle of the witness' answer.

22          THE COURT:  Well, why don't you ask the next

23  question and make sure the foundation that we've talked

24  about is here for these others.

25  BY MR. GRIFFIN:

Yoder - Direct

1  Q    You have reviewed that file as part of your

2  official duties; have you not?

3  A    I have.

4  Q    Okay.  Please proceed.

5              MR. KIM:  Objection, Your Honor.  May we

6  approach?

7              THE COURT:  I'm going to overrule the

8  objection if it's part of his official duties.

9  A    There are two that are fairly similar.  I'm trying

10  to disentangle them in my mind.  One was an agent from

11  1972, a hire who --

12              MR. KIM:  Objection, Your Honor.  May we

13  approach?

14              THE COURT:  If it's something other than what

15  we've already talked about.

16              MR. KIM:  Yes, Your Honor, clarification.

17              THE COURT:  All right.

18      (Conference at the bench, as follows:)

19              THE COURT:  All right.

20              MR. KIM:  Your Honor, I apologize for the

21  sidebar.  My understanding of the Court's order was

22  that it would have to be related to prior to this

23  litigation.  The Individual that Mr. --

24              THE COURT:  Not so much prior to this

25  litigation but as part of his official duties, not

Yoder - Direct

1   something he was given purely for the purpose of

2   looking at for purpose of this litigation.

3           MR. KIM:  That is precisely what -- that is

4   precisely why this special agent's medical files were

5   given.

6           THE COURT:  I assume that's what he

7   understands when you say official duties.  It would be

8   his duties --

9           MR. KIM:  He misunderstands.

10          THE COURT:  It would be his duties as a

11  medical officer.

12          MR. GRIFFIN:  Yes.

13          THE COURT:  Not purely for looking at

14  something for the purposes of this litigation, but for

15  the purposes of discharging some obligation he had as a

16  medical officer to evaluate these people.  Anyway,

17  that's my ruling.  So if he's telling -- if he's not

18  testifying to something other than on that basis --

19          MR. GRIFFIN:  Well, I've asked him the

20  question Your Honor asked me to ask him precisely the

21  way you asked me to ask him.

22          THE COURT:  Right.

23          MR. GRIFFIN:  He gave me an affirmative

24  answer.  He's interrupted two of his answers when he

25  was about to share relevant information to the jury.  I

Yoder - Direct

1 don't believe it's appropriate to interrupt the

2 witness' answer, especially when I faithfully complied

3 and asked the precise question.

4          THE COURT:  Do you understand my ruling now

5 in terms of what I'm allowing him to testify to?  This

6 would be any information, any knowledge he has of these

7 people that came to him at any time in his capacity as

8 a medical officer for the purposes of his discharging

9 his duties as a medical officer.

10          MR. GRIFFIN:  Let me write this question

11 down.

12          THE COURT:  And not purely for the purposes

13 of this litigation, not purely for the purposes of

14 something he was given to look at.  If the only purpose

15 in his looking at this was for the purposes of this

16 litigation, it was for -- what I'm going to let him

17 testify to is if he was given this information for the

18 purposes of his evaluating these people for the

19 purposes of the FBI's making a decision about what to

20 do with these people.  All right.

21          MR. GRIFFIN:  I am not going to ask him

22 anything about what he has done to prepare for

23 litigation.  That's not -- I have no intention of

24 asking him that question.  They absolutely can ask that

25 question.  But I am going to ask him if it is part of

Yoder - Direct

1  his official duties to look at Sub-M files and

2  determine what to do with other people.

3            He will tell me that he reviews old Sub-M

4  files to make sure they're consistent and make sure

5  they treat people similarly, that he looks at those all

6  the time.  He's qualified to do that and has done that.

7  In this particular case, he has looked at a number of

8  hand injuries in connection with Mr. T.F. and Ms. S.R.

9

10           THE COURT:  What you said is fine as long as

11  that what we're talking about is not something he was

12  given purely for the purposes of this litigation, if it

13  had some purpose within the FBI in terms of discharging

14  his duties other than as a witness at his deposition.

15           MR. GRIFFIN:  I will establish other reasons

16  why he looks at these records other than testifying in

17  court.

18           MR. KIM:  Your Honor, if I may, if you could

19  make the instruction to the witness because I don't

20  believe he understands the questioning.  He thinks that

21  he's talking about all of these witnesses, and he just

22  started talking about one of them.  He clearly doesn't

23  understand, Your Honor.  I think that he should be

24  clarified as to the scope of what he's testifying

25  about.

Yoder - Direct

1          MR. GRIFFIN:  Your Honor, we are going to

2    object to the Court instructing the witness before I

3    even ask a question.  I'm going to ask the precise

4    question that Your Honor asked me to ask.

5          THE COURT:  Well, what I'm going to do is I'm

6    going to recess matters right now.  I'm going to let

7    the jury go.  I want to take it up with the witness to

8    make sure he understands what we're talking about.  If

9    there is an issue on this 30(b)(6), I'll take it now as

10   well.

11         MS. BUTLER:  Take it up now?

12         THE COURT:  Yeah.

13         MS. BUTLER:  Because I'm not sure that we --

14   can we gather the information to get you in the

15   morning --

16         THE COURT:  Right.

17         MS. BUTLER:  -- or later on today?

18         THE COURT:  Right.  All right.  Okay.

19         MR. GRIFFIN:  No more questioning will be

20   today?

21         THE COURT:  Right.

22         MR. GRIFFIN:  Okay.

23      (Proceedings continued in open court, as follows:)

24         THE COURT:  Ladies and gentlemen of the jury,

25   we are going to take our evening recess at this time.

Yoder - Direct

1  There's a number of legal issues that the Court needs

2  to deal with.  So I'm going to release you for the

3  evening at this time.  You will report back to the jury

4  room tomorrow at 9:15, and we'll begin hopefully at

5  9:30.

6          As I indicated to you during the recess,

7  please do not discuss this case with anyone.  I'm sure

8  there will be family and friends who are curious about

9  how you spent your day.  Just tell them that you are

10  under instructions not to talk about the case with

11  them.  And certainly don't do any kind of Internet

12  research or review of anything that you've heard here

13  today.

14          So with those instructions, you're excused to

15  until tomorrow.

16      (The jury exits at 5:23 p.m.)

17          THE COURT:  All right.  Doctor, would you

18  have a seat for a moment.

19          Have a seat, please.

20          Doctor, the question I have for you is your

21  knowledge of these individuals, these other individuals

22  that have had hand injuries that have affected their

23  ability to shoot, within what context did you acquire

24  that information?

25          THE WITNESS:  That would primarily be records

Yoder - Direct

1  reviewed.

2              THE COURT:  For what purpose?

3              THE WITNESS:  Mainly for this case.  Is that

4  what you meant?

5              THE COURT:  Well, I'm asking.  Is it within

6  any context other than for the purposes of this case?

7              THE WITNESS:  Primarily for the purposes of

8  this case.  The first thing we would do when a case

9  like this comes up is we would look at our board

10 process that looks at people who have chronic or

11 permanent injuries that go to a board of their peers to

12 determine whether they can continue in their duty.

13             And if they have returned to full duty,

14 oftentimes I'll forget about them because they're not

15 ones that we continue to need action medically on.

16             So the main differential is was it a

17 permanent injury that did not return to full duty.

18 Then we would have better track of those.  Or are they

19 ones that recovered to the extent they could return to

20 their duties?

21             THE COURT:  So the medical records you were

22 provided were given to you as a result of Mr. Slaby's

23 claim; is that right?

24             THE WITNESS:  Essentially, yes.

25             THE COURT:  What was the purpose of giving

Yoder - Direct

1  you those documents?

2          THE WITNESS:  Well, two of them we knew about

3  were active cases, the first two I mentioned, because

4  those were readily in mind.  The other ones, we went

5  back to the field nurses to ask them for cases that

6  they had familiarity with that were of this type.

7          THE COURT:  For what purpose was that?

8  That's what I'm --

9          THE WITNESS:  For the specific question that

10 came up on Mr. Slaby.

11         THE COURT:  But was it for the purposes of

12 your own internal review and processes, or was it for

13 the purposes of responding specifically to discovery

14 requests or --

15         THE WITNESS:  Discovery, yes, sir.

16         THE COURT:  All right.  Mr. Griffin, did you

17 want to lay any other foundation with him?  Do you want

18 to explore anything else that you think would allow him

19 to testify?

20         MR. GRIFFIN:  Sure.

21 BY MR. GRIFFIN:

22 Q    Dr. Yoder, you were asked by the FBI to appear for

23 a deposition to testify about these agents; were you

24 not?

25 A    Correct.

Yoder - Direct

1  Q     Okay.  And you did testify about these agents?

2  A     Yes.

3  Q     And you're familiar and know well the Sub-M files

4  and how to interpret them for the ladies and gentlemen

5  of the jury?

6  A     It's easier when I have them in front of me, but

7  yes, I have some recollection of each of them.

8  Q     Sure.  In other words, you knew that the FBI had

9  designated you to testify about these agents and their

10 injuries?

11 A     I believe so, yes.

12 Q     Okay.  And you prepared yourself by reviewing

13 those documents to give testimony about what had

14 happened with those agents vis-a-vis their firearms

15 restrictions and catastrophic or severe hand injuries?

16 A     Yes.

17 Q     And you were able to communicate exactly what the

18 decision making was and to determine which of those

19 agents had severe, permanent hand injuries and were not

20 firearms restricted, correct?

21 A     Yes.  To the extent that that information was in

22 the medical file, yes.

23 Q     Sure.  But what I'm saying is that you -- as a

24 medical officer, you have the foundation to be able to

25 talk about and to give testimony about those Sub-M

Yoder - Direct

1  files?

2  A    Yes.

3  Q    And you work with them every day?

4  A    Almost every day, yes.

5  Q    And you were able to spend several hours talking

6  to me and sharing the FBI's position with respect to

7  those four agents that we discussed on May 22, 2013?

8  A    Yes.

9  Q    And that was the day that the FBI designated you

10 to talk about those four agents?

11 A    Yes.

12 Q    And in terms of the way we covered it, not to

13 belabor the point, but in your fitness-for-duty

14 examinations, you on occasion actually reviewed FFD

15 files to make sure of consistency and to make sure you

16 are applying the same kind of rationale; did you not?

17 A    Yes.

18 Q    In other words, for example, K.K. -- excuse me,

19 not K.K., but T.F., the gentleman from New York that

20 had the boat accident, or S.R., as part of your

21 official duties sometimes you review other

22 fitness-for-duty files to see how certain cases were

23 handled; don't you?

24 A    Yes.

25 Q    And in connection with S.R. and T.F., as we've

Yoder - Direct

1  called them so far, and I guess they're -- you know

2  we're talking about Tim Flaherty and Sheila Ryan,

3  right?

4  A    Yes.

5  Q    And in connection with those two files, you

6  actually went through and looked at other Sub-M files,

7  people who had had hand injuries to see what HCPU had

8  done in other situations with hands, correct?

9  A    Based upon the discovery question, yes.

10 Q    Right.  But not just in connection with the

11 discovery, but to make sure that HCPU stayed on the

12 same page in evaluating T.F., Tim Flaherty, and Sheila

13 Ryan as well, right?

14 A    I wouldn't have gone back to look for others, no.

15 Q    But you did look at some other Sub-M files of

16 people with hand injuries when you and Dr. Wade were

17 deciding what to do with S.R. -- with Sheila Ryan and

18 with Tim Flaherty, right?

19 A    No, not really.

20 Q    What does that mean, not really?

21 A    We wouldn't go back.  We would base it on -- I

22 mean, each case is independently evaluated.  There's

23 specific details of the case that would be based upon

24 the essential duties just like for an applicant.

25 Q    Right.  But I thought you told me in a close case,

Yoder - Direct

1  you guys would look at other Sub-M files to make sure

2  you were acting consistently, at least following the

3  same kind of criteria?

4  A    Those that were on record, yes --

5  Q    Okay.

6  A    -- if I had looked at previous ones.  But I

7  wouldn't go out searching for Sub-M files, the ones

8  that I had no familiarity with normally.

9  Q    But in any event, even those that you didn't have

10 any personal involvement with, you were able to review

11 and give testimony about those files and the FBI

12 designated you to do so, correct?

13 A    Yes.

14 Q    And you did so cooperatively?

15 A    To the extent that I could, yes.

16 Q    All right.  We talked about them fully, about

17 their severe injury and the fact that they were not

18 restricted from firearms despite their limitations?

19 A    I think most of them were restricted.

20 Q    For some period of time?

21 A    Yes.

22 Q    Right.  We'll talk about that in a moment, what

23 time they're restricted and when they're released.  But

24 you had enough understanding of those Sub-M files to

25 express the FBI's position on those agents?

Yoder - Direct

1   A     Pretty much, yes.  It was in the medical file.

2   Often the firearms information is spotty and the Sub-M

3   files.  That's all.

4   Q     No problem.  Some of these folks that we talked

5   about, you actually had a role in the evaluation, such

6   as Ms. Ryan, Mr. Kolbye, Mr. Saturno, Mr. Fung?  These

7   are people you actually have had some involvement with,

8   correct?

9   A     I don't recognize the Fung case.  I'd have to look

10  at that one.

11  Q     But Saturno you remember?

12  A     I believe so, yes.

13  Q     We talked about Sheila Ryan, right?

14  A     Correct.

15  Q     We talked about Kolbye?

16  A     Kolbye.

17  Q     You can't remember Fung, but am I missing one

18  still?  Oh, Jill Blackman, Jill Blackman, the recent

19  one.

20  A     Okay.  I did not write up her case, but I'm

21  familiar with it.

22  Q     Okay.  So at least -- let me count them -- five

23  out of the six?

24  A     (Nods head up and down.)

25  Q     You've had some role yourself?

Yoder - Cross

1  A    Yes.

2  Q    The only one that you didn't have any personal

3  involvement was Robert Drdak, right?

4  A    That sounds right.

5  Q    Okay.  Because you got there in what?  '88 or '89?

6  A    '98.

7  Q    '98.  Excuse me.

8       And he retired sometime about that time?

9  A    Mr. Drdak retired in '99, as I recall.

10  Q    Okay.  Right.  But did you -- was it established

11  or not -- or I can't remember.  Maybe you can.  Did you

12  have some involvement with his Sub-M file before he

13  retired?

14  A    I don't think at all, no.

15  Q    Okay.  So that one among the six, but you still

16  were designated by the FBI to testify and give

17  testimony about Mr. Drdak when we spoke on May 22; am I

18  right?

19  A    Yes.  He was a part of the discovery, yes.

20  Q    You were designated to talk medically about those

21  agents who had the hand injuries, who were allowed to

22  be restricted or not restricted from firearms?

23  A    Correct.

24          THE COURT:  Mr. Kim, do you want to ask

25  Dr. Yoder any questions about this issue?

Yoder - Cross
CROSS-EXAMINATION

1

2  BY MR. KIM:

3  Q    Dr. Yoder, do you know what a 30(b)(6) witness is?

4  A    What a what?

5  Q    A 30(b)(6) witness, do you know -- are you

6  familiar with that term at all?

7  A    I am not.

8  Q    So would you know what it means in legal terms to

9  be designated as a witness to testify about documents?

10  A    I'm just asked to appear by the FBI.  That's all I

11  know.

12  Q    And did you have any personal recollection of the

13  medical records of Agent Kevin Kolbye before this

14  litigation?

15  A    I remember, when I reviewed the record, doing his

16  exam in 2006, but that's really the only one that I've

17  had.

18  Q    And Sheila Ryan?

19  A    She was a board case.  So I was more intimately

20  involved in her case.

21  Q    And did you have any recollection of Mr. Saturno

22  until this case?

23  A    No.  I had to review the Sub-M, but I did return

24  him to duty, I noticed, in 2004, I believe.

25  Q    I think we've already established that Mr. Drdak

Yoder - Cross

1   retired before you arrived at the agency.  Is that

2   correct?

3   A    We had about a year overlap, but it was -- I had

4   no knowledge of his case at the time.

5   Q    Do you have any idea who Eleazar Vasquez is?

6   A    These names are familiar, but I have no knowledge

7   of the details of the case.

8   Q    Or -- and I think you said the same thing for

9   Mr. Fung.

10  A    Right.

11  Q    And did you have any personal involvement in the

12  fitness-for-duty examination of Ms. Blackman?

13  A    I did not.

14            MR. KIM:  That's all I have, Your Honor.

15            THE COURT:  All right.  Thank you.

16            Dr. Yoder, you're excused until tomorrow

17  morning at 9:30.  Please do not discuss your testimony

18  outside of the courtroom during the evening recess.

19            THE WITNESS:  Yes, sir.

20            THE COURT:  You're excused.

21            THE WITNESS:  I can leave now?

22            THE COURT:  Yes.

23       (The witness exits at 5:34 p.m.)

24            THE COURT:  Mr. Griffin, do you want to say

25  anything more about this?

1          MR. GRIFFIN:  No.  I'm ready to finish my

2    examination of him.  I think I've got about 30 minutes,

3    45 minutes to finish up.

4          Some of these I thought I made clear.  I'm

5    not going to talk about whoever Mr. Eleazar or whatever

6    that name was.  The only six, I think, that he's

7    testified about and have any knowledge about are going

8    to be the four that we spoke to him about on May 22,

9    those being Ryan, Drdak, Saturno, and Kolbye.

10         And I'm also going to ask him to save time --

11   instead of having Dr. Wade do it -- to testify about

12   the other two.  When Dr. Yoder wasn't available, they

13   gave us Dr. Wade later, and he testified about the

14   other two, the other two being Mr. Fung and

15   Ms. Blackman.

16         THE COURT:  All right.

17         MR. GRIFFIN:  And so that's what our

18   intention is to do, and we expect -- I think that I can

19   get him through with 30 to 45 minutes in the morning.

20         THE COURT:  All right.  Mr. Kim, do you want

21   to speak anymore about this?

22         MR. KIM:  No, Your Honor, I don't have

23   anything.  I think it's clear that he got most of his

24   personal knowledge through this litigation.

25         THE COURT:  All right.  Based on what I've

 1  heard, I'm going to allow Dr. Yoder to testify as to

 2  his knowledge and information he has based on both his

 3  personal involvement and also based on the documents

 4  that were provided to him by the FBI.  Obviously, they

 5  were provided to him for some purpose in connection

 6  with testifying.

 7          While he may not have been formally

 8  designated as a 30(b)(6) on these issues, he was

 9  certainly provided documents and information.  So he

10  was in a position to testify knowledgeably with respect

11  to them.  So I am going to allow him to testify on

12  these issues tomorrow morning.

13          All right.  Anything else before we recess

14  for the evening?

15          I'm going to give you an opportunity to say

16  what you want about your motion for reconsideration,

17  Ms. Butler.

18          MS. BUTLER:  Would you like me to proceed

19  now?

20          THE COURT:  Yes.

21          MS. BUTLER:  Your Honor, the reason that we

22  filed this motion for reconsideration is because we

23  think that some of the factual underpinnings to what

24  the government has said about this matter need to be

25  clarified and some of the legal propositions that they

1  were putting forward similarly.

2          Let me start with the facts.  The facts are

3  this:  On April 3, Mark Crider was told that he was

4  going to be asked to give a deposition in this case.

5  That very day, as part of his duties, he has the

6  obligation to inform his chain of command.  So he first

7  went to the ASAC, the assistant special agent in

8  charge, in his office, a man named G.B. Jones, but

9  Mr. Jones was out of the office on a special

10 assignment.

11         So then his next step -- this is part of his

12 duties -- was to go to Ms. Carlson and tell her, I've

13 been asked to give a deposition.  This is what he has

14 to report for logistics purposes, for the approval

15 purposes.  So she then ushers -- says, Come into my

16 office.  And then she starts this diatribe about how he

17 should testify.

18         THE COURT:  I understood all of that.

19         MS. BUTLER:  Mind you, this is not the first

20 time this happened.  Because in 2011, Mr. Crider was

21 just having lunch with Justin Slaby, and when he got

22 back to --

23         THE COURT:  Well, it was the first time it's

24 happened with Ms. Carlson, correct?

25         MS. BUTLER:  It is the first time, but

1  Mr. Jones, Mr. G.B. Jones, had done it before, and the

2  SAC at the time was a woman named Nancy McNamara.  And

3  she had done this.  Okay.  So this is all part of

4  official duties to inform your chain and then you get

5  this diatribe.

6          But when Mr. Crider left, he went and told

7  two FBI lawyers.  Did they report it as they're

8  required to do?  As they say, they take this thing so

9  seriously.  Did either of them report it?  No.

10          What happened, we believe the evidence shows,

11  is that they waited until the day of Mr. Crider's

12  deposition to see if he would testify the way they

13  wanted him to and to see if I would have the wisdom to

14  ask him the right question.

15          And when he confessed this, they didn't go

16  then.  They didn't stop the deposition and say, This is

17  incredible.  What happened is that Mr. Ates told them,

18  told these two lawyers here, this is a serious matter,

19  and we are going to have to take it to the Court.

20  That's when they reported it.

21          So this fiction that they immediately jumped

22  on it is false.  And the other part of the fiction,

23  Your Honor, is that the day before this evidentiary

24  hearing that Judge Davis called this same Nancy

25  McNamara -- the same woman who had already reamed

1   Crider out for talking to Justin Slaby is now the head

2   of the FBI's Inspections Division, and she tells

3   Ms. Carlson, By the way, you don't need to testify

4   tomorrow.  And that is on the record.  Because

5   Ms. Carlson says, I got a call from Nancy McNamara that

6   said I don't have to testify.

7           All right.  They said that was because they

8   were so concerned about getting the truth out.  They

9   haven't done anything yet.  In fact, the FBI has said

10  repeatedly over and over in papers that they can't even

11  tell this Court or Judge Davis whether this even

12  happened because that would be wrong.  So now it's been

13  seven weeks since they supposedly started an

14  investigation, and they haven't concluded it.  So the

15  idea that they were moving as quickly as they can and

16  that they take seriously what happened, I think, is

17  fundamentally undermined by the time line.  That's one

18  thing.

19          The second thing is they have said they

20  believe that this cannot come into evidence, something

21  that every court that's looked at it says this is

22  fundamentally a sign of a weak case when a party

23  engages in witness tampering, fundamentally a sign of a

24  weak case.  They say it can't come in because the woman

25  wasn't acting in the scope of her employment.  And as

1   we said in this motion for reconsideration, she was

2   certainly acting in the scope of her employment.  She

3   was the person that he had to go to.  She was the

4   person who would receive this information.

5          And I would note that while they deal with

6   the case of *Martin v. Cavalier* in a footnote, that is a

7   case, Your Honor, where a person was found to be in the

8   scope of employment when assaulting people.  Right,

9   because the person was on the work site.  It happened

10  during working hours.  He was a supervisor.  You don't

11  have to be the top dog.

12         But the scope of employment is a concept that

13  they just have never said -- they've never taken any

14  position.  They've never provided any facts.  And by

15  the way, they have the duty to prove she is not in the

16  scope of employment.  They have provided no facts at

17  all.  The only facts have come from us, which are that,

18  of course, she was the person he had to go to.

19         And then you get into this.  So that's one

20  issue.  And as I said, there are cases that we've cited

21  them where the person has created criminal and engaged

22  in criminal conduct, where they engaged in fraud, where

23  they had assaulted people, but they were in the

24  workplace.  They were in working hours, and they were

25  in the scope of --

1          THE COURT:  Have you found any case where

2   somebody who was not involved and had no involvement in

3   the underlying decision, who did something comparable

4   years after the underlying events?  I mean, is there

5   any case that you think is comparable to the facts of

6   this case?

7          MS. BUTLER:  There are a number of employment

8   cases, Your Honor, that say that a statement that's

9   made after the fact can be just as powerful as a

10  statement made at the time.

11         THE COURT:  By somebody who had no

12  involvement with the underlying events?

13         MS. BUTLER:  As Judge Davis said, when --

14         THE COURT:  There may be all kinds of

15  integrity issues triggered by this, and I don't

16  minimize those for a minute.  But the issue is whether

17  any of this is probative of why he was dismissed from

18  the academy two years earlier by people who had

19  absolutely no connection to Ms. Carlson.

20         MS. BUTLER:  She was the one who had the

21  connection to the witness, who can prove the case.  We

22  have already heard it, Your Honor.  We have already

23  heard it in opening that Mark Crider --

24         THE COURT:  But as I understand the facts,

25  whatever she said had absolutely no influence on the

1    truthfulness of his testimony.  You have conceded that,

2    correct?  So you are not offering it to impeach him in

3    any way, correct?

4              MS. BUTLER:  No, but it's a sign of a weak

5    case.  It doesn't matter.  It is attributable to the

6    organization when it happens just like the assault is,

7    Your Honor.  If we had a sexual --

8              THE COURT:  I understand.  But these are all

9    the same issues that you raised in one fashion or

10   another, and that relates to whether the degree to

11   which whatever Ms. Carlson said should be viewed as

12   speaking on behalf of the organization of the FBI.

13   That's what it comes down to.  It comes down to an

14   argument that that is a party admission, correct?

15             MS. BUTLER:  And what this motion for

16   reconsideration also deals with is the misnomer that it

17   is a party statement, you know, that it's an admission.

18   The idea that it needs to be authorized is specifically

19   rebutted in the case law.  Because, obviously, no one

20   is going to authorize somebody to assault someone, to

21   steal money from them, to create fraud.  That is not an

22   authorized act.  But just as those acts are within the

23   scope of employment and are properly discussed with the

24   jury, so is this one.

25             And in fact, as I said, our review is that

1    every case in the country that has dealt with this --

2    and thank the Lord there haven't been very many.  I

3    will grant you.  Thank the Lord there haven't been very

4    many.  But they say it is admissible because when a

5    party tries to tamper with a witness -- they don't say

6    tamper with the plaintiff; they say tamper with a

7    witness -- it is a sign of a weak case.

8            THE COURT:  My question is that is there any

9    case that you rely on where the person who made the

10   attempts was as attenuated and as remote to the

11   underlying events, both in terms of personal

12   involvement and in terms of time, as Ms. Carlson was in

13   this case?

14           MS. BUTLER:  My cocounsel has handed me a

15   note which I think has a very relevant point, which is

16   that people that engage in spoliation in cases have

17   nothing to do generally with the underlying facts.  We

18   have many cases that say that.  And so we would be

19   happy to present those, but --

20           THE COURT:  This is not spoliation.  This is

21   not spoliation.  This is --

22           MS. BUTLER:  No.  But it's a -- I think it's

23   worse because it is an attempt -- like spoliation, it

24   is an attempt to not have the truth come out.

25           And when you say is attenuated, the fact of

1  the matter is that she is not at all attenuated from

2  the witness she's tampering with.  That's the analysis.

3  The analysis is the woman is -- she's telling

4  Mr. Crider, FBI headquarters is mad that we even put

5  up -- there is a connection there.  Your Honor, we

6  wanted to get at that connection.  I don't think it's

7  appropriate that the fact that they tell her not to

8  testify, the fact that they don't really investigate

9  very promptly means that we can't even inquire of her

10  what happened, but this assumption is made that nothing

11  happened.

12         In other words, we wanted to probe it to the

13  end but she -- because she had nothing to do with

14  Justin Slaby, she has everything to do -- as Judge

15  Davis said, she inserted herself in the case when she

16  took it upon herself to try to change the outcome of

17  the case.  How much more intertwined can you get with a

18  case than when you try to remove basically a witness

19  from the stand?

20         That's what we don't understand.  That's why

21  we think it's so important to look at the law that says

22  it's a sign of a weak case.  No.  Is it a matter of

23  law?  No.  If they want to get up and have somebody

24  say, Look, we really took this very seriously, let us

25  explain how -- if they want to get up and say, as they

1    said before, Mr. Crider, after you reported this

2    witness tampering, did the lawyers tell you to lie or

3    did they tell you to tell the truth?  And he'll say,

4    Well, they told me to tell the truth.  Well, after the

5    cat's out of the bag, I don't think that's so

6    surprising.  But it is a fact --

7            THE COURT:  Well, they told him to tell the

8    truth immediately, correct?

9            MS. BUTLER:  After he reported the witness

10   tampering.

11           THE COURT:  No.  As I understand the facts,

12   the same day or within a very short time after he was

13   approached by Ms. Carlson, he reported the conversation

14   to two persons, both of which told him to tell the

15   truth, correct?

16           MS. BUTLER:  Afterwards.  And those are the

17   same people, Your Honor, who did not report it.

18           THE COURT:  But it was within a very short

19   period of time.

20           MS. BUTLER:  I know.  So I tell you:

21   Somebody tried to, you know, tamper with me.  You're a

22   lawyer, and you are going to say, Well, go with it.  I

23   mean, obviously, after the fact.  But I think the proof

24   is in the pudding, Your Honor, because neither one of

25   those people reported it.

1          THE COURT:  They were both outside of the

2   Milwaukee office; weren't they?

3          MS. BUTLER:  No.  They were there.  They had

4   an obligation.

5          THE COURT:  No.  I'm talking about the

6   general counsel.  They were people who were outside of

7   the Milwaukee office, correct?

8          MS. BUTLER:  The Office of General Counsel.

9          THE COURT:  Yes.

10          MS. BUTLER:  Yes, they are outside.

11          THE COURT:  All right.

12          MS. BUTLER:  The last thing, as we said, is

13   apparent authority is that the FBI had clunked her in

14   authority.  Under the case law on that, again, the

15   issue is not whether she is authorized to do something.

16   It is whether they have created the conditions where

17   she can do something.  Because, Your Honor, in every

18   employment case, you have somebody doing bad stuff.

19   You have somebody lying.  And if lying gets in, as

20   *Reeves v. Sanderson Plumbing* says it does, telling

21   somebody to lie is the flip side of that coin.

22          THE COURT:  I understand your position.

23          MS. BUTLER:  Thank you.

24          My cocounsel is saying that I have not made

25   it clear.  I want to be sure that it is clear that

1 there was a six-week time span between the day it was

2 reported and the date of the deposition.  Nothing

3 happened.  These lawyers did nothing.  They did nothing

4 until Mr. Ates told them this matter was going to go

5 outside the FBI.

6            THE COURT:  I understand.

7            MS. BUTLER:  Then they also waited to see if

8 he would take the bait.

9            THE COURT:  I understand.

10           Ms. Wetzler.

11           MS. WETZLER:  Your Honor, quite simply, the

12 Court got it right the first time.  On a motion for

13 reconsideration, as the Court is well aware, there are

14 usually three grounds on which the Court might revisit

15 a ruling, an intervening change in the controlling

16 law -- we don't have that here -- newly discovered

17 evidence -- nothing that Ms. Butler has told you today

18 was not already available previously in the

19 litigation -- and third, to correct a clear error of

20 law or a manifest injustice.  We don't have that

21 either.

22           Your Honor is quite right.  This is a *sui*

23 *generis* situation.  This is a situation like no other

24 where the -- and the plaintiff has not been able to

25 point you to any case that would suggest that the

1   ruling Your Honor found was wrong.  They have not found

2   any case where someone who had no involvement

3   whatsoever in the employment action at issue, two years

4   after the relevant decision made comments that

5   reflected personal opinion.

6          This is simply not a situation that is common

7   in the case law, and there is a reason that they

8   haven't been able to find it.  It's a very unique

9   situation, and it's a situation that, quite frankly,

10  Your Honor was correct in finding is not the proper

11  subject for this trial.  It would violate Rule 401 and

12  403, not only 801(d)(2)(D).  Your Honor ruled on three

13  separate grounds.  The issues that we have heard

14  Ms. Butler speak mostly about are 801(d)(2)(D) issues,

15  not 401 issues, not 403 issues.  All of those are a

16  proper basis for objections.

17         The most glaring case that's absent from the

18  plaintiff's motion for reconsideration that was filed

19  late last night is *Parker v. Danzig*.  Actually, there

20  are two cases, *Parker v. Danzig* and *Young v. UPS*.  They

21  do attempt to distinguish *Young v. UPS*, although not on

22  any cognizable ground that should change this Court's

23  finding that that case is controlling.

24         But there is no attempt to come to terms with

25  *Parker v. Danzig*.  That's the closest case that we

1  have.  It is an 801(d)(2)(D) case that specifically

2  held that in employment discrimination cases like this

3  one, scope of employment means involvement in the

4  plaintiff's employment decisions.  That is an EDVA case

5  that relied on Fourth Circuit law, not on the law of

6  other circuits that plaintiff has cited.

7        And Your Honor has already dealt with the

8  *McQueeney* case.  That's the one that plaintiff keeps

9  coming back to, but it is clearly distinguishable for

10  the reasons that Your Honor pointed out in your order.

11        Ultimately, plaintiff is resorting to trying

12  to malign efforts by the FBI to do the right thing

13  here.  What happened in Milwaukee, Your Honor, is quite

14  right.  The two people who immediately found out about

15  this matter immediately told Mr. Crider that he needed

16  to tell the truth first and foremost.  That was the

17  same day as the comments were made.  In addition, CDC

18  Kalb admonished SAC Carlson the very same day and said,

19  You can't say that.

20        And counsel questioned CDC Kalb quite heavily

21  at the evidentiary hearing as to why didn't you report

22  this that day, and she said -- or anytime thereafter.

23  And she said, Because I didn't understand it as an

24  attempt to suborn perjury.  I thought it was an

25  ill-advised, off-the-cuff remark.  Those are her words.

1        And so by the time it became evident that

2   plaintiff's counsel -- that something bigger may have

3   happened -- and again, we can't take a position because

4   of the pending investigation.  But by the time it

5   became evident that there was even a possibility that

6   something more significant had happened, that was the

7   time of the deposition.  And it was that very same day

8   that the Office of General Counsel in Washington, D.C.,

9   the deputy general counsel reported the matter to the

10  Inspections Division, and it is now under a pending

11  investigation.

12       Now, Your Honor's ruling, frankly, didn't

13  even turn on the question of repudiation.  I offer

14  these thoughts simply because I can't let stand the

15  suggestion that the FBI has not taken this seriously.

16  So I offer those points simply to make clear that the

17  FBI has acted properly but fundamentally.

18       This is an 801(d)(2)(D) problem.  The

19  controlling law here is *Young v. UPS* and *Parker v.*

20  *Danzig*, not the cases the plaintiff has cited.  And we

21  have a 401 and 403 problem.  The 403 prejudice here far

22  exceeds any possibility of probative value.

23       Thank you.

24       THE COURT:  All right.  Thank you.

25       All right.  Ms. Butler, I'll let you have the

1    last word on this.

2              Go ahead.

3              MS. BUTLER:  Your Honor, in terms of

4    Ms. Wetzler's comments about 401, that's why I was

5    discussing with you the case law that says an attempt

6    to tamper with a witness is a sign of a weak case.  It

7    is very relevant.  It is highly relevant.  A number of

8    cases have been reversed because such evidence was not

9    allowed in.

10             In terms of 403, the question is whether it

11   is unfairly prejudicial.  It is also prejudicial to

12   have the -- that the employer assaulted somebody.  That

13   somebody created some kind of criminal problem, that

14   there was fraud, but that doesn't make it unfairly

15   prejudicial.  And we do not think it is.  Because the

16   case law, which Ms. Wetzler ignores, is that it is a

17   sign of a weak case.

18             In terms of scope of employment, we did prove

19   scope of employment.  That is what I was just talking

20   about, working hours.  It is her position you have to

21   go to -- she is the big boss.  She tells you to come in

22   her office.  You can't very well say no, I'm not going

23   to go.  That's scope of employment.  It's being able to

24   control that situation.

25             Of course, no one authorizes criminal

1  conduct; although, we would like to get at who actually

2  did authorize it.  But that's not the question for

3  801(d)(2)(D).  And the case law says it doesn't have to

4  be authorized.  It can be against every policy that the

5  employer has, and it still comes in.  It is still

6  relevant.

7          I, frankly, am shocked that the FBI continues

8  to say, We get a pass.  They haven't brought up anybody

9  who has questioned Mr. Crider's integrity.  What we

10  have here, Your Honor, is only a few people will do

11  what Mark Crider did.  We all know that from human

12  nature.  Most people will tow the line, and I'm sure

13  Your Honor has seen that in affidavits filed in cases

14  when you get the person up on the stand and they say,

15  Well, they told me to sign it.

16          They waited to see if that's what Mr. Crider

17  would do, and now it's sort of an open season on

18  anybody.  That's exactly what Magistrate Davis said.

19  This becomes open season in the Eastern District of

20  Virginia.  The FBI knows witness tampering is good to

21  go.

22          It is not good to go, Your Honor.  It is a

23  sign of a weak case, and an agent, special agent who

24  has experienced it, who is supposed to be investigating

25  criminal misconduct, not being a victim of it, should

1  have the right to say that on the stand because it is

2  very much a part of our case.

3          And I understand that Magistrate Davis has a

4  lot more experience with what has happened to the run

5  up with the trial than you do, Your Honor, but this is

6  part of a pattern of misconduct that we've seen.  This

7  is not standing alone, but it is the one we would like

8  to share with the jury.

9          Will we talk about some of the other -- I

10 mean, we're not going to get the lawyers on the stand

11 and say why did it take you until three days before an

12 extended discovery cutoff after we had given them the

13 names of all of these six people -- that now they are

14 trying to keep Mr. Griffin from talking about.  Why did

15 it take you that long when you knew their names to give

16 us those names?

17         THE COURT:  You are moving to another issue.

18         MS. BUTLER:  I'm just saying that it is a

19 serious matter.

20         THE COURT:  I understand.

21         The plaintiffs have filed a motion for

22 reconsideration of the admissibility of Carlson's

23 statements to Crider, specifically, to this Court's

24 order dated July 25 granting the defendant's motion in

25 limine to exclude evidence relating to allegedly

1  sanctionable conduct.  The Court has reviewed the

2  motion.

3         The Court concludes that plaintiffs have

4  failed to establish any grounds for reconsideration.

5  Everything they've proffered to the Court by way of

6  their motion for consideration was presented to the

7  Court in connection with its initial consideration of

8  the motion, and the Court understood their positions as

9  they've reiterated them in the motion for

10 consideration.

11        More importantly, the Court has reconsidered

12 its order and has concluded that the order was, in

13 fact, correct for the reasons that the Court stated in

14 the order.

15        So for those reasons, the Court is going to

16 actually grant the motion for reconsideration but upon

17 reconsideration affirm its order granting defendant's

18 motion in limine to exclude evidence relating to

19 allegedly sanctionable conduct for the reasons stated

20 in its previous order dated July 25, 2013.

21        Anything else?

22        MR. GRIFFIN:  Your Honor, in terms of

23 housekeeping, as Your Honor knows, we have to proffer

24 the three witnesses with knowledge of Ms. Carlson's

25 conduct.  Those three witnesses would be Special Agent

1  Crider.  We will have to proffer him outside the

2  presence of the jury so that Your Honor then can make a

3  ruling on the merits.  I know it seems archaic, but I

4  think the Fourth Circuit makes us actually have you

5  listen --

6          THE COURT:  You can just file something

7  summarizing the proffer in written form.

8          MR. GRIFFIN:  I don't think the Fourth

9  Circuit is going to allow us.  I think they're going to

10  require us to actually question him and offer our

11  proffer.

12          THE COURT:  Well, then they can reverse me

13  because I'm not going to spend time putting witnesses

14  on for proffers.  You can put it in a written statement

15  what the proffer would be of any of the witnesses that

16  you would have produced on this issue.

17          MR. GRIFFIN:  What kind of proffer will you

18  say is sufficient for Your Honor with respect to

19  Section Chief Smith?

20          THE COURT:  Whatever you would expect him to

21  say.  So you can just proffer whatever you would expect

22  those people to say and just put it in a written

23  proffer and file it with the record of the case.

24          MR. GRIFFIN:  And Ms. Carlson, she's under

25  subpoena.  Our intention -- I'm assuming Your Honor

 1  will not allow us to proffer her testimony or her

 2  responses to questions.

 3          THE COURT:  Well, if I had allowed you to go

 4  down this road, proffer whatever evidence you would

 5  have proffered.

 6          MR. GRIFFIN:  Well, we can't proffer it

 7  because we don't have it.

 8          THE COURT:  Well, if I had allowed you to put

 9  it on, what would you have done?

10          MR. GRIFFIN:  We would have played it in

11  front of the jury.  My understanding -- I'll certainly

12  rely on Mr. Ates.

13          THE COURT:  You would have put on Agent

14  Crider.

15          MR. GRIFFIN:  In front of the jury.

16          THE COURT:  Right.

17          MR. GRIFFIN:  But as I understand the Fourth

18  Circuit law, it is not adequate for us.  Unless you do

19  tell us, I will not allow you to make your proffer --

20          THE COURT:  I will allow you to make a

21  proffer.  I'm just telling you how to do it.  Just go

22  ahead and put it on the record.  I'll even let you at

23  some point do it orally, or you can put it in writing.

24  But I don't see any reason for you to actually call any

25  of these witnesses.

 1          MR. GRIFFIN:  Not in front of the jury.

 2          THE COURT:  Or in court.

 3          MR. GRIFFIN:  For any purpose at all?

 4          THE COURT:  Well, for the purposes of your

 5  proffer, and I understood you are going to call Agent

 6  Crider.

 7          MR. GRIFFIN:  Right.  But normally, what we

 8  would do is to say, Your Honor, we're now at the time

 9  of the testimony we need to approach the bench.  The

10  jury would be excused.  We would then have those

11  questions and answers.

12          THE COURT:  I don't see any need for that.

13  You can just do it orally by way of a summary proffer

14  instead of questions and answers of a witness.

15          MR. GRIFFIN:  We will not waste any time.

16  When it comes to that time, we'll ask to make the

17  proffer with Special Agent Crider.  Your Honor can tell

18  us not to do that, and then we will do exactly what you

19  suggested.

20          Thank you, Judge.

21          THE COURT:  All right.

22          MS. WETZLER:  May I just clarify, Your Honor,

23  that we would get an opportunity to respond to point

24  out any objections we would have had to the questions

25  that Mr. Griffin would have asked?

1            THE COURT:  You can file a counter proffer if

2    you want to do that.

3            MS. WETZLER:  Thank you, Your Honor.

4            THE COURT:  All right.

5            MR. ATES:  I hate to belabor this, Your

6    Honor.  John Ates for Plaintiff Slaby.  There's some

7    Fifth Amendment issues that would have been raised had

8    Ms. Carlson been allowed to testify.  I just want to be

9    clear on the record that the parties, I believe --

10           Please correct me if I'm wrong.

11           I believe we have stipulated that she would

12   have invoked the Fifth as to any question offered or

13   asked by the plaintiff during this proffer.  Because as

14   you well know, that leads to some inferences.  We just

15   want that to be a part of the proffer as well.

16           And I want -- at least I understand the

17   government's position to be that they agree that

18   without asking those questions here in court, it was a

19   proper invocation of the Fifth Amendment right not to

20   testify by Ms. Carlson.  And I can be corrected if I

21   have that wrong, Your Honor.

22           THE COURT:  All right.  Well, just include

23   that as part of your proffer.

24           MR. ATES:  Thank you.

25           MS. WETZLER:  Mr. Ates does not have that

1  wrong.  That was our stipulation.  With regard to the

2  inferences, the reason it's important that we have an

3  opportunity is that any adverse inference would itself

4  have to meet the criteria of 401, 403, and other rules

5  of evidence.  So that's why it's important that we have

6  an opportunity to show why the questions they would

7  have asked may not have met those criteria; therefore,

8  an adverse inference would not be appropriate under the

9  *Custer Battles* case.

10         Thank you.

11         THE COURT:  All right.  Anything else?

12    (No response.)

13         THE COURT:  All right.  Stand in recess until

14  tomorrow morning.

15         ------------------------------------
                    Time:  6:10 p.m.
16

17

18

19

20

21
       I certify that the foregoing is a true and
22
    accurate transcription of my stenographic notes.
23

24
                              _____
                                        /s/
25                            Rhonda F. Montgomery, CCR, RPR